# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: BP P.L.C. SECURITIES LITIGATION | ) ) ) | No. 4:10-MD-2185 |
| THIS DOCUMENT RELATES TO: | ) | Honorable Keith P. Ellison |
| Ohio Public Employees Retirement System | ) | |
| No. 4:12–1837 | ) | |
| _____ | ) | |
| | ) | |
| OHIO PUBLIC EMPLOYEES | ) | |
| RETIREMENT SYSTEM, | ) | **SECOND AMENDED COMPLAINT** |
| 277 East Town Street, | ) | |
| Columbus, Ohio 43215 | ) | |
| | ) | |
| AND | ) | **JURY DEMAND ENDORSED HEREON** |
| | ) | |
| STATE TEACHERS RETIREMENT | ) | |
| SYSTEM OF OHIO, | ) | |
| 275 East Broad Street, | ) | |
| Columbus, Ohio 43215 | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| SCHOOL EMPLOYEES | ) | |
| RETIREMENT SYSTEM OF OHIO, | ) | |
| 300 East Broad Street, Suite 100, | ) | |
| Columbus, Ohio 43215 | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| OHIO POLICE AND FIRE | ) | |
|  PENSION FUND, | ) | |
| 140 East Town Street, | ) | |
| Columbus, Ohio 43215 | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BP PLC | ) | |
|  1 St. James Square | ) | |
|  London | ) | |

SW1Y 4PD                                    )
                                            )
                  DEFENDANT.                )

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION……………………………………………………………… ……1

II.     JURISDICTION AND VENUE…………………………………………….….........6

III.    THE PARTIES………………………………………………………………..........7

        A.      Plaintiffs………………………………………………………………7

        B.      Defendant………………………………………………………… . …8

IV.     NON-PARTIES…………………………………………………………….….........9

V.      CONFIDENTIAL WITNESSES…………………………………………………...14

VI.     BACKGROUND………………………………………………………………...15

        A.      BP's Relevant Operations……………………………… ……………….........15

        B.      BP's Process Safety Controls Were Deficient Prior to the Relevant Period…..16

VII.    DEFENDANT KNEW OR RECKLESSLY DISREGARDED THAT BP'S
        STATEMENTS REGARDING THE MANAGEMENT OF RISK IN OFFSHORE
        DRILLING AND THE IMPLEMENTATION OF PROPER PROCESS SAFETY
        CONTROLS AND PROCEDURES WERE FALSE AND MISLEADING AND
        OMITTED TO DISCLOSE MATERIAL INFORMATION WHEN
        MADE…………………………………………………………………………….38

        A.      Defendant Knew, or Recklessly Disregarded, That BP's Process Safety
                Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling,
                Risks that Materialized at the Macondo Well…………… . . . . . . . . . . . . . . . . 38

        B.      BP's Knowledge or Reckless Disregard regarding Corporate Statements…….46

        C.      Additional Knowledge and Reckless Disregard Allegations:  Defendant's
                Disregard of Safety and Operational Concerns……………………………..49

        D.      Additional Knowledge or Reckless Disregard Allegations:  BP Retaliated Against
                Individuals Who Raised Concerns About the Safety and Integrity of its
                Operations………………………………………………………………...56

# TABLE OF CONTENTS
(continued)

**Page**

VIII.  THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER
       HORIZON OIL SPILL AND ITS AFTERMATH…………………………………62

    A.  BP's Systematic Failures Caused the Explosion on and the Sinking of the
        Deepwater Horizon Rig………………………………………………………...62

    B.  BP Was Wholly Unprepared to Contain the Oil Spill…………………………80

IX.  DEFENDANT KNOWINGLY OR RECKLESSLY MADE MATERIALLY FALSE
      AND MISLEADING STATEMENTS AND OMITTED MATERIAL FACTS DURING
      THE RELEVANT PERIOD……………………………………………………………95

    A.  The February 22, 2008 Statements……………………………………………96

    B.  The February 27, 2008 Statements……………………………………………98

    C.  The April 17, 2008 Statements……………………………………………...102

    D.  The December 17, 2008 Statements………………………………………...106

    E.  The March 4, 2009 Statements……………………………………………...111

    F.  The April 16, 2009 Statements……………………………………………...115

    G.  The February 26, 2010 Statements……………………………………………117

    H.  The March 5, 2010 Statements……………………………………………...120

    I.  The March 22, 2010 Statements……………………………………………124

    J.  The March 23, 2010 Statements……………………………………………127

    K.  The April 24, 2010 Statement ………………………………………………130

    L.  The April 28-29, 2010 Statements…………………………………………133

    M.  The May 5, 2010 Statements………………………………………………136

X.  LOSS CAUSATION………………………………………………………………141

**TABLE OF CONTENTS**

(continued)

**Page**

XI.     DEFENDANT HAD AN AFFIRMATIVE DUTY TO DISCLOSE MATERIAL
        INFORMATION REGARDING PROBLEMS WITH PROCESS SAFETY AND THE
        TRUE SCOPE OF OMS…………………………………………………………...147

XII.    PLAINTIFFS JUSTIFIABLY RELIED ON BP'S FALSE AND MISLEADING
        STATEMENTS AND MATERIAL OMISSIONS.…………………………………148

XIII.   PRAYER FOR RELIEF…………………………………………………………..151

Plaintiffs, the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, the School Employees Retirement System of Ohio, and the Ohio Police & Fire Pension Fund (collectively "Plaintiffs" or the "Ohio Funds") bring this action under English common law and statutory law against BP plc ("BP" or the "Company").  This case arises from Plaintiffs' purchase and/or acquisition of BP ordinary shares between February 22, 2008 and May 28, 2010 (the "Relevant Period").[1][2]

## I.   **INTRODUCTION**

1.      On April 20, 2010, the deep sea drilling rig, the *Deepwater Horizon* – which Transocean owned and BP leased, operated, and controlled – exploded in the Gulf of Mexico. Transocean was drilling a deepwater well, known as the Macondo well, which BP owned and from which BP was going to extract oil.  The "temporary abandonment" of the Macondo well, on

---

[1] The allegations in this Complaint are based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters, based on an investigation conducted by Plaintiffs' counsel, including, among other things:  (i) review and analysis of BP's public filings with the U.S. Securities and Exchange Commission ("SEC") and other regulatory agencies; (ii) review and analysis of other publicly available information concerning BP, including governmental records, documents obtained through other civil actions against BP, independent reports, and other testimony, documents, and reports obtained in connection with hearings held by the U.S. House of Representatives, the U.S. Senate, the Joint Investigation of the U.S. Coast Guard and Bureau of Ocean Energy Management, Regulation and Enforcement; (iii) the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("Presidential Commission"); (iv) interviews with former BP employees and other witnesses; and (v) testimony and documents produced in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL 2179 (E.D. La.).  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity to engage in discovery.

[2] Substantially similar allegations were made in a complaint filed in the District Court for the Southern District of Texas in the matter *In re BP plc Securities Litigation,* MDL 2185.  On February 13, 2012, Judge Ellison sustained in substantial part the claims against the Defendants named herein with respect to BP's American Depository Shares (ADSs).  The court dismissed the claims pertaining to BP's ordinary shares on the basis of the recent Supreme Court decision *Morrison v. National Australia Bank,* 130 S.Ct. 2869 (2010), which interpreted the scope of the federal securities laws.  Plaintiffs therefore bring their English law claims before this Court in order to recover the losses suffered on their purchases of BP's ordinary shares.

On September 30, 2013, the Court entered a Memorandum and Order [MDL No. 10-md-2185, Dkt. #678, No. 4:12-cv-01837, Dkt. #65] holding that the Complaint could state a claim under English common law and statutory law, and that the Ohio Funds' claims under the Ohio Securities Act were not subject to English law and survived dismissal.  On December 5, 2013, the Ohio Funds filed their Amended Complaint [No. 4:12-cv-01837, Dkt. #70] asserting claims solely under the Ohio Securities Act.  On April 7, 2014, the Court entered an Order [No. 4:12-cv-01837, Dkt. #92] dismissing Plaintiffs' Ohio blue sky law claims but permitting the Plaintiffs to amend their complaint to assert claims under English law, which Plaintiffs now do.

April 20, 2010, was 45 days late and $58 million over budget.  A series of last minute modifications – a hallmark of BP's operations – had rattled the crew, with one supervisor reporting that "*we're flying by the seat of our pants*."

2.      At approximately 9:00 p.m. on April 20, 2010, drilling mud laced with oil and gas rocketed up through the well, knocking birds from the sky and covering the deck of the rig in a thick layer of oil-filled drilling mud.  Shortly thereafter, gas and oil flowing from the well ignited, causing an explosion aboard the *Deepwater Horizon* that claimed the lives of 11 crew members and injured many others, including some who leapt from the five story rig to save their lives.

3.      The *Deepwater Horizon* burned for almost two days before sinking on the morning of April 22, 2010.  As the *Deepwater Horizon* sank, it further damaged the remaining pipe that had connected the rig to the wellbore.

4.      Eighty-seven days passed before BP finally stopped the flow of oil from the Macondo well on July 15, 2010.  Approximately *5 million barrels* of oil (more than 206 million gallons) – or an average of 60,000 barrels a day – spilled into the waters of the Gulf of Mexico, constituting the largest oil spill in the history of the petroleum industry.  As noted in a *Fortune* magazine article, in terms of the number of barrels of oil spilled into the sea, the oil spill in the Gulf of Mexico "surpassed the Exxon *Valdez* disaster by at least 1,800 percent."

5.      For nearly three years prior to the *Deepwater Horizon* disaster, Defendant made representations to outside investors that were far different from the reality of BP's internal operations.  Defendant touted the growth potential of BP's Gulf of Mexico operations and highlighted compliance with recommendations for improvement in process safety, convincing investors, including Plaintiffs, that BP would be able to generate tremendous growth with

2

carefully managed and minimal risk.  Defendant's misrepresentations and material omissions misled the investing public, including Plaintiffs.

6.        As the truth regarding the lack of safety and integrity of BP's operations emerged, as well as information regarding:  (i) the true size of the oil spill; (ii) BP's inability to control the spill; and (iii) the mounting costs BP would pay as a result of the environmental disaster – BP's ordinary shares plunged in value.  From the date of the *Deepwater Horizon* explosion through May 28, 2010, BP's ordinary shares, which trade on the London Stock Exchange, plummeted in value, falling from 655.40 pence ("p") per share prior to the well explosion on April 20, 2010 to 494.80p per share on May 28, 2010.

7.        As subsequent investigations into the disaster make clear, the blowout and spill were the result of BP's long-standing and systemic disregard for process safety, which Defendant misrepresented and failed to disclose to Plaintiffs.  As a result, Plaintiffs were misled and deceived into purchasing BP ordinary shares during the Relevant Period.

8.        Prior to the Relevant Period, BP was notorious for its history of process safety failures.  In 2005, BP was at the center of one of the largest industrial accidents in United States history when its Texas City oil refinery exploded, killing 15 workers and injuring more than 170.  In 2006, BP was at the center of a massive oil leak when it was forced to shut down one of its Prudhoe Bay transit pipelines in Alaska after discovering a 212,000 gallon oil leak in a section of corroded pipe.  The leak was later found to have resulted from poor maintenance and almost non-existent inspections.  Subsequent inspections in early 2007 discovered additional sections of corroded pipeline, requiring BP to shut down these sections of the pipeline.

9.        In response to these industrial accidents, and others described more fully herein, and at the urging of the U.S. Chemical Safety Board (the "CSB"), BP established an

independent panel to review and improve its process safety procedures.  Former U.S. Secretary of State James Baker, III chaired what is referred to herein as the "Baker Panel."  After completing its investigation, the Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of the Presidential Commission, that "***BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety:  hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting***.  And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."  More specifically, the Baker Panel found that:  "***from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value***."

10.     In response to the Baker Report, BP's senior management pledged to make safety BP's number one priority.  The Company publicly represented to investors, including Plaintiffs, that "[a]bove all else we need to concentrate on two things – safety and performance.  ***Safety is fundamental to everything that we will do. We will embrace with equal commitment each of the three dimensions of safety – personal safety, process safety and the environment.***  Our aspiration is to be an industry leader in each."

11.     When Anthony "Tony" B. Hayward ("Hayward") became BP's Chief Executive Officer ("CEO") in May 2007, one of his first commitments was to "***focus on safety like a laser***."  Hayward, other BP representatives, and BP itself, repeatedly reaffirmed – in its public filings with the United States Securities and Exchange Commission ("SEC"), which were disseminated to investors in Ohio, including Plaintiffs – BP's commitment to process safety and, in particular, the virtues of such efforts in one of its greatest profit centers, the Gulf of Mexico.

4

12.      BP represented to investors, including Plaintiffs, that BP would improve its process safety performance.  As part of its process safety improvements, BP developed a plan entitled "operations management system" or "OMS," which was touted as improving BP's process safety worldwide.  BP, however, omitted to disclose to Plaintiffs the material fact that OMS was specifically designed to exclude from its process safety improvements certain of BP's highest risk and most dangerous operations, including its operations aboard the *Deepwater Horizon*.

13.      Indeed, while BP was touting to investors, including Plaintiffs, that the Company was committed to improving its process safety record in the wake of the Texas City and Prudhoe Bay disasters, it failed to inform Plaintiffs of the gaping hole in its process safety improvement program:  improvements in process safety would ***not*** apply to drilling rigs operated, but not owned, by BP, thus excluding the vast majority of BP's drilling operations in the Gulf of Mexico, including the *Deepwater Horizon*.

14.      Furthermore, BP failed to inform investors, including Plaintiffs, that notwithstanding its so-called process safety improvements, BP was not capable of responding to a deep sea well blowout nor was it able to clean up the resulting oil spill, like the one at the Macondo well.  Indeed, following the explosion of the *Deepwater Horizon*, BP was woefully under equipped and ill prepared to stop the flow of oil in a reasonable amount of time, or to contain and/or clean up such a massive oil spill.  Instead, BP was simply making up their containment plan day-by-day and hoping that it would work.

15.      No fewer than nine governmental investigations reviewed the facts surrounding the catastrophe, including a commission appointed by the President of the United States:  the National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling (the

5

"Presidential Commission").  The Presidential Commission, after interviewing hundreds of witnesses, reviewing hundreds of thousands of pages of documents and consulting with industry experts, issued the "Presidential Commission Report" in January 2011.  The first conclusion of the Presidential Commission Report was simple yet powerful:  "*[t]he explosive loss of the Macondo well could have been prevented*."  Indeed, the Presidential Commission specifically found that:  "*the blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, the root causes are systemic*" to BP.

16.     In fact, the Presidential Commission Report found, much like the Baker Report three and a half years earlier, that BP's "*approach to managing safety has been on individual worker occupational safety but not on process safety.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety*."

17.     Plaintiffs were misled and deceived when they purchased BP ordinary shares. They were misled into believing that BP had committed to, and had made improvements to, its process safety programs and performance when it had not.  They were misled and deceived into believing that BP would improve its process safety performance throughout the entire Company when, in fact, BP omitted to disclose that it excluded from its marquee process safety improvement initiative the vast majority of its drilling operations in the Gulf of Mexico, which constituted some of BP's highest risk and most dangerous operations.

18.     BP's misrepresentations of material facts and omissions of material information induced Plaintiffs to purchase BP ordinary shares and Plaintiffs suffered losses with

respect to their ownership of those shares when the truth concerning BP's operations and its safety performance was revealed.

## II.   JURISDICTION AND VENUE

19.     Pursuant to the Court's Memorandum and Order of September 30, 2013 [MDL No. 10-md-2185, Dkt. #678, No. 4:12-cv-01837, Dkt. #65], Plaintiffs' claims herein arise under the common law and statutory law of England.

20.     This Court has federal question jurisdiction over the subject matter of this action under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b)(1).

21.     Venue is proper in this Court because Defendant disseminated the false and misleading statements alleged herein into Cuyahoga County.  Defendant removed this action to the United States District Court of the Northern District of Ohio on May 5, 2012 and, on May 30, 2012, requested that it be transferred to this Court.

22.     Defendant conducted extensive business in Ohio and disseminated false and misleading statements into Ohio, as alleged herein.

23.     This action is not preempted by the Federal Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353 (1998) because this action is not a class action or an action brought by a representative party and does not seek damages on behalf of more than fifty persons.

## III.   THE PARTIES

### A.     Plaintiffs

24.     The Ohio Public Employees Retirement System ("OPERS") is the largest public pension fund in Ohio, with assets of approximately $75.7 billion as of December 31, 2010.  OPERS serves nearly 954,000 members, including 171,955 retirees and beneficiaries receiving monthly pension and/or health benefits.  As set forth in the table at Exhibit A OPERS

7

purchased BP ordinary shares at artificially inflated prices during the Relevant Period and has been damaged thereby.

25.     The State Teachers Retirement System of Ohio ("STRS") is an Ohio public pension fund serving nearly 475,200 active, inactive, and retired Ohio public educators.  STRS has approximately $66.8 billion in assets as of June 30, 2011.  As set forth in the table at Exhibit B, STRS purchased BP ordinary shares at artificially inflated prices during the Relevant Period and has been damaged thereby.

26.     The School Employees Retirement System of Ohio ("SERS") is an Ohio public pension fund with 192,558 active and retired members.  SERS provides retirement benefits for non-teaching public school employees:  bus drivers, custodians, administrators, administrative assistants, food service providers, educational aides and others.  SERS has assets of approximately $11.7 billion as of June 30, 2011.  As set forth in the table at Exhibit C SERS purchased BP ordinary shares at artificially inflated prices during the Relevant Period and has been damaged thereby.

27.     The Ohio Police & Fire Pension Fund ("OP&F") is an Ohio public pension fund that provides pension and disability benefits for police officers and firefighters across Ohio.  OP&F serves approximately 29,000 active members and more than 25,000 retirees and their beneficiaries.  OP&F has approximately $12.33 billion in assets as of February 29, 2012.  As set forth in the table at Exhibit D, OP&F purchased BP ordinary shares at artificially inflated prices during the Relevant Period and has been damaged thereby.

**B.     Defendant**

28.     Defendant BP plc is a UK corporation with its principal executive offices located in London, England.  According to a March 27, 2012 press release published on the BP plc website, "[t]hrough its heritage companies of Standard Oil of Ohio (SOHIO) and Amoco,

8

BP's roots in Ohio date back to 1870.  BP operates the BP-Husky refinery near Toledo which it owns in a joint venture with Husky, LLC, and is also a leading marketer of fuels in Ohio through independently-owned marketers under the BP brand.  BP heritage companies also have been active in the upstream business throughout its history in the state of Ohio."  BP has extensive operations in the state of Ohio and systematic contacts with the state, including but not limited to:  (a) BP continuously sells, supplies, and markets large volumes of oil and gas in Ohio, including through over 600 BP-branded gas stations throughout the state; (b) BP is a 50% owner of the BP-Husky Refinery (formerly the BP Toledo Refinery) in Oregon, Ohio, east of the City of Toledo, that has capacity to process 160,000 barrels of crude oil per day, and employs 600 BP personnel and another 500-700 contractors; (c) on March 27, 2012, BP entered into an agreement to lease 84,000 acres in the Utica/Point Pleasant Shale in Trumbull County, Ohio for future oil and gas production; (d) BP markets its ordinary shares, American Depositary Shares, and other securities to investors in Ohio and otherwise solicits or encourages investment in the Company via advertisements and other communications disseminated into Ohio; and (e) BP files annual reports and other documents with the SEC and publishes other materials on its website that were disseminated into Ohio.  During the Relevant Period, BP made materially false and misleading statements as alleged herein, which were disseminated into Ohio.

IV.    **NON-PARTIES**

29.    BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  According to BP plc's annual reports on Form 20-F, BP America is BP's "agent in the US."  BP America maintains a registered agent in the state of Ohio: CT Corporation System, 1300 East Ninth Street, Cleveland Ohio, 44114.

9

30.        BP Exploration & Production, Inc. ("BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP Exploration provided materially false and misleading filings to the Minerals Management Service ("MMS") during the Relevant Period that were disseminated into Ohio.

31.        BP plc controls and/or holds itself out as controlling the operations of BP Exploration and BP America, including in descriptions of the BP Exploration and BP America and their operations published on the BP plc website.

32.        Hayward served as BP's CEO from May 2007 until October 2010 and served as an executive director of the Company from 2003 to November 2010.  Hayward, who holds a PhD in Geology, began working at BP in 1982 as a rig geologist offshore of Aberdeen, Scotland and later as a field geologist in various locations throughout the world.  From 2002 to 2007, he served as the CEO of BP's Exploration and Production business segment, which oversees exploration and drilling in the Gulf of Mexico, among other places.  Hayward was a member of BP's executive management.  Starting in 2006, Hayward headed BP's Group Operations Risk Committee ("GORC"), an executive committee that reviewed the Company's safety protocols, including OMS, and responded to safety incidents in BP's operations.  Hayward also was the executive liaison to BP's Safety and Ethics & Environment Assurance Committee ("SEEAC"), which is the board of directors' committee responsible for ensuring that BP's safety protocols are implemented and followed, including the implementation of the Baker Panel's recommendations.  GORC prepared regular safety reports for SEEAC, including quarterly reports called the Health Safety Environment & Operations Integrity Report, otherwise known as the "Orange Book."  During the Relevant Period, Hayward signed certain BP Annual Reports and "Group Chief Executive's Reviews," which are alleged herein to have been knowingly or recklessly false and

misleading (and that omitted critical information) when made, and made other knowingly or

recklessly false and misleading statements as well; all of those statements were disseminated into

Ohio.  On July 27, 2010, BP announced that Hayward would be leaving the Company, effective

October 1, 2010.

      33.      Douglas J. Suttles ("Suttles") served as BP's Chief Operating Officer for

Exploration and Production from January 2009 until at least January 2011.  Suttles has worked in

the oil industry since 1983 and has worked in several different engineering and leadership roles

at BP, including Vice President for Northern North Sea Operations and President of BP's

Trinidadian oil business.  In January 2007, he was named President of BP Exploration (Alaska)

Inc.  Suttles holds a degree in Mechanical Engineering.  During the Relevant Period, Suttles

made knowingly or recklessly false and misleading statements (and omitted critical information)

as alleged herein that were disseminated into Ohio.  On January 12, 2011, Suttles, who was only

50 years old at the time, announced his retirement from BP.

      34.      Andrew G. "Andy" Inglis ("Inglis") served as the Company's CEO of BP

Exploration and Production, Inc. ("Exploration and Production" or "E&P") and as an executive

director of the Company from February 2007 until October 2010.  Inglis joined BP as a

Mechanical Engineer in 1980 and worked in various locations throughout the world, including

the Gulf of Mexico, Alaska, and the North Sea.  In 1996, Inglis became Chief of Staff for

Exploration and Production and from 1997 to 1999 he was responsible for leading BP's activities

in the deepwater Gulf of Mexico.  Beginning in July 2004, Inglis was Executive Vice President

and Deputy CEO of Exploration and Production.  Inglis was a member of BP's executive

management.  As CEO of E&P, Inglis attended SEEAC meetings to report on topics specific to

BP Exploration and Production.  Inglis also served as a GORC member, provided special reports

11

on Exploration and Production to the Chairman of GORC (Hayward), and received quarterly

Orange Book reports that monitored the progress of OMS implementation across BP.  Inglis is a

Chartered Mechanical Engineer and is a Fellow of the Royal Academy of Engineering and of the

Institute of Mechanical Engineers.  Inglis considered himself at the apex of responsibility during

the Relevant Period (with the possible exception of Hayward) for BP's exploration and

production activities worldwide:

> Q.   Do you feel any responsibility, sir, at all for what happened on April 20th of 2010?
> A.   As the CEO of the exploration and production company, I am responsible for the safe and reliable operations across all of the E&P operations globally.
>
> * * *
>
> Q.   And that, of course, would include Gulf of Mexico, correct?
> A.   Again, as I said, I was responsible for the – the safety and reliability of – of our operations globally. So that would include the Gulf of Mexico operations.
>
> * * *
>
> Q.   All right. And in terms of safety for drilling and exploration operations in the Gulf of Mexico and worldwide insofar as safety is concerned, other than perhaps Dr. Hayward, you would have been the highest in line of authority; is that true?
> A.   In terms of the – the responsibility for their safe and reliable operations, yes.

Inglis Dep. at 75:24-76:5, 79:18-24, 80:13-22.  Inglis made knowingly or recklessly false or

misleading statements (and omitted critical information) regarding BP's process safety system,

as alleged herein, which were disseminated into Ohio.  On September 29, 2010 BP announced

that Inglis would be stepping down from his role as head of the "Upstream business," would step

down as a main board director on October 31, 2010, and would leave the Company at the end of

that year.

      35.      Hayward, Suttles, and Inglis, because of their positions with the Company,

possessed the power and authority to control the contents of BP's reports to the SEC, press

releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each was provided with copies of the Company's reports and press releases that were disseminated into Ohio during the Relevant Period and are alleged herein to be false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of Hayward, Suttles, and Inglis knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made regarding BP's operations were then materially false or misleading when made. Each of Hayward, Suttles, and Inglis herein made materially false or misleading statements, or omitted to disclose material facts, to investors in Ohio, including Plaintiffs, and disseminated such material misstatements into Ohio and caused Plaintiff to purchase BP ordinary shares at artificially inflated prices and/or forbear from selling their BP ordinary shares.

36.     Lord Edmund John Philip Browne, Baron Browne of Madingley ("Browne") served as the Company's CEO from 1995 until April 2007. Browne joined BP as an apprentice in 1966 and held various positions, including Managing Director and CEO of BP Exploration. Browne was a member of BP's executive management.

37.     H. Lamar McKay ("McKay") has served as Chairman and President of BP America since January 2009. McKay began his career in 1980 at Amoco Production Company. Since 1998, he has worked for BP in various capacities, including as the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for worldwide Exploration and Production. In May 2007, McKay became the Senior Group Vice President of BP and Executive

Vice President of BP America, in which capacity he led BP's negotiations on the settlements for both the Texas City refinery disaster and Alaska pipeline oil spills.  McKay is a member of BP's executive management.  He holds a degree in Petroleum Engineering and is based in Houston, Texas.

38.       William Castell ("Castell") joined BP's Board of Directors in 2006 as the chairman of SEEAC.  At each SEEAC meeting Castell and other SEEAC members were provided a report from GORC, usually presented in person by Hayward, and each quarter SEEAC received the Orange Book.  Additionally, SEEAC was provided regular reports on the implementation of Baker Panel recommendations and reports on the development and implementation of OMS.

39.       Robert "Bob" Malone ("Malone") served as Chairman and President of BP America from July 2006 until February 2009, and as an Executive Vice President of BP until March 2009.  Malone served on BP's executive management team.  Malone holds a degree in Petroleum Engineering and has worked for BP for 34 years.

40.       David Rainey ("Rainey") is BP's Vice President of Exploration for the Gulf of Mexico.  Rainey was the person within BP Exploration and Production who had "ultimate accountability" for implementing OMS in the Gulf of Mexico and he participated in the Gulf of Mexico gap assessment in 2009 that identified significant risks to BP in the Gulf of Mexico.  Rainey was also a member of BP's executive management.

## V.    CONFIDENTIAL WITNESSES

41.       Confidential Witness #1 ("CW1") is a confidential witness on process safety and risk assessment and management.  Through 2005, CW1 consulted directly with the BP Board of Directors and executive management.  Specifically, CW1 acted as a safety systems and risk assessment consultant for, among other things, deepwater platforms and offshore drilling,

including but not limited to the Gulf of Mexico. Subsequent to the consultation, through the present, CW1 has been apprised of information related to BP's process safety and risk assessment and management in the Gulf of Mexico operations.

42. Confidential Witness #2 ("CW2") is a former BP senior manager and an expert in offshore oil and gas drilling and completions. CW2 possessed information related directly to BP's Gulf of Mexico deepwater exploration, including but not limited to process safety implementation. Prior to separating from BP in 2009, CW2 reported directly to senior BP executives and indirectly to Inglis.

43. Confidential Witness #3 ("CW3") is an oil industry operational safety expert and former consultant to the BP Board of Directors. CW3 presented information and analyses directly to non-party Lord Browne and former CEO Hayward on issues, including but not limited to, implementation of process safety and risk management practices.

## VI. BACKGROUND

### A. BP's Relevant Operations

44. BP is a global oil and gas company and is the third-largest energy company in the world. BP is active in every area of the oil and gas industry, including drilling exploration and production, refining, distribution and marketing, petrochemicals, power generation and trading. With operations in over 80 countries, BP produces around 3.8 million barrels of oil equivalent per day. Its largest division is BP America, which is the biggest producer of oil and gas in the U.S.

45. BP's Exploration and Production segment includes oil and natural gas exploration, field development and production, and marketing and trading of natural gas. It has exploration and production activities in Angola, Azerbaijan, Canada, Egypt, Libya, the Russian Federation, Trinidad and Tobago, Norway, the United Kingdom, and the United States

15

(including the Gulf of Mexico), as well as in the Asia Pacific, Latin America, North Africa, and the Middle East.

46.     Throughout the Relevant Period, BP touted its Exploration and Production business and, more specifically, its operations in the deepwater Gulf of Mexico, a region BP hailed as a "profit centre" and a "high margin" production area.  BP described the Gulf of Mexico as "an important source of domestic energy, and offshore deepwater developments" and told investors that oil from that region accounted for one-sixth of all oil produced in the U.S.

47.     In BP's 2008 Annual Report filed on Form 20-F on March 4, 2009, the Company highlighted the safety and success of its operations in the Gulf of Mexico, emphasizing the fact that it was one of the largest deepwater operators in the world.  At the same time, BP failed to disclose that it:  had not implemented safety measures for its Gulf of Mexico operations;  had disregarded safety warnings about its operations; and lacked robust risk management processes, which left the Company dangerously exposed to a catastrophic accident.

**B.     BP's Process Safety Controls Were Deficient Prior to the Relevant Period**

48.     Prior to the beginning of the Relevant Period, BP was no stranger to the risks involved in the petroleum industry and deepwater drilling and, in fact, was at the center of a number of catastrophic incidents that took a toll on lives and the environment.

*BP's Flawed Process Safety Controls Cause Grangemouth Incidents*

49.     Between May 29 and June 10, 2000, BP's Grangemouth storage and refining complex in Scotland experienced three major incidents.  These included a power failure leading to the emergency shutdown of the oil refinery; the rupture of a key steam pipe; and a fire in the refinery's catalytic cracker unit, which produces gasoline.  The UK HSE investigated the incidents and issued a report in 2003 finding in all three incidents "weaknesses in [BP's] safety management systems on-site over a period of time."  BP carried out an internal investigation,

16

which concurred in many of the UK HSE's findings.  BP later pled guilty to criminal charges stemming from the incidents and paid over £1 million in fines.

**Safety Lapses in BP's Deepwater Drilling Operations**

50.     In 2002, the *Ocean King*, a drilling rig under BP's operational control in the Gulf of Mexico, experienced two separate blowout incidents within a three-month span, raising questions about BP's process safety and well design procedures and practices.

51.     The first incident occurred in August 2002, when the *Ocean King* suffered a gas blowout while drilling a well in the Gulf of Mexico's Grand Isle block near Louisiana.  The crew's efforts to contain the well failed and they were forced to evacuate the rig because of the high level of airborne gas.  The flow of gas and other material exploded, causing a fire on the rig and $2 million in damage.

52.     During its investigation, MMS discovered that BP had inexplicably installed a non-compliant blowout diverter system, which contributed to the explosion and fire, rather than the one specifically designed and approved for the rig.  MMS also found that the fire's effects were intensified because BP personnel had stored pressurized containers of flammable gas too close to the diverter output.  Worse still, the investigation revealed that BP engineers, because of a nearby well drilling project, knew that there was a shallow gas pocket at 2,700 feet beneath the sea floor surface, the precise depth which the rig had reached when the well blew out.  The incident was both caused by and revealed a host of systemic safety issues involving BP's failures to build and execute wells as designed, ensure the proper design of the drill rig, and keep accurate up-to-date designs of their equipment.

53.     Just three months later, in November 2002, after the *Ocean King* had undergone major repairs and returned to the Grand Isle block, a second incident occurred, similar to the first.  After cementing the steel casing in another newly drilled well hole, mud and gas

17

began to flow onto the rig, indicating a failed cementing job.  After an unsuccessful effort to contain the well, the crew evacuated.  The MMS issued a harsh critique of the second incident, noting the flawed attempt to bring the well under control, and serious deficiencies in BP's safety protocols and knowledge of equipment.

54.      The two incidents in 2002 resulted in the MMS issuing a special "Safety Alert" to all drilling companies in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job.  The Safety Alert specifically mentioned MMS's findings about BP during the *Ocean King* incident, cautioning others in the industry about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

55.      In May 2003, BP suffered a near blowout not far from the Macondo well.  In that incident, the Transocean rig *Discoverer Enterprise*, on contract with BP, drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor. The breaking of the riser was strikingly similar to what occurred on the *Deepwater Horizon* after it exploded.  Fortunately for BP, the backup "deadman" switch on the rig's blowout preventer ("BOP") worked:  the BOP's rams closed, preventing the flow of oil or gas into the Gulf of Mexico.  A subsequent inspection, however, showed that pieces of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged – demonstrating that the "fail safe" BOP device, regardless of its immediate effectiveness, was subsequently vulnerable to damage or incapacitation by a falling riser pipe – an outcome which in fact occurred during the *Deepwater Horizon* incident.

56.      In August 2004, BP experienced a blowout in the Nile delta, off the coast of Egypt, when the *GSF Adriatic IV*, a gas drilling rig leased from Global Santa Fe (which, in 2007,

merged with Transocean) exploded while completing a well for a joint consortium, which included BP.  The fire raged for over a week before the well was brought under control. Analysts later said that Egypt's natural gas production was reduced by 10-15 percent because of the incident.  As with the *Deepwater Horizon* incident, the blowout occurred after a final cementing job failed.

### *Pipeline Cracks in the Thunder Horse PDQ*

57.     In July 2005, BP's massive and newly-deployed production and drilling rig in the Gulf of Mexico, *Thunder Horse PDQ*, was evacuated for a passing hurricane and almost capsized after a key internal valve, which had been installed backwards, allowed ballast water to accumulate in one section of the rig, causing a dangerous tilt.  When the rig was later put in dry-dock for repairs, cracks were discovered in the underwater pipelines beneath the rig.  A senior engineering consultant who worked on the *Thunder Horse* project later told *The New York Times* that the pipeline cracks "could have been catastrophic."  He continued by noting that:  "You would have lost a lot of oil a mile down before you would have even known.  It could have been a helluva spill – much like the *Deepwater Horizon*."  The *Thunder Horse* repairs took three years to complete.

### *Safety Lapses that Caused the Texas City Refinery Explosion*

58.     On March 23, 2005, an explosion occurred at BP's Texas City refinery. Fifteen people were killed and approximately 170 were injured.  The U.S. Environmental Protection Agency's ("EPA") criminal investigative division launched a criminal investigation, as did the U.S. Occupational Safety and Health Administration ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TCEQ").

59.      In April 2005, OSHA placed BP under its Enhanced Enforcement Program for employers who are "indifferent to their obligations under the OSH Act."  EPA civil inspectors entered into a settlement with BP, laying out a timeline and plan to bring the refinery's operations into compliance with EPA regulations.  TCEQ reached a similar agreement with BP in mid-2006.

60.      In mid-2005, the CSB recommended that BP appoint an independent commission to investigate the Company's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment.  In response, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by former Secretary of State James Baker.  The Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007.

61.      In March 2007, CSB completed its investigation of the Texas City incident and issued its report on March 22, 2007.  The report flagged weaknesses in BP's safety culture.  It criticized BP's management for its lack of "focus on controlling major hazard risk," finding that managers provided "ineffective corporate leadership and oversight."  The CSB's report also identified the Company's failures to heed warning signs and internal concerns raised by its own staff, writing that BP's managers "provided ineffective leadership and oversight" and "did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to safety rules and procedures."  The CSB found a direct correlation between the blast and BP's cuts in safety and staffing budgets, concluding:  BP "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes."  Finally, the CSB report criticized BP for failing to learn from its earlier, similar mistakes.

*Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations*

62.      In early 2006, an oil spill of 210,000 to 260,000 gallons occurred on BP's

Prudhoe Bay pipelines on Alaska's North Slope, facing the Arctic Sea.  The pipeline had been

leaking for weeks and was first discovered on March 2, 2006.  Joint federal and state

investigations, encompassing both criminal and civil matters, began in March 2006.  The

investigations ultimately addressed not only the March 2006 leak, but also addressed weaknesses

in other parts of the pipeline, and a subsequent leak that occurred on the pipeline in August 2006.

63.      An EPA criminal investigation concluded that widespread corrosion in the

pipelines had led to the March and August leaks (and other points of corrosion uncovered in the

investigation) and that BP could have prevented the leaks by maintaining and inspecting its

pipelines.  It further concluded that the duration of the spill revealed BP's criminal neglect of the

pipeline.

64.      In 2007, BP pled guilty to a criminal charge in connection with the March 2006

spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself.

BP was sentenced to three years of probation and fined $22 million.

65.      The 2006 spill was BP's second criminal plea in the U.S. in a decade:  in the

late 1990s BP was indicted because its engineers were injecting dangerous materials into a well

casing to dispose of the materials.  In response, BP pled guilty in 2000, was put on five years of

probation, and entered into a compliance agreement with the EPA's debarment division.

66.      In March 2007, the Company received warnings about the deficiencies in its

corporate governance from the consulting firm Booz Allen Hamilton ("Booz Allen").  In the

wake of the 2006 spill on its Prudhoe Bay pipeline, BP had retained Booz Allen to "identify

potential organizational, process, and governance issues" that related or contributed to the

incident.  Booz Allen found that BP's executive management and Board of Directors had created

a culture focused on cost-cutting and ensuring that budget targets were met, while ignoring

safety issues and critical maintenance.  Among other findings, Booz Allen found major

shortcomings in the Company's internal communications culture noting, in particular, that

"critical risk data" and concerns about major risks were not properly communicated within BP.

More specifically, Booz Allen noted that "[r]isk-related vertical and horizontal communications

do not elevate critical risk data to senior leadership."  Booz Allen effectively put Defendant on

notice that it could not rely on the Company's internal reporting mechanisms to receive "critical

risk data" and thus understand the risk of catastrophic operating failure.

68.     In May 2007, the chairman of the CSB, Carolyn Merritt, testified before

Congress about similarities between Booz Allen's report on Alaska and the CSB report on Texas

City, noting that "[v]irtually all of the seven root causes identified for the Prudhoe Bay [Alaska]

incidents have strong echoes in Texas City," and identified "common findings" that included

"flawed communication of lessons learned, excessive decentralization of safety functions and

high management turnover.  BP focused on personal safety statistics but allowed catastrophic

process safety risks to grow."

### *BP Purports to Adopt the Baker Panel Recommendations*

68.     With all of its past problems staring BP in the face, in early 2007, the Company

finally appeared to address its previous safety shortcomings.  The Baker Panel strongly

suggested that BP immediately implement the following ten recommendations:

> RECOMMENDATION #1 – PROCESS SAFETY LEADERSHIP – The Board of
> Directors of BP p.l.c, BP's executive management (including its Group Chief
> Executive), and other members of BP's corporate management must provide
> effective leadership on and establish appropriate goals for process safety. Those
> individuals must demonstrate their commitment to process safety by articulating a

clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION #4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

RECOMMENDATION #8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION #9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION #10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

69.     Following the release of the Baker Panel recommendations, BP consistently stated that it would implement the mandates across all lines of its business.  In a January 16, 2007 press conference responding to the findings of the Baker Report, Browne announced:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. *I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations*.

* * *

The list of what we have done since the accident *shows how seriously we take process safety*.

70.     Yet the truth, as described herein, is not only that BP did not "get it," but that Defendant knew of or recklessly disregarded its continued failure to implement the process safety programs and procedures either as promised or necessary to avoid the recurrence of similarly preventable deep sea drilling incidents.  The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "*it's professed commitment to safety*" belied BP's public representations concerning its professed commitment to ensuring the safety of its deep sea drilling operations.

24

*BP Creates the Group Operations Risk Committee and the Safety, Ethics and Environment Assurance Committee to Implement and Monitor Process Safety Systems*

71.     As part of the Company's professed commitment to process safety, BP told investors that OMS was designed to address the Baker Panel's recommendation to establish and implement an integrated and comprehensive system that would systematically identify, reduce and manage process safety risks.  In connection with this public mandate, BP set up a committee called GORC – Group Operations Risk Committee – that would be tasked with oversight and implementation of OMS, among other responsibilities.  GORC met monthly and included sectional CEOs, with Hayward serving as Committee Chair.  GORC's role was to educate Hayward, the CEO, and to insure that operational risks were identified and properly managed. Additional information regarding GORC's duties and responsibilities has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

72.     Hayward and Inglis both testified that they were knowledgeable about the scope and implementation of OMS through their participation in GORC.  Inglis testified:

> A.     The group operations – Group Operations Risk Committee was set up by – by Tony Hayward to monitor our safety and integrity performance.  It was there to act as a vehicle for continuing to improve our performance.  That was through OMS.  So part of it was to actually look at how OMS was being implemented.  It connected into the OMS audit function, so that reported in to GORC.

Inglis Dep. at 279:21-280:4.

73.     Similarly, as the CEO of BP and Chairman of GORC, Hayward was responsible for overseeing OMS development and implementation, which gave him detailed knowledge in these areas:

> Q.     And you are very familiar with process safety because of your position as Chair of the Group Operating Risk Committee, aren't you?

25

> A.   I am.
>
> * * *
>
> Q.   And one of the responsibilities you had . . . as Chair of [GORC] . . . tell me whether I read this correctly, quote, "Oversight of development and implementation of BP's Operating Management System . . ."
>
> A.   That's correct.

Hayward Dep. at 149:10-13; 163:14-21.

74.   Hayward, Inglis, and other members of GORC received regular status updates concerning the scope and implementation of OMS via the "Orange Book."  As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS:

> Q.   What was the purpose of the Orange Book?
>
> A.   The Orange Book actually started in the upstream [synonymous with "Exploration & Production"].  It was sort of under my leadership, and then it got introduced as something that would apply across the whole of the – of the group, but, in essence, it was to provide a – a performance monitoring in – performance monitoring information around safety and operational integrity.  So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS.  So it was a – a compendium of all the information that you could use to assess progress on our safety and operation integrity agenda.

Inglis Dep. at 286:24-287:15.

75.   Inglis testified that he monitored the implementation of OMS through the Orange Book:  "There was then a very rigorous process for [OMS'] implementation, as I've described to you.  I monitored the implementation of that through the – the Orange Book and the three stages of [g]ap assessment, prioritization, and MOC [Management of Change]."  Inglis Dep. at 379:11-16.

76.   Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS:

26

Q.   And what other areas would not have had OMS fully implemented until the end of 2010, other than the Gulf of Mexico?

A.   I can't remember the list, but, you know, we have a list that's in many of these reports, that – that document – if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in – in transition.

Hayward Dep. at 791:7-11.

***SEEAC Closely Monitored BP's Safety Performance Including OMS Implementation***

77.   BP's SEEAC – Safety, Ethics and Environment Assurance Committee – was a board-level committee.  SEEAC was created to ensure that company publications concerning environmental, safety, and ethical matters were accurate.  It purportedly carried out that purpose by obtaining reports from Hayward, a Special Liaison to SEEAC, who regularly reported to SEEAC concerning issues within the purview of GORC, including the status of OMS implementation.  SEEAC also independently monitored progress in BP's process safety efforts.  Inglis also reported to SEEAC, from time to time, concerning matters relating to his Exploration and Production unit.  SEEAC met regularly (more than quarterly) – eight times in 2008, seven times in 2009, and nine times in 2010 – and was continuously updated with respect to BP's implementation of OMS.  Indeed, Hayward attended each of these meetings up until the time of the blowout.

78.   William Castell, the chairman of SEEAC, testified that "the duties and obligations [of SEEAC] are set out in [BP's] Annual Report."  BP's 2008 Annual Report, published on March 4, 2009, defined SEEAC responsibilities to include:  "[r]eviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make [*sic*] recommendations to the Board about their adoption and publication."  It defined "the main tasks and requirements for SEEAC" to include "monitoring and obtaining assurance that the management or mitigation of material non-financial risks [was] appropriately addressed

27

by the group chief executive."  Castell testified that non-financial risks include safety-related risks.

79.     The 2008 Annual Report also discussed the types of information received by SEEAC:  "[SEEAC] receives information on agenda items from both internal and external sources, including internal audit, the safety and operations function, the group compliance and ethics function, and Ernst & Young.  Like other board committees, SEEAC can access independent advice and counsel if it requires, on an unrestricted basis."

80.     Moreover, Castell testified that SEEAC members received the Orange Book on a quarterly basis, and that it contained detailed data concerning BP's safety performance:

Q.     Now, the Reports you get, that's the Orange Book; is that right?
A.     We receive an Orange Book on a quarterly basis, sir.

Q.     Yes.  And tell us what that is.  What is the Orange Book?
A.     The Orange Book is a compilation of Operations and Risk data which is – which is received by the Group Operations Risk Committee, which is the mechanisms of formal reporting to the GORC Committee as to the level of safety achieved, the lead and lag factors, the major incidents reported.  These are all consolidated.  So on a quarterly basis, there is a consolidated document that refers to the last quarter's performance.

* * *

Q.     Is it metrics?
A.     It's metrics, and it's – well, it goes beyond metrics, sir.  There are Reports that highlight where there have been major incidents.  There are verbal Reports from Upstream and Downstream, and there are Reports on Audit, so not always metrics.  There are also, you know, comments on audits, audit closeouts, et cetera.

* * *

Q.     I'm trying to understand at what level the seriousness of an incident would come to your Committee, the SEEAC Committee.  How – how bad does it have to be before your Committee finds out about it?
                              * * *
A.     I think you've seen from the data, sir, that we have the data that comes to us.  When you say, "How bad does it have to be," the – the data in the

28

> Orange Book goes down to lost days of work.  So if they lost days at work, we can see it.

Castell Dep. at 377:23-378:12, 378:15-22, 380:22-381:1, 381:4-8.

81.     Additional information regarding SEEAC's duties and responsibilities has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

***BP Launches OMS Purportedly to Implement the Baker Panel's Recommendations, but Exempts OMS's Application from Rigs that BP Operated, But Which It Did Not Own***

82.     In 2007, BP introduced OMS at 12 representative pilot sites and by early 2008 BP purportedly sought to implement OMS company-wide.  OMS was supposedly the cornerstone of BP's efforts at improving its process safety protocols and preventing major accidents in the wake of the Texas City disaster.  According to Ellis Armstrong, CFO of BP Exploration and Fed. R. Civ. P. 30(b)(6) witness in the MDL 2179 action, BP's executive management made the determination to extend the Baker Panel process safety recommendations across the entire panoply of the BP Group, including Exploration and Production in the Gulf of Mexico, rather than limiting implementation to its refineries.  Armstrong Dep. at 57:1-13.  Hayward repeatedly and publicly referred to OMS as the means by which BP would improve its process safety performance.

83.     On May 20, 2008, BP released its 2007 Sustainability Report.  In the "Group chief executive's introduction" to that report, Hayward noted that BP was "still learning lessons from" Texas City and had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so."  Describing BP's efforts in that regard, Hayward stated, "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations.  My executive team continues to monitor closely our safety

29

performance."  In that regard, the 2007 Sustainability Report further noted that the Hayward-led GORC met 14 times in 2007.

84.     On March 4, 2009, BP released its 2008 Annual Report filed on Form 20-F, which was signed by Hayward.  According to the 2008 20-F, OMS was a "***framework for operations across BP*** that is integral to improving safety and operating performance in ***every site***."

85.     Contrary to Defendant's representations, however, and as admitted by BP in the course of federal judicial proceedings, OMS did not apply to BP's operations on rigs unless the rig was actually owned by BP.  Meaning, six out of seven rigs in the Gulf of Mexico during early 2010, including the Transocean-owned *Deepwater Horizon*, were excluded from OMS.  *See* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20.  This was no accident.  Indeed BP never intended for OMS to apply to the entirety of BP's operations and OMS was specifically not applicable to drilling rigs that BP operated, but which it did not own.  Therefore, massive portions of BP's riskiest and potentially most profitable exploration and production projects were exempt from OMS because the well sites were physically drilled by contracted drilling rigs.  Indeed, BP used contracted rigs to drill the vast majority of wells in the deepwater Gulf of Mexico.  Armstrong Dep. at 247:18-248:4.  This practice and the intent to exclude contracted drilling rigs from OMS coverage meant that OMS did not apply to the vast majority of BP's deepwater drilling operations in the Gulf of Mexico, including the Transocean-owned *Deepwater Horizon*.

86.     The deposition testimony of several key BP personnel in the MDL 2179 action confirms this reality.  John Mogford ("Mogford"), BP's former Global Head of Safety & Operations and a member of GORC testified that:  "OMS was designed for BP owned and

operated institutions, so the focus was on BP production facilities where BP had people . . .

according to the guidance for where it was to be applied, on – OMS was not designed to be

implemented on contractor sites or vessels."  Mogford Dep. at 150:13-19.  According to

Mogford, this key limitation of the OMS was known to GORC, including Hayward and Inglis,

because the "OMS document, it was approved, and the scope was approved . . . at the GORC."

*Id.* at 461:18-19.  Mogford testified that GORC held "a discussion that the scope was that [OMS]

applied to BP owned and operated and controlled sites."  *Id.* at 461:23-25.

       87.      Likewise, in his deposition in MDL 2179, Hayward testified that BP's OMS

and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the

*Deepwater Horizon*:

> Q.    And, again, the effective well control system, is that something that is both
> part [Transocean]'s and part BP's?
> A.    Yes, ***very largely Transocean, because it is a Transocean Drilling Team
> that implement the well control procedures.  There's no one from BP
> involved in implementing well control procedures***.  So what we have to
> do is determine that the well control procedures that Transocean has and
> that are documented as their well control procedures are appropriate, and,
> of course, that they're . . . followed.
>
> Q.    Okay.  But if there are well control procedures and process procedures in
> place in the gulf of Mexico, BP procedures, those are applicable as well as
> the [Transocean] procedures?
> A.    Well, I don't want to be pedantic, ***but BP doesn't have well control
> procedures to manage a well that is beginning to flow, because we're not
> actually drilling any of the wells that our contractors are***.  So what we
> want to verify is that those procedures are in place, and they're deemed to
> be appropriate, and people have been trained such that they know them,
> and when a situation occurs, that they implement and follow them to
> control the well.

Hayward Dep. at 668:7-669:5.

      88.      John Baxter, Group Head of Engineering for BP and member of GORC, testified

that OMS did not apply to the *Deepwater Horizon,* and that as a result numerous safety and risk

management procedures instituted in direct response to the Baker Panel recommendations were

not applicable to the majority of BP's drilling fleet in the Gulf of Mexico, including the *Deepwater Horizon*. Baxter Dep. at 175:14-15. For example, BP did not apply its Integrity Management, Major Accident Risk ("MAR") analysis, Safety & Operations Audits, or Control of Work to the majority of its drilling rig fleet, including the *Deepwater Horizon*, because OMS was limited to rigs that were owned by BP. *Id*. at 175:11-12; 186:24-187:8; 191:20-192:23; 210:3-10. This was confirmed by Pat O'Bryan, Vice President of Drilling & Completions, who testified that "[t]he only drilling rig that we had in our fleet [in the Gulf of Mexico] that would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse." O'Bryan Dep. at 413:6-9. Yet, this significant limitation to OMS was omitted from public disclosure.

89.     Several BP employees familiar with BP's drilling and completions in the Gulf of Mexico revealed that upstream operations – *i.e.* drilling rigs, including the *Deepwater Horizon* – did not receive information on OMS. For instance, John Guide, Wells Team Leader for the *Deepwater Horizon*, testified that he had no formalized training on OMS until January 2011. Guide Dep. at 433:5-8. Ronnie Sepulvado, Well Site Leader on the *Deepwater Horizon* since 2003, stated that he didn't know what the Gulf of Mexico local OMS was, that he had only "heard" of process safety, and he was completely unfamiliar with 13 policies that were ostensibly part of the Gulf of Mexico Local OMS. Sepulvado Dep. at 357:16-20, 391:6-394:10. Additionally, Cheryl Grounds, Chief Engineer of Process and Process Safety, stated that "[m]y understanding is it was frequently stated in the company is [*sic*] that drilling managed their own work. And we had a lot of work to do in process safety elsewhere, so that was prioritized. So I focused on producing assets and major capital projects[.]" Grounds Dep. at 88:18-24. These statements confirm that the scope of OMS was never intended to apply to some of BP's most critical projects involving drilling rigs that were not owned by BP.

***Hayward Knew That a Deepwater Blowout Was the Highest Risk Facing BP Operations in the Gulf of Mexico and Knew That Drilling in the Gulf of Mexico Itself Was Highly Risky***

90.     Hayward stated that BP's cornerstone process safety program (OMS) in the Gulf of Mexico, would apply "across all of BP's operations," that BP had "completed the transition to OMS in" the Gulf of Mexico and that OMS "turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed."  These and other similar statements were, at a minimum, severely reckless, considering his knowledge that a deepwater blowout was the highest risk facing BP in the Gulf of Mexico.  Not only did Hayward know that his misrepresentations concerning OMS implementation were false, but he also knew that those misrepresentations concerned the highest risk that BP faced in the Gulf of Mexico, and one of the highest risks facing the company.  As Hayward testified in his deposition in the MDL 2179 Action:

> Q.     Well, what you did know, though, was that DEEPWATER blowout was the highest risk across the entire corporation and that it was the highest risk for your Exploration and Production Unit, wasn't it?
>
> A.     It was certainly one of the highest risks for the corporation. It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit.

Hayward Dep. at 196:10-18.

***Contrary To Defendant's Assertions, the Gulf of Mexico Had Not Completed The Transition to OMS At The Time Of The Deepwater Horizon Disaster***

91.     BP's 2008 and 2009 Annual Reports on Form 20-F included Defendant's representations that OMS was in place at BP's exploration and production projects in the Gulf of Mexico.  BP stated unequivocally that, "[e]ight sites completed the transition to OMS in 2008," including "the Gulf of Mexico."  In reality, however, as BP conceded at oral argument, this statement was false when made.  MTD Hr'g Tr. (Dkt. 304) at 58: 15-21 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that that is a statement of

33

specific fact . . . that the plaintiffs have alleged and that I will admit to the Court is not accurate").

92.     During the Relevant Period, Defendant presented specific information about OMS, including the number of sites in which the program was supposedly implemented, specific sites where it was supposedly already implemented, and statistical percentages demonstrating that the Company was supposedly on track with implementation.  BP presented this hard data on OMS implementation – and the benefits that OMS had allegedly already begun to achieve – alongside the Company's expectations for continued success in its Gulf of Mexico operations.  However, the transition to OMS in the Gulf of Mexico was not complete in 2008 and was not even complete at the time of the *Deepwater Horizon* disaster.  Moreover, as discussed herein, even had OMS been fully implemented – which it had not been – it still would not have applied to the *Deepwater Horizon.*

93.     As Hayward testified at his deposition in the MDL 2179 action, he knew that OMS was not fully implemented in the Gulf of Mexico as of April 2010:

> Q.     Go back to an old familiar subject, the OMS.  Did you know in April of 2010, that the OMS had not been fully implemented in the Gulf of Mexico?
> A.     I – yeah.  I believe I was aware that it had not been fully implemented.  It was in the process of being implemented as it was in other parts of BP.
>
> Q.     But specifically with respect to the Gulf of Mexico, that's your answer?
> A.     Yes.
>
> Q.     Okay.  When did you come to learn that?
> A.     I would have been aware of it prior to the – you know, in the course of doing my – my job.
>
> Q.     Okay.
> A.     Because we had a – as I've explained a number of times through this deposition, the Group Operations Risk Committee was looking at the progress of implementation.

> Q.   So you were getting reports as to where it was implemented, where it was not yet implemented?
> A.   And where it – where it was entrained, so to speak.

Hayward Dep. at 662:25-663:20.

94.   Hayward further testified that BP did not even begin to implement OMS in the Gulf of Mexico until the Fall of 2009 and that he did not expect implementation to be complete until the end of 2010:

> Q.   [Y]ou said that you were on target to implement OMS in the Gulf of Mexico in 2009?
> A.   I – my recollection is that we began the process of cutover to OMS in the Fall of 2009.
>                        * * *
> Q.   And your recollection also is that you would have completed that implementation in the Gulf of Mexico by the end of 2010?
> A.   That's correct.

Hayward Dep. at 789:11-14, 789:17-20.

95.   BP's failure to complete implementation of OMS in the Gulf of Mexico had enormous repercussions.  Hayward testified that the *Deepwater Horizon* tragedy potentially could have been avoided if OMS had been fully implemented in the Gulf and/or applicable to the *Deepwater Horizon*:

> Q.   If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?
>                        * * *
> A.   There is possible potential –
>                        * * *
> A.   Undoubtedly.

Hayward Dep. at 793:25-794:8.

96.   Likewise, SEEAC Chairman Castell fully understood that implementation of OMS had not been completed in the Gulf of Mexico by 2008.  Castell testified, "I believe OMS started its integration in the Gulf in 2009.  I would be personally surprised – and I don't know, but I'd be

surprised if it had been fully integrated with all the legacy systems [as of April 20, 2010]."

Castell Dep. at 71:11-14.

97.     Additional information regarding the timing of the transition to OMS in the Gulf of

Mexico has been produced in MDL 2179.  Pursuant to the protective order in that case, and

Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the

additional information under seal.

98.     In addition, the people charged with implementing OMS in the Gulf of Mexico

were transferred or terminated in Q4 2009 and Q1 2010.  Moreover, according to CW2, BP's

OMS lagged far behind its peers (*e.g.* Chevron and Exxon) in 2009, and by 2010, the program

was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico.

99.     According to CW1, there was a company failure to implement an OMS protocol

that would have ensured that the individual decision makers at the rig level understood how cost-

savings and corner-cutting could affect the process safety of the *Deepwater Horizon.*

100.    In the fourth quarter of 2009 and in January 2010, BP, as part of a global cost-

cutting restructuring, reorganized the drilling operations unit for the Gulf of Mexico.  According

to CW2, the global reorganization was attributable to decisions made by Inglis and Suttles.  A

consequence of the restructuring was the termination or forced transfer for those chiefly

responsible for BP's Gulf of Mexico Operations, including but not limited to safety processes

and the implementation of BP's OMS in the Gulf of Mexico.

101.    Further, as described below, the individuals brought in to implement BP's OMS

and manage BP's Gulf of Mexico Operations lacked the knowledge, experience and expertise of

those they were replacing.  In fact, in September 2009 a non-public BP rig audit of the

*Deepwater Horizon* found that safety goals were not commonly known or properly

36

communicated to employees and that not all relevant rig personnel were knowledgeable about drilling and well operations practices.

102.   According to CW2, the restructuring of BP's Gulf of Mexico operations was undertaken despite concerns raised by CW2 and other senior BP employees to top-level management with direct reporting responsibilities to BP's board of directors.  These concerns related to BP's ability to operate safely in the Gulf.

103.   Ian Little was the Gulf of Mexico wells manager for BP.  Little was replaced by David Sims who, according to CW2, lacked Little's knowledge and expertise.  Despite this, Sims was required to make decisions regarding not only management of the well, but also required to manage the response to the *Deepwater Horizon's* explosion.

104.   Prior to becoming Vice President of Drilling and Completions, London in December 2009, Harry Thierens served from 2006-2009 as the well director for the Gulf of Mexico.  He managed the engineering and operations group in the Gulf of Mexico.  Thierens was replaced by David Rich, who according to CW2 lacked the expertise of Thierens.

105.   Kevin Lacy was the Vice President of Drilling and Completions for BP until December 15, 2009 when he left the Company.  Lacy, who worked in exploration and production for thirty years, was replaced by Patrick O'Bryan.

106.   According to CW1 and CW2, O'Bryan lacked Lacy's experience and expertise.  According to CW2, by 2009 and 2010, BP still had not implemented a robust operations management system to ensure offshore processes could be managed effectively for both exploration and risk.  Given the difficulties of Gulf of Mexico exploration, this invited disaster.

**VII.   DEFENDANT KNEW OR RECKLESSLY DISREGARDED THAT BP'S STATEMENTS REGARDING THE MANAGEMENT OF RISK IN OFFSHORE DRILLING AND THE IMPLEMENTATION OF PROPER PROCESS SAFETY CONTROLS AND PROCEDURES WERE FALSE AND MISLEADING AND OMITTED TO DISCLOSE MATERIAL INFORMATION WHEN MADE**

**A.   Defendant Knew, or Recklessly Disregarded, That BP's Process Safety Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling, Risks that Materialized at the Macondo Well**

107.     Throughout the Relevant Period, Defendant was aware, or recklessly disregarded, that its statements to investors regarding BP's commitment to safety were not true and that its statements touting the importance of deepwater drilling in the Gulf of Mexico omitted material information regarding BP's highly risky and unsafe practices in its deep sea operations.

108.     The Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;
- Failing to wait for the foam stability test results and/or redesigning slurry;
- Failing to run a cement evaluation log;
- Failing to use the correct spacer to avoid disposal issues;
- Failing to recognize the dangers inherent in displacing the mud from the riser before the surface cement plug had been set;
- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet below the mud line;
- Failing to install additional physical barriers during the temporary abandonment procedure;
- Failing to perform further well integrity diagnostics in light of the troubling and unexplained negative pressure test failures; and
- Failing to monitor the mud pits and conducting other simultaneous operations during mud displacement.

109.     The Presidential Commission then concluded that:  **"*The evidence now available does not show that the BP team members (or other companies' personnel)***

*responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives.*"

### Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems

110.     As early as 2003, BP knew or recklessly disregarded risks associated with oil spills in offshore drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment."

111.     BP was aware – though it failed to disclose its awareness to the investing public – that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well kick incidents in the Gulf of Mexico since 1973, some of which involved "well loss" and "rig and platform destruction by fire."  Indeed, an October 22, 2003 MMS alert noted that **"*[a]nnular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico.*"**

112.     BP had experienced cementing failures and knew of similar failures on other companies' rigs prior to and during the Relevant Period.  Additionally, BP experienced, but did not disclose, its own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008.

113.     More specifically, on or around September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is the largest of BP's deepwater drilling operations in Azerbaijan.  Shortly thereafter, another rig in the field, called *B-17*, suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, raising the possibility of an explosion.   *B-17* was evacuated and its well was sealed, either by annular rams or because the well simply "bridged" (collapsed on itself

or otherwise stopped flowing on its own).  As a result, BP shut down most of the entire field's operations, cutting daily production by over 600,000 barrels per day.  In later communications, BP told U.S. officials that they suspected that numerous wells had a "bad cement job."

114.      BP made no announcement or disclosure of this incident at the time it occurred.  In fact, BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008 and notably omitted references to the blowout on *B-17*, the fact that gas alarms went off on the field's central production platform, and the possibility that cementing jobs on other wells were faulty as well.  As noted by *The Wall Street Journal* on December 17, 2010: "BP had been 'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the public and [to] its partner."  Moreover, according to the same article, several of BP's partners "were upset with BP for allegedly withholding information from them about the incident."

### *Defendant Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Its Process Safety Procedures Accordingly*

115.      As early as 2000, and on a continuous basis throughout the Relevant Period, Defendant was aware of or recklessly disregarded the substantial and known risks associated with relying on a single blind shear ram in a BOP to prevent an uncontrolled oil or gas release.  Indeed, Defendant was well aware that blind shear rams were highly untrustworthy and failed nearly 50% of the time.

116.      A BOP is a large, five-story device placed on the ocean floor at the so-called "mud line."  The BOP sits beneath the riser (the pipe connecting the rig to the sea floor) and on top of the cement surface casing that seals around the "annulus," which runs down further into the earth toward the "pay sands" where oil and gas are found.

117.     More specifically, Defendant knew, or recklessly disregarded, that, in the event the BOP needed to be activated, the following should occur:

- Closure of the "variable rams," which would seal the area around the drill pipe in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well), thereby sealing oil and gas in the annulus below the BOP; and then attempting to pump drilling mud into the annulus to outweigh and balance the pressure of rising oil and gas; or:

- In a worse scenario, and if the method described above did not work, activate the BOP's "blind shear rams," which are intended to cut through drill pipe in the well and then seal the oil down in the annulus below the BOP; or

- In an emergency setting, set the BOP to activate all of its rams – variable, annular, and blind shear – and disconnect from the riser, preventing further gas or oil from rising to the rig above.

118.     As set forth below, as early as 2000, and on a continuous basis throughout the Relevant Period, Defendant knew, or were reckless in not knowing, that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drilling pipe is thicker and more difficult to cut and where hydrostatic pressures affect the hydraulic systems that control the BOP rams.

119.     In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but *two* separate blind shear rams, because of the significant risk that one might fail.  The SINTEF report, while not publicly released, was shared with BP and other industry operators.

120.     In both December 2002 and September 2004, MMS provided to BP and other industry operators several reports written by West Engineering Services revealing serious deficiencies with blind shear rams.  In particular, the reports mentioned:

- The incapacity of shears to cut through many newer types of drill pipe, which tend to be thicker than older pipes;

- The certainty with which the shears that close on the thick joints that connect the sections of pipe together (rather than simply closing on the pipe itself) fail; and

- The significantly lower capabilities of shears to cut pipe at extreme depths, for instance, in excess of 5,000 feet, because of the effect of hydrostatic pressure on BOPs' hydraulic systems.

121.     The studies noted above, although not known to the general public, were shared with, and made available to, industry members, including senior BP managers and directors involved in drilling operations, and were discussed at industry conferences that occurred during the Relevant Period, including, but not limited to, conferences held by the Society of Petroleum Engineers ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans, February 2-4, 2010 and in Amsterdam in 2009.  Senior BP drilling managers routinely attended SPE and IADC conferences, including those noted above.

122.     In April 2000, an independent expert report by EQE International, a risk and insurance consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater Horizon*.  The report, which was not publicly disclosed until June 20, 2010, identified a serious flaw in the BOP's design – despite extensive back-up systems, or so-called "redundancies," in the BOP's layout – there was a particular component in the unit's hydraulic system, a single "shuttle valve," which had no backup.  In response, EQE noted the potential for a "single point failure" of the shuttle valve and explained that if the shuttle valve failed, the remaining redundancies built into the BOP would be rendered irrelevant.

123.     Significantly, throughout the Relevant Period, BP actually utilized the services of West Engineering, the company that carried out the research for MMS on BOP reliability, to

carry out specific studies for the Company on risk issues relating to BOP testing. In both 2008 and early 2010, BP specifically requested, as a member of the joint industry group focused on deepwater drilling issues, that West Engineering carry out research projects on BOP reliability and testing, and integrate past studies analyzing BOPs and their device failures.

124. A July 2009 report also put BP on notice that BOPs were unreliable. BP's partner, Transocean, commissioned the report, which analyzed past BOP performance (including in the Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of Alaska. The report, written by the consultant group Det Norske Veritas, which was subsequently contracted by the U.S. government to perform an extensive investigation into the *Deepwater Horizon*'s BOP in the wake of the April 2010 blowout and explosion, found that, in practice, blind shear rams on offshore BOPs had a failure rate of 45 percent.

125. Hayward acknowledged in his deposition that he was aware that problems had been identified with BOPs and that those problems were generally known throughout the industry. Hayward Dep. at 774:9-780:20. Nevertheless, the existence of this report and its findings were not disclosed to the investing public until June 20, 2010.

126. BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram. In addition, BP contracted with Transocean in 2004 to replace one of the variable bore rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up subsea testing procedures. Yet, the installation of this test ram lowered the unit's reliability even further. Indeed, an agreement between BP and Transocean executed in October 2004, Transocean noted BP's awareness that the removal of the variable bore ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile." The existence of this agreement was not made public until June 20, 2010.

43

127.     Thus, despite all the knowledge and information about difficulties with cementing and BOPs, Defendant either knew, or recklessly disregarded, that BP failed to establish uniform process safety features for rig operators to follow during off shore drilling to address cementing issues and for the Company to follow with regard to BOPs.

### BP Received No Less Than One Hundred Safety Warnings for its Safety Process Lapses in its North Sea Deepwater Drilling Operations

128.     Defendant knew of the significant risks in its deepwater drilling operations during the Relevant Period that were pervasive across BP's deepwater operations.  Yet, Defendant knew, or recklessly disregarded, that BP's process safety protocols failed to properly and sufficiently address these known risks.

129.     Unknown to the investing public, the UK HSE levied extensive citations and fines on BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010, and citing the Company for safety or environmental violations related to exploration and production rigs, pipeline and storage systems, and other facilities.  Many of the communications related to offshore deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion*, *Unity*, *Bruce*, *Hutton*, *Magnus*, *Clair*, and *Miller* vessels.  Some of these rigs and the ships that serviced them were decades old, and the safety issues, in many cases, concerned a failure to properly maintain and inspect equipment.

130.     According to UK HSE records, the *Schiehallion*, an aging floating production storage and offloading ("FPSO") ship in the far North Sea, experienced a 2005 engine room fire and a 2006 "mooring chain failure," resulting in special UK HSE inspections and meetings with BP officials, and notifications concerning various violations of safety and environmental violations during the Relevant Period.

131.     In correspondence in 2006, UK HSE strongly urged BP to dry-dock the

*Schiehallion* for repairs.  BP refused, arguing that they would instead prioritize efforts to

improve the ship's condition through a focus on maintenance.  UK HSE, in a letter to BP on

February 2, 2007, strongly criticized BP's decision, noting several areas of maintenance backlog

and numerous cases in which past UK HSE notices were not addressed, and listing various

continuing operations which were not in compliance with "relevant statutory provisions"

("RSPs"):

> Finally, it is HSE's view that ***the overall magnitude of the various categories of
> maintenance backlog [on the Schiehallion] is such that BP does not have
> sufficient control of the situation***. . . . [T]he situation means that there are
> concerns for BP's continued ability to comply with the fundamental duties under
> Sections 2 and 3 of the HASWA [Health and Safety at Work Act].  At the meeting
> of 29th January, we discussed with BP the issues associated with drydocking,
> shutting down production and prioritizing integrity management (i.e., the latter
> being BP's current approach) as a means of addressing the overall maintenance
> backlog.  ***We listened to BP's opinions on the issues associated with the various
> options, but remain unconvinced that BP's proposed course of actions to remain
> on station, with an increased focus on integrity, is compatible with achieving
> compliance with the RSPs given the historic susceptibility of the FPSO
> Schiehallion to events or conditions that exacerbate ongoing maintenance
> backlogs*** (e.g., 2005 Compressor Fire, 2006 Mooring Chain Failure).

132.     The February 2, 2007 UK HSE letter continued, laying out concerns that were

prescient of the *Deepwater Horizon* incident:

> [UK HSE maintains] the view that ***major accidents result when a series of
> failings with several critical risk control systems materialize concurrently. . . .
> The number and relatedness of backlogs on the Schiehallion is such that it
> appears as though there is a significant risk of such a series of failings arising.***

133.     The February 2, 2007 UK HSE letter concluded with criticism of BP's larger

problem with its lax safety culture and inability to avoid a major incident that presaged the

Presidential Commission's findings regarding the *Deepwater Horizon* disaster:  "BP's decisions

on the *Schiehallion* have not in any way been informed by a systematic assessment [by

independent safety inspectors] of the adequacy of the management system to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

134.     According to a 2009 UK HSE letter, BP again suffered a "significant Hydrocarbon Release" (*i.e.*, an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008. The UK HSE said the release was attributable to a "failure to comply" with BP's own process safety procedures.

135.     Several other UK HSE letters were sent to BP between 2007 and 2010 as well. These letters outlined safety and maintenance problems on other rigs that could create a serious risk of hydrocarbon release:

- A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig, criticizing BP's failure to inspect several "high risk" systems for corrosion, as requested in previous notices.  The inspector wrote:  "This lack of progress is unsatisfactory.   It is important that the condition of these systems is ascertained in a timely manner, in order to reduce the risk of loss of containment incidents" (*i.e.*, spills); and

- Additional letters to BP Exploration Operating Company Ltd. on March 25, 2008, March 5, 2009, and July 7, 2009 relating to the *Bruce*, *Magnus*, *Unity*, and *ETAP* platforms criticize BP for failing to conduct maintenance programs compatible with the intended lifespan of its rigs – suggesting, in other words, that BP was running its own equipment into ruin.

**B.  BP's Knowledge or Reckless Disregard Regarding Corporate Statements**

*BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk*

136.     Detailed information regarding BP's internal reporting structures with respect to process safety and risk assessment has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material,

46

Plaintiffs have previously filed the additional information under seal to further support the allegations set forth below.

137.     The Safety & Operations segment ("S&O") was a key component of OMS that BP utilized to achieve monitoring of process safety performance.  Before and during the Relevant Period, BP utilized the S&O function for a variety of reporting mechanisms, progress updates and metrics which allowed for the Executive and Board to monitor process safety performance.  Additional information regarding the role and responsibilities of BP's S&O function has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

138.     The Orange Book was a reporting format conceived of by Inglis and Hayward to relay key safety information to GORC.  Ellis Armstrong, CFO of BP Exploration and Production, was involved in the process of creating the Orange Book.  Armstrong Dep. at 85:21-22.  Armstrong testified that the purpose of the Orange Book was to cull safety metrics across BP and regional business units, including E&P in the Gulf of Mexico that "had the same level of standing in the firm as financial information."  This information was reported on a quarterly basis to GORC and SEEAC in connection with the committees' safety monitoring roles. Armstrong Dep. at 86:4-11.

139.     Additional information regarding the type of information contained in the Orange Books has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

***SEEAC Approved BP's Publications Regarding Safety***

140.     As noted above, SEEAC responsibilities included:  "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication."  Additional detailed information regarding SEEAC's role and responsibilities has been produced in MDL 2179. Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

141.     Additionally, BP's "Sustainability Reporting 2009 Safety" ("2009 Sustainability Report") was published on April 15, 2010.  Information regarding the process for finalizing and publishing the 2009 Sustainability Report has been produced in MDL 2179. Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

142.     Just weeks before the publication of the Sustainability Report, SEEAC met again, and the top item on its agenda was commendation of the final draft form of the report. Additional information regarding SEEAC members' comments on the Sustainability Report has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

***Defendant Consciously Limited The Scope of Safety & Operations Audits To Exclude The Majority Of BP's Deepwater Drilling Fleet***

143.     Contrary to BP's representations that OMS was a systematic management framework that provided superior monitoring of safety, Hayward and Inglis made the decision to omit some of the most lucrative – and the riskiest – of all BP operations from S&O audits.

144.     These S&O audits were especially critical because they tested rig and rig personnel's compliance with safety standards and risk management practices, including requirements set forth under OMS.

145.     As evidenced by information produced in MDL 2179 (which Plaintiffs have previously filed the additional information under seal due to confidentiality assertions by Defendant), Hayward and Inglis made a conscious decision to exclude some of BP's riskiest operations, including the vast majority of BP's deepwater wells in the Gulf of Mexico, from the scope of the S&O audit function.  Had such operations not been purposefully excluded, GORC and SEEAC (which received all S&O audits) would have received detailed information concerning the myriad process safety failures on the *Deepwater Horizon* (such as those identified throughout the Presidential Commission's Report).

146.     The decision to exclude Gulf of Mexico from BP's S&O Audits belied BP's repeated public statements regarding a systematic framework for improved process safety. Additional information regarding this decision has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

**C. Additional Knowledge and Reckless Disregard Allegations:  Defendant's Disregard of Safety and Operational Concerns**

147.     Additional information regarding Defendant's disregard of safety and operational concerns has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

*Defendant Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased From Transocean*

148.   Additional evidence produced in MDL 2179 demonstrates that during the Relevant Period, Defendant knew of, or recklessly disregarded, significant process safety problems with rigs operated or owned by third parties.  These individuals knew of especially acute problems for Transocean-owned rigs.  Pursuant to the protective order in MDL 2179, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal to further supplement the allegations set forth below.

149.   On July 21, 2007, BP experienced a high-potential incident in the Gulf of Mexico. The incident involved Transocean rig operators dragging the BOP along the sea floor which almost severed underground pipelines.

150.   In addition, as a result of certain incidents, a joint safety improvement plan was to have been implemented to address rig-safety culture and joint standardization.

151.   Inglis himself expressed concerns that OMS standards were not being applied to contractor operated drilling rigs.  In an email to the Upstream Senior Leadership Team dated July 13, 2009, Inglis stated:

> One of the emerging findings from our analysis of incidents is that conformance with Control of Work (CoW) practices, on many of our contractor operated drilling rigs, falls short of BP expectations. I have asked Barbara [Yilmaz] to clarify the expectations we have of our contractors in the matter of CoW and the bridging requirements between contractor practice and BP's CoW Standard.

### Concerns about the Integrity of Safety Processes in Alaska

152.   On April 11-12, 2009, Marc Kovac ("Kovac"), a BP mechanic, welder and union representative, sent two emails to BP's Ombudsman's office – which was headed by the Honorable Stanley Sporkin (a retired federal judge) – copying numerous BP Exploration Alaska BPXA offices raising serious concerns about the integrity of pipelines in Alaska, overstretched staff and contractors, and general problems with inspections of oil wells in the western part of

BP's Prudhoe Bay facilities.  The first email noted that "it's getting back to a very dangerous situation, too much overtime and too much responsibility and area to cover for each man.  Anything can happen when [well] pads are not monitored.  Anything can happen when workers work over 12 hours a day, every day.  Things are not getting better."  In a second email dated April 12, 2009, Kovac listed a host of specific examples of overstretched staff, concluding that the situation "sets us up for another major mishap.  Who will they blame this time?  This situation is not acceptable."

153.    Then, in June and August 2009, BP employees and representative members of the United Steelworkers met with BP management in Alaska about various safety and pipeline integrity issues and complaints about BP's culture making it difficult for employees to raise safety issues.  Minutes released from the United Steelworkers revealed that union representatives raised detailed concerns to BP management about understaffing and excessive overtime (being required to work 16-18 hour shifts) and noted that these issues caused an "increased . . . risk for accidents."

154.    This concern was underscored in October 2009 by Phil Dziubinski ("Dziubinski"), BPXA senior officer for HSSE.  Dziubinski noted that a shift greater than 16 hours impeded workers' ability to make sound decisions, describing the impaired decision-making ability as akin to "intoxication."  He noted these conditions were persistent in BP's operations before and throughout the Relevant Period.  Further, he believed that the failure to abate such work conditions would require BP to affirmatively acknowledge to HSE Committees, the Board, the Ombudsman and Congress that this situation put "production ahead of safety."  In late 2009, Dziubinski was asked to resign from his post in what he believes was retaliation for voicing his concerns.

155.    In the June and August 2009 meetings, union representatives also raised concerns about delayed replacement or repair of equipment and old, corroded pipelines, including gas leak detectors.  (Faulty gas leak detection devices were among the problems that led to the ignition of flammable gases during the blowout and subsequent explosion on the *Deepwater Horizon*.)  "*We have several lines ready to leak*," the representatives are noted as stating.  The minutes show union representatives urging BP not to simply "patch" pipelines:  "These lines should be replaced."

156.    These were precisely the types of safety issues BP informed investors it would address after the Baker Report was released and the types of safety issues that BP represented to investors were – purportedly – already being addressed and remedied throughout the Relevant Period.

### *Afraid-a-spill E-mail Raises Complaints about Alyeska's Operations*

157.    In late 2009, another private employee "concern" was sent to the BP Ombudsman from an anonymous employee of BP-operated Aleyska, the BP-led consortium that operates the Trans-Alaska Pipeline in Alaska.  The email was signed "Afraid-a-spill."  The email raised a litany of complaints about Alyeska's operations, including serious safety and pipeline integrity concerns.

158.    Unidentified executives, the email stated, "told employees not to speak up or go against" the Alyeska CEO, Kevin Hostetler ("Hostetler").  The email stated that as a result of Hostetler's behavior, the work environment at Alyeska had degraded over several years to the point where:  "*People are afraid to speak up on safety or integrity issues for fear of retaliation*."  According to a subsequent investigation into the allegations by BP-retained lawyers with the law firm Morgan Lewis & Bockius, the subject of the email was communicated to BP senior

leadership in early 2010, and Judge Sporkin, the Ombudsman, discussed it with BP leadership, which led to the firm being hired to carry out a further investigation.  The results of the investigation still are not public.

159.   Concerns about the risks of spills in BP's Alaska operations, and the inadequacy of BP's pipeline integrity and inspection programs, were not only being voiced internally or to the BP Ombudsman.  BP also received enforcement letters sent to BP companies by the U.S. Department of Transportation's "Pipeline and Hazardous Materials Safety Administration" ("PHMSA").  PHMSA letters communicate regulatory violations, enforcement actions, orders to comply, and warnings relating to pipelines.  In 2008 through 2010, BP related companies operating in the United States received 40 separate enforcement letters from PHMSA, a far higher number than those sent in the same period to peer companies Exxon Mobil, Conoco Philips, Chevron, or Shell.  (During the same period, Shell received only six PHMSA letters.)  One PHMSA letter was sent to BP on April 20, 2010, the very day the *Deepwater Horizon* explosion occurred.  In that letter, PHMSA communicated that it had found serious shortcomings with BP's pipeline inspection and anti-corrosion systems in Alaska, increasing the likelihood of a major spill.

160.   These were precisely the types of safety issues BP informed investors it would address after release of the Baker Report and the types of safety issues that BP represented to investors were – purportedly – already being addressed and remedied throughout the Relevant Period.

***Aftermath of BP's 2007 Criminal Plea***

161.   During the Relevant Period, Hayward and Inglis knew, or recklessly disregarded, that the recommendations of the Baker Panel were not being adequately instituted throughout the Company, especially in terms of improving its process safety practices.  In particular, as set forth below, between 2008 and 2010, the Environmental Protection Agency warned BP's General Counsel, among other senior BP executives, that EPA investigators found BP to be operating unsafely.  Yet, once again, Defendant omitted this information from the public, including Plaintiffs.

162.   As described above, BP pled guilty to a violation of the U.S. Federal Water Pollution Control Act in connection with the Alaska pipeline oil spill, admitting that its "criminal negligence" had caused the corrosion and thus the spill.  BP was sentenced to three years of probation, and fined $22 million.  In late 2008, BP attempted to obtain an early release from probation in Alaska, arguing to its federal probation officer, Mary Frances Barnes ("Barnes"), that the Company had made "significant progress" in relevant areas of maintenance and inspection.  Unbeknownst to investors, however, Barnes, found continuing safety issues and incidents with BP operations and denied BP's request.  In September 2010, due to continuing complaints that she received about safety and pipeline integrity issues in 2008 through 2010, Barnes requested that the court revoke BP's probation and that additional fines and penalties be levied against the Company.

163.   Also unknown to investors during the Relevant Period, BP was potentially facing serious disciplinary action by the EPA's Suspension and Debarment Division ("SDD"), in connection with past and ongoing misconduct in Alaska, Texas, and other states.  The SDD has the authority to prevent BP from being a party to any U.S. government or state contract or grant funded with federal funds, which would materially affect BP's revenues.

54

164.   Beginning in early 2008 and through early 2010, Jeanne Pascal ("Pascal"), the EPA SDD Debarment Counsel for Region 10 (West Coast and Alaska) who handled EPA debarment oversight activities on the BP Group in the greater United States, communicated repeatedly by telephone and email with senior BP officials, including senior BP executive and Doug Suttles, BP General Counsel Jack Lynch ("Lynch"), and BP's counsel at Vinson & Elkins, Carol Dinkins, among other persons.  The BP Ombudsman, Judge Sporkin, also raised Pascal's concerns with the President of BP America, McKay.  In her communications, Pascal noted that her office was in receipt of information from BP employees and from EPA inspectors in Alaska and Texas demonstrating that BP was *in a state of continuing non-compliance* with numerous applicable laws and civil settlement agreements; that BP was continuing to run many of its operations unsafely; and that BP was continuing to retaliate against workers and contractors who raised safety and environmental issues.  Thus, on several occasions during the Relevant Period, Pascal stated that, because of the Company's continuing misconduct, the EPA was entitled to file a debarment complaint, to strip BP and its subsidiaries of the right to bid for U.S. government contracts and to bid for U.S. government oil and gas concessions.

165.   BP was also informed of significant problems with its process safety with respect to refineries.  For example, in May 2010, it was revealed that between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – all of BP's main competitors only had 22 citations combined during this period.  Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010.

166.    These were precisely the types of safety issues BP informed investors it was addressing after release of the Baker Report.

D.    **Additional Knowledge or Reckless Disregard Allegations:  BP Retaliated Against Individuals Who Raised Concerns About the Safety and Integrity of its Operations**

*Whistleblower Retaliation in the Gulf of Mexico*

167.    Throughout the Relevant Period, and contrary to BP's representations to its shareholders, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations.  These whistleblowers provide further support of Defendant's knowledge or reckless disregard of the falsity and misleading nature of their Relevant Period statements.

168.    In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to raise concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*.  One particular concern was that designs for critical units on the rig were not updated to reflect changes made during repairs, maintenance, or other modifications.

169.    On or around August 15, 2008, BP manager Barry Duff ("Duff"), who worked with Abbott, wrote to BP managers and corroborated Abbott's concerns, stating that a lack of properly-reviewed and approved designs could result in "*catastrophic operating errors*" and that "*currently there are hundreds if not thousands of Subsea documents that have never been finalized*," a situation which Duff referred to as "*fundamentally wrong*."

170.    Abbott continued to raise the above concerns from November 2008 through January 2009 when he was fired in retaliation for his whistle-blowing.  Shortly after his

termination, Abbott raised his concerns with the Company's Ombudsman.  On June 17, 2010, Abbott was invited to testify before Congress to describe the circumstances that led him to initially report his concerns to senior BP management.  During his testimony, Abbott stated, in part, that:

> *From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies*.  Of course, everyone and every company will make mistakes occasionally.  *I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP Horizon, or BP Texas City, or the BP's Alaska pipeline spills.  BP's own investigation of itself,* by former Secretary of State James Baker*, reported that BP has a culture which simply does not follow safety regulations.  From what I saw, that culture has not changed*.

171.   Among the documents sent to the BP Ombudsman, and forwarded to senior BP managers during the Ombudsman's investigation into Abbott's allegations in 2009 and early 2010, was a declaration by a safety engineer in Houston, Texas, Mike Sawyer, who independently reviewed Abbott's allegations, internal BP emails, and applicable regulations.

172.   The Sawyer affidavit affirmed that a "large portion of [the *Atlantis'*] subsea safety critical drawings, documents, specifications, and certificates were not in final, 'as-built' status," and warned:  "*The lack of 'as-built' design documents is a violation of Federal requirements under the Department of Interior MMS Safety and Environmental Management Systems as specified in 30 CFR Part 250 [including] 30 CFR 250.903 and 905*."  The Sawyer affidavit specifically warned that:

- Time is of the essence in avoiding an Outer Continental Shelf (OCS) environmental disaster, Atlantis production should be shut in until resolution of its design short comings is complete and a thorough inspection confirms that critical breaches have been satisfactorily resolved. . . . *It is inconceivable that BP could justify the risk of commissioning Atlantis production without completed design documentation reflecting the latest approved design version* . . . .

- The absence of a complete set of final, up-to-date, 'as-built' engineering documents, including appropriate engineering approval, introduces substantial risk of large scale *damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers*, primarily because analyses and inspections based on *unverified design documents can not accurately assess risk or suitability for service*. . . .

- "The wide spread pattern of unapproved design, testing, and inspection documentation on the Atlantis subsea project creates a risk of a catastrophic incident threatening the GOM deepwater environment and the *safety* of platform workers. *The extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time*.

173.   In April 2010, BP's Ombudsman wrote to Abbott and affirmed that his allegations had been substantiated.  More specifically, Abbot received a letter from BP's Deputy Ombudsman, Billie Garde ("Garde"), on April 13, 2010, stating:  "Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. . . . *The concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you were there, and after you left*."

174.   In addition, the Presidential Commission Report found that a contributory factor to the *Deepwater Horizon* explosion and the problems in attempting to trigger the BOP related to BP's practice of not updating designs and plans from their original schematics – much like the problems complained about with regard to the *Atlantis*.

175.   On the issue of retaliation, the Presidential Commission Report also noted that a survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation.  The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – *i.e.,* approximately one month prior to the *Deepwater Horizon* explosion.  According to the Presidential Commission,

the survey found that:  "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

***Whistleblower Retaliation in Alaska***

176.    The BP Ombudsman conducted a robust investigation of Acuren, the company responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP contractor Marty Anderson ("Anderson") had worked until 2008 and who had began to raise serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and inspection system in Alaska and Acuren's staffing for that program.  According to 2009 communications between the BP Ombudsman's office and Lynch, in 2007 Anderson began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown."  According to the BP Ombudsman's office, the audit confirmed Anderson's claims.

177.    The matters concerning Anderson and pipeline inspections were serious enough for the BP Ombudsman's office to raise them with BP and BP North America officials, including Rick Cape, BP's Vice President for Compliance and Ethics**, *specifically recommending to him that Anderson's concerns be reported to the BP Board of Directors and to Lynch*.  In addition, the Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-President of BP North America Bob Malone.  Garde wrote to Lynch about it in September 2009, and Anderson himself met with Lynch on August 3, 2009.  BP did not adequately address the continuing concerns that had been raised.  An internal email dated July 15, 2010, from Christine

Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues identified by Marty [Anderson] years ago appear to be persisting" [*i.e.*, into mid 2010] and "it is clear that, over time, root causes have not been identified and/or addressed . . . ."

178.   A 2008 BP Ombudsman "Workforce Briefing" containing an assessment of Acuren's "Work Environment" reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns.  A "key insight" in the presentation stated that "[a]ctions and events in the past 18 months [*i.e.*, during the period BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes."  The section noted:  "[p]roduction is viewed by very many workers as the primary focus," (*i.e.*, as opposed to safety).  The presentation also noted that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ."  In fact, one in three employees believed "recent resignations" were due to HIRD, and 38 percent of employees – and 80 percent of the employees who worked on natural gas lines – indicated as the reason for not reporting safety concerns:  "nothing seems to happen to reported items."

179.   The Ombudsman also noted that about one in ten Acuren employees said in the last 18 months that they had been asked to perform a job that was not in compliance with regulations or safety practices.  (The number was even higher for workers who monitor BP natural gas pipelines:  almost half of Acuren's workers indicated that they had been asked to perform "non-compliant work".)

180.   The 2008 presentation also included selected quotes from employees, including the following:

- "I've raised issues, now I'm labeled a troublemaker."

- "You get treated better when your supervisor doesn't hear from you."

- "[A] co-worker falsified production numbers and I brought it to my supervisor's attention with the result that I was ostracized, moved to a different shift, moved to the ghetto and told I should produce more in line with the guy who falsified the records."

- "Supervisors talk safety but when concerns are brought up they are viewed as irritating and just given lip service."

- "I have stopped jobs for safety reasons and they just hand it to the next guy till they find someone who will do it" [*i.e.*, the job that was stopped].

- "I was pressured to change my evaluation of some pipe which I deemed to be defective."

- "BP doesn't listen, they put too much emphasis on rules to look good but have no common sense when it comes to safety."

- "BP's support of safety comes off as lip service and seems to only be in place to lower their insurance rates. While superficially, BP delivers lip service about safety, their continually increasing demands accompanied by consistently decreasing resources create a 'results oriented' atmosphere where the ends justify the means."

- "BP creates the adverse and dysfunctional world we work in here. Many problems that occur are because they drive people too hard to perform with limited resources. . . ."

181.   Furthermore, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees.  For instance, according to an article published by ProPublica on June 7, 2010, on December 9, 2009 a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (manipulating devices to change readings) and "falsified inspections."  This individual's name is Stuart Sneed ("Sneed").  Sneed worked on BP's Alaska pipeline and stated that:  "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you.  They'll

destroy your life. . . .  No one up there [in Alaska] is going to say anything if there is something

they see is unsafe.  They are not going to say a word."

## VIII.    THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH

### A.    BP's Systematic Failures Caused the Explosion on and the Sinking of the *Deepwater Horizon* Rig

*BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan*

182.    The tragedy of the Macondo well explosion was avertable, but BP's overarching

culture of indefensible risk-taking prevailed.  At every turn, BP's conduct evidenced a systematic

departure from recognized industry safety practices.  Thus, the Presidential Commission found

that "*the cumulative risk that resulted from these decisions and actions was both unreasonably*

*large and avoidable[.]*"

183.    In March 2008, BP paid approximately $34 million to acquire the exclusive

drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in

the Gulf of Mexico that encompasses the Macondo well.  Although the Mississippi Canyon area

has many productive oil fields, BP knew little about the specific geology of Block 252 and, in

fact, the Macondo was the Company's first well on the new lease.  BP planned to drill the well to

20,200 feet in order to learn the geology of the area and to determine whether the oil and gas

reservoir would warrant installing production equipment.  The Macondo well was located 47.6

miles off the coast of Louisiana.  It was believed that the well could hold as much as fifty (50)

million barrels (or 2.1 billion gallons) of producible oil.

184.    Throughout the Relevant Period, MMS required BP to prepare and file oil spill

response plans demonstrating the Company's specific strategy and ability to respond to an oil

spill if one occurred while drilling in the Gulf of Mexico.  MMS regulations required that an oil

spill response plan include, *inter alia*:  (i) an emergency response action plan; (ii) disclosure of the equipment available to combat an oil spill; (iii) any oil spill response contractual agreements with third-parties; (iv) calculations of the worst-case discharge scenarios; (v) a plan for dispersant use in case of a spill; (vi) an in-situ oil burning plan; and (vii) information regarding oil spill response training and drills.  *See* 30 C.F.R. § 254.21.

185.   The first of these requirements, the "emergency response action plan," is the "core" of the overall operational response plan and required BP to disclose, among other things: (i) information regarding the Company's oil spill response team; (ii) the types and characteristics of oil at the facility; (iii) procedures for early detection of a spill; and (iv) procedures to be followed in the event of an oil spill.  *See* 30 C.F.R. § 254.23.

186.   BP publicly filed its oil spill response plan for the Gulf of Mexico, entitled "Regional Oil Spill Response Plan – Gulf of Mexico," with the MMS on December 1, 2000 and last revised the plan on June 30, 2009 ("BP's Regional OSRP for the GOM").  A regional oil spill response plan is designed to cover multiple facilities or leases of a lessee that have: (i) similar modeled spill trajectories and worst case discharge scenarios, (ii) the potential to affect the same ecological or socioeconomic resources, and (iii) are located in close enough proximity to be served by the same response equipment and personnel.  BP's Regional OSRP for the GOM covers a massive area, including all of the United States' interests in the Gulf of Mexico.  This area encompasses the coastal waters of Texas, Louisiana, Alabama, Mississippi, and Florida.  BP has approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico.  BP's Regional OSRP for the GOM applied to all of these wells.

187.   According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil***

*per day to 250,000 barrels of oil per day*.  More specifically, BP's Regional OSRP for the GOM stated:  (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day.  BP's Regional OSRP for the GOM explicitly states that the Company and its subcontractors *could recover approximately 491,721 barrels of oil per day* (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico. Moreover, the Company claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills*."

188.   On March 10, 2009, the MMS deemed the Company's initial exploration plan for Mississippi Canyon Block 252 ("BP's EP") "submitted."  BP's EP included the area encompassing the Macondo well.[3]  In connection with the EP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo Well.  Following the sinking of the *Deepwater Horizon*, a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit.

189.   According to BP's EP, the worst case scenario of an oil spill occurring in Mississippi Canyon Block 252 would be the release of approximately *162,000 barrels of oil per day***.**

190.   In BP's EP, the Company claimed it would have no difficulty responding to a worst case scenario while drilling the Macondo well:

---

[3]  BP's Regional OSRP for the GOM and EP are collectively referred to herein as "BP's Oil Spill Response Plan."

> *Since BP … has the capability to respond to the appropriate worst-case scenario included in its regional OSRP …, and since the worst-case scenario determined for our [EP] does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP … has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our [EP].*

* * *

> *[D]ue to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.*

191.   Because the worst case scenario discharge figures in BP's EP – which BP calculated – fell below the threshold established in BP's Regional OSRP for the GOM, the Company was not required to submit a site-specific drilling plan for the Macondo well itself.

192.   In October 2009, the semi-submersible Transocean rig *Marianas* began drilling the Macondo well.  However, operations were halted at approximately 4,000 feet below the sea floor due to damage caused to the rig by Hurricane Ida.

193.   The replacement rig, the *Deepwater Horizon*, arrived at the Macondo well on January 31, 2010.  Although the rig was in place on that date, several steps needed to occur prior to beginning any drilling operation, including connecting the rig's BOP to the wellhead.  BP completed these steps by February 10, 2010 and the *Deepwater Horizon* began drilling shortly thereafter.

194.   Once the rig was connected to the BOP via the riser, BP inserted the drill bit and drilling pipe through the riser and BOP in order to reach the wellbore in the ocean floor.  As drilling progressed, so-called "drilling mud" was pumped down through the drilling pipe and emerged through holes in the drill bit.

195.   Drilling mud is not mud in the traditional sense; it is a blend of synthetic fluids, polymers and weighting agents costing approximately $100.00 per barrel.  Drilling mud accounts

for as much as 10% of the total cost in drilling a deepwater well.  Drilling mud is a critical part of the drilling process.  For example, as it is circulated down the drilling pipe and back up the wellbore to the rig, drilling mud clears the wellbore of broken rock and other debris (referred to as "cuttings"), cools the drill bit and maintains stable pressure within the well, which is critical to the mechanical stability and integrity of the wellbore.

196.   When drilling a deepwater well like the Macondo – which lies approximately 5,000 feet (or about 1 mile) below the ocean's surface and extends another 13,000 feet below the ocean floor – controlling pressure is a paramount concern.  The inward or "pore" pressure (*i.e.*, the pressure exerted by the fluid in the surrounding rock formation on the wellbore) must be balanced with the outward or "fracture" pressure (*i.e.*, the pressure exerted by the drilling fluids in the wellbore on the surrounding rock formation).  Following proper safety procedures is critical because uncontrolled well pressure can cause an explosion.

197.   On April 9, 2010, the weight of the drilling mud being pumped into the Macondo well was too high and fractured the surrounding formation; drilling mud began flowing into the cracks in the formation.  In an attempt to plug the fractures and stop the outflow of drilling fluid, BP circulated 172 barrels of thick, viscous fluid, referred to as a "lost circulation pill," into the wellbore.  The lost circulation pill succeeded in staunching the outflow of drilling mud, but the episode underscored the sensitivity of the Macondo well.  As noted by the Presidential Commission:  "***BP's on-shore engineering team realized the situation had become delicate***. They had to maintain the weight of the mud in the wellbore at approximately 14.0 pounds per gallon (ppg) in order to balance the pressure exerted by the hydrocarbons in the pay zone." Thus, BP's engineers were on notice that they must be even more vigilant in monitoring and controlling the competing pressures within the wellbore.

*Casing and Cementing the Well*

198.   Once the initial drilling of the well was complete, BP then needed to insert casing to seal off the walls of the wellbore to provide structural integrity.  BP considered two casing methods:  a long-string casing and a liner/tie-back casing.  The long-string casing involves hanging a single continuous wall of steel from the wellhead on the ocean floor down to the bottom of the well over thirteen thousand feet below.  The liner/tie-back method entails hanging shorter segments of casing to one another in order to form a stronger and less flexible piece of metal.  A critical distinction between the two methods is that the long-string casing method provides two barriers to flow up the annular space (once cementing is complete) whereas the liner/tie-back casing provides four barriers to annular flow.  This means that the liner/tie-back method provides twice the safety precautions as compared with the long-string casing method.  In addition, BP knew that obtaining a reliable primary cement job with the long-string casing would be much more difficult.

199.   In fact, between April 14 and 15, 2010, the BP engineering team in Houston, Texas modeled the likely success of the cementing process using the two casing methods and determined that ***the long-string method would fail in effectively cementing the Macondo well***.

200.   In light of this determination, the engineering team elected to proceed with the liner/tie-back method, but, according to the Presidential Commission, others at BP opposed the decision.  In the end, despite the conclusion that the long-string method could not be cemented reliably, BP's view prevailed and the crew proceeded with the long-string casing method.

201.   The next step in the drilling process was to thread the long-string casing through the center of the wellbore down to the bottom of the well.  Centering the casing is of vital importance to obtaining a secure cement job.  As the cement mixture flows out of the casing, it

ascends through the annular space surrounding the casing.  If the space around the casing is uneven (*i.e.*, there is more space on one side than on the other), the cement begins to fill in the annular space in an uneven manner, leaving channels of drilling mud in the cement.  These channels are pathways through which highly pressurized hydrocarbons can flow.

202.   To ensure that the long-string casing will be centered, guides called "centralizers" are placed around the casing at regular intervals.  For the Macondo well, BP decided that it would use only six centralizers because that was the amount currently available on the rig.  It does not appear that the Company's reasoning was based on any scientific or engineering calculations.  However, before BP could actually place the centralizers in the well, it needed Halliburton – who BP contracted for this cementing job – to verify that six centralizers would be sufficient.

203.   On or about April 15, 2010, Halliburton engineer Jesse Gagliano ("Gagliano") performed computer simulations to assess the likelihood of a satisfactory cement job using six centralizers.  Gagliano's calculations demonstrated a high likelihood of channeling resulting in a cement failure if the Company used only six centralizers.  Computer simulations showed that twenty-one centralizers were necessary – *i.e.,* almost four times as many as BP intended to use.

204.   After reviewing the modeling data himself, BP Drilling Team engineer Gregory Walz ("Walz") agreed with Gagliano's conclusions.  On April 16, 2010, Walz wrote to other BP engineers and stated, in part, that the operation needs "to honor the … modeling to be consistent with our previous decisions to go with the long string."  Walz proceeded to make arrangements to obtain the additional centralizers.

205.   However, BP Well Team Leader John Guide ("Guide"), who was also based in BP's Houston office, opposed using the additional centralizers because the installation would

delay the team by approximately ten hours and would therefore cost BP money.  Although BP

ordered additional centralizers, when they arrived on the *Deepwater Horizon* it was determined

that the centralizers were the wrong type.  Despite the serious threat of channeling identified in

the modeling data, however, Guide's view prevailed and only six centralizers were used to center

the more than thirteen thousand foot long-string casing in the wellbore.

206.   BP's culture of unreasonable, indefensible risk taking is echoed in an email by

Brett Cocales (a drilling operations engineer in BP's Houston office), dated April 16, 2010, in

which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will
> not seek the perfect center of the hole unless it has something to centralize it.
> ***But, who cares, it's done, end of story, will probably be fine*** and we'll get a good
> cement job.

207.   On April 17, 2010, after learning that BP would proceed with only six centralizers,

Gagliano re-ran the computer simulations and modeling using seven centralizers and the

conclusion was the same: the well would have "***a SEVERE gas flow problem***."  BP, however,

continued to ignore its own expert's opinion.

208.   On April 18, 2010, BP began lowering the long-string casing into the wellbore.  To

enable the drilling mud located in the wellbore to flow smoothly and distribute evenly as the

long-string casing is lowered, two trap doors within the long-string casing, referred to as the

"float collar," are propped open with a tube called an "auto fill tube."

209.   On April 19, 2010, after the long-string casing reached the bottom of the wellbore,

BP needed to dislodge the auto fill tube, converting the float collar from a two-way valve to a

one-way valve.  Successfully converting the float collar insures that the pumped cement will

only flow downward through the casing, a critical step in the cementing process.

210.    Two events should have indicated to BP that the conversion of the float collar was not proceeding properly.  First, the tube should be dislodged once the flow through the tube reaches six barrels of mud per minute (6 bpm), equivalent to six hundred pounds of pressure per square inch (600 psi).  Yet, as the crew pumped drilling mud down the casing, pressure began to climb beyond the 600 psi threshold which should have converted the float collar, but still the crew was unable to establish flow.  The pressure continued to rise, peaking at 3,142 psi (more than five times more pressure than should have been needed to convert the float collar) before suddenly dropping precipitously.  It appears that BP assumed that this meant the float collars had converted.  This is a scientifically indefensible position, however, because, as noted by the Presidential Commission: "[t]he auto fill tube was designed to convert in response to *flow-induced* pressure.  Without the required rate of flow, an increase in *static* pressure, no matter how great, will not dislodge the tube."

211.    Second, after the tube is dislodged and the float collar is converted to a one way passage, the amount of pressure needed to circulate drilling mud from the rig, down the drilling pipe and up the annular space to the rig again should have been 570 psi.  Yet, as BP began the process of converting the float collars, the results differed considerably.  After the spike and sudden drop in pressure, the circulation pressure was only 340 psi.

212.    BP personnel on the rig erroneously ignored the mounting evidence that something was amiss, and proceeded to the next step in the well abandonment plan – mud circulation.

213.    Correct mud circulation requires a complete circulation of drilling mud in the wellbore, referred to as "bottoms up" circulation.  The process, which requires about 12 hours, allows workers on the rig to test the mud for gas influxes, safely remove any gas pockets, and evacuate any debris or other foreign matter that could contaminate the cement.  Given the

70

heightened challenges of cementing a long-string (as opposed to a liner/tie-back) casing, this step was critical.  In addition, "bottoms up" circulation would allow the BP crew to test the mud at the bottom of the well for hydrocarbons, the presence of which would indicate a leak in the cement job at the bottom of the well.

214.   In order to complete a "bottoms up" circulation, BP needed to circulate 2,760 barrels of drilling mud.  Instead, as noted by the Presidential Commission, BP circulated only 350 barrels of mud – eight times less than the amount required to properly complete the "bottoms up" circulation of the well.

215.   In cementing the Macondo well, BP used nitrogen foam, a cement with which it had little experience in the Gulf of Mexico.  In February 2010, Gagliano conducted tests regarding the stability of the nitrogen foam cement.  The tests showed that the mixture was unstable and therefore represented an additional risk of well failure.  According to the Presidential Commission Report, these test results were communicated to BP personnel in Houston on March 8, 2010, however, the warnings were ignored and BP pumped nitrogen foam cement into the Macondo well.

216.   BP's internal guidelines dictated that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone.  For the Macondo well, BP injected just enough cement to extend the annular cement barrier half the distance, or only 500 feet above the uppermost hydrocarbon zone.  According to the Presidential Commission Report, this deviation reduced the safety margin for this procedure by 50% and meant that a total of sixty barrels of cement would be used to cement the well, which BP's own engineers recognized left absolutely no margin for error.  Also according to the Presidential Commission Report, BP was also keenly aware that it was pumping the cement at an unsafe rate (four barrels per minute rather than six

barrels per minute), further impeding the efficiency with which cement would be displaced from the annular space, and reducing its safety margin even further.

217.   At 12:40 a.m. on April 20, 2010, the crew finished pumping the primary cement job.  A team of outside technicians was on hand to conduct the battery of tests needed including, but not limited to, the "cement log," which was designed to evaluate and test the sufficiency of the cement job.  The cement log is an acoustical test used to identify areas (if any) where the cement failed to channel up through the annular space in a uniform fashion.  If cement channeling is uneven, pockets form, creating the possibility that hydrocarbons will enter the wellbore where they can ascend (and expand) rapidly.

218.   The acoustical test was especially critical given BP's prior erroneous decisions regarding the construction of the Macondo well, which included, *inter alia*:  (i) using the difficult-to-cement long-string casing method; (ii) foregoing the "bottoms up" mud circulation; (iii) failing to use twenty one centralizers as the Company's expert recommended; (iv) ignoring scientifically accepted data pertaining to the float collar conversion; (v) electing to use nitrogen foam cement deemed unstable in prior testing; (vi) pumping the cement at reckless rates; and (vii) halving the safety margin by setting the cement 500 (rather than 1,000) feet above the hydrocarbon bearing "pay zone."  BP decided to forego the acoustical test and sent the team of technicians home by helicopter at 11:15 a.m. that morning.  Forgoing the acoustical test saved the Company approximately ten hours and $100,000.  This decision was contrary to industry practice and the recommended safe practices of the American Petroleum Institute.

**BP Begins the Temporary Abandonment Process**

219.   The *Deepwater Horizon* rig is a drilling rig as opposed to a production rig.  Once drilling operations are complete, the well is placed in "temporary abandonment" until the arrival

of the production rig, which will connect to the well and begin pumping oil and gas from the site. Placing the well into temporary abandonment means that that the drilling rig will be removing its own BOP and riser from the wellhead.  There are several key features in the temporary abandonment process to insure that the well is secure before the BOP and riser are removed.  For one, a cement plug, which acts like a cap, is placed in the well.  Typically this cap is placed at or near the mudline.  The area in the well *beneath* the cap is filled in with heavy drilling mud, which applies additional downward pressure on the hydrocarbon bearing zone.  If the cement plug is placed at a greater depth, this necessarily means that there will be less heavy drilling mud in the well underneath the cement plug.  Finally, the crew will install a "lockdown sleeve" at the wellhead.  Throughout this process, the well is monitored and a series of tests are performed to insure that the well is secure – *i.e.*, that no hydrocarbons are leaking into the well.  According to the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the day abandonment procedure began.  Indeed, the temporary abandonment plan had undergone numerous changes leading up to April 20, 2010, but, according to the Presidential Commission: "It does not appear that the changes to the temporary abandonment procedures went through any sort of formal review at all."

220.   Prior to abandonment, the well must be tested to insure that there are no leaks.  In part, this involves conducting a "negative-pressure test" to assess whether hydrocarbons are flowing into the well.  To conduct this test, BP needed to simulate the pressure conditions that would exist in the well once it was placed into temporary abandonment.  As part of the negative pressure test, the crew removed 3,300 feet of mud from the wellbore.

221.   To remove the drilling mud from the wellbore (and later the riser), BP pumped "spacer" through the drilling pipe followed by seawater.  Spacer is a synthetic blend that acts as a barrier between the drilling mud and seawater.  Although the use of spacer is a common and accepted practice, BP's spacer concoction was mixed on board the rig from leftover chemicals that would enable BP to save money and skirt environmental regulations.  As explained by the Presidential Commission:

> While drilling crews routinely use water-based spacer fluids to separate oil-based drilling mud from seawater, *the spacer BP chose to use during the negative pressure test was unusual.*  BP had directed . . . mud engineers on the rig to *create a spacer out of two different lost-circulation materials left over on the rig – the heavy, viscous drilling fluids used to patch fractures in the formation* . . . .
>
> *BP wanted to use these materials as spacer in order to avoid having to dispose of them onshore as hazardous waste pursuant to the Resource and Conservation Recovery Act*, exploiting an exception that allows companies to dump water-based "drilling fluids" overboard if they have been circulated down through a well.  *At BP's direction, the [mud engineers] combined the materials to create an unusually large volume of spacer that had never previously been used by anyone on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*

222.   Testimony before the Presidential Commission indicates that this concocted, untested spacer may have clogged the BOP's kill line, interfering with the results of later testing designed to assess the integrity of the well.

223.   After removing drilling mud from the wellbore, BP began a negative-pressure test to determine whether the well was sealed such that gas or liquid could not permeate into the well. This negative pressure test is the *only* test that assesses the integrity of the cement job at the bottom of the well.  BP had no established procedure or protocol for conducting a negative pressure test.

224.   To conduct the negative-pressure test, the crew "bled off" pressure from the drilling pipe until it was 0 psi.  The pipe was then sealed and monitored.  For a successful

negative pressure test, the pressure within the drilling pipe must remain at 0 psi for a certain period of time.  The BP crew went through this process *three* times – bleeding down the pressure and then sealing the pipe – and all *three* times the pressure within the drill pipe jumped, reaching 1400 psi on the third attempt.  Thus, the pressure test failed three times, in identical fashion.

225.    The negative-pressure test performed exactly as intended.  It gave the clear, unequivocal warning that the integrity of the well was compromised.  As noted by the Presidential Commission:  "[B]ased on available information, *the 1400 psi reading on the drill pipe could only have been caused by a leak* into the well."  In May 2010, BP admitted in Congressional testimony that these pressure test results clearly signaled a "very large abnormality" in the well.  Yet, notwithstanding the unequivocal results of the negative pressure test and without communicating the results to safety experts in Houston, BP ignored the warnings and instead applied the same test to the "kill line," one of the pipes used to circulate fluids into and out of the well.

226.    After conducting the negative-pressure test a *fourth* time (this time on the kill line), BP achieved what it considered to be a successful test result, and continued with the temporary abandonment process.  During this last test, the crew was able to maintain 0 psi on the kill line, but the pressure on the drill pipe continued at 1400 psi.  The Presidential Commission Report found that "BP used a spacer that had not been used by anyone at BP or on the rig before, that was not fully tested, and that may have clogged the kill line," leading to the so-called successful test result.

227.    As part of the negative-pressure testing of the well, the crew had already removed 3,300 feet of drilling mud below the sea floor from the well and replaced it with seawater.  This decision was driven by BP's choice to place the "cement plug" at a depth of 3,000 feet.  The

cement plug is a three hundred foot cap, which is placed in the well as an additional safety measure to secure the well while it is in temporary abandonment.  Placing the cement plug 3,300 feet below the ocean floor is not in accordance with accepted industry practice for performing this function.  Indeed, placing the cement plug three *thousand* feet below the mud line was inconsistent with MMS regulations and required special dispensation.

228.   The associated risks were amplified by BP's decision:  (i) to leave 3,300 feet of the well below the ocean floor filled with only seawater, rather than heavy drilling mud and (ii) to postpone placement of the cement plug in the well.  As a result, once BP opened the annular preventers on the BOP to facilitate the removal of mud from the riser, the only remaining barriers between the rig and the highly pressurized hydrocarbons in the well were the drilling mud remaining in the bottom section of the well and, beneath that, the cement job at the very bottom of the well.

229.   At this stage, there was nothing to prevent leaked hydrocarbons (if present in the wellbore) from traveling up the riser to the rig.  An influx of hydrocarbons is called a "kick" and is exceedingly dangerous due to the highly pressurized conditions.  One gallon of gas at the bottom of the well is capable of expanding to 1,000 gallons by the time it reaches the rig on the ocean's surface.  As the gas expands, it accelerates the kick.  It is therefore imperative that the well be monitored closely for any evidence of a mounting kick.

230.   At 8:02 p.m. on April 20, 2010, BP began to remove the drilling mud from the riser.  As operations proceeded, the drilling mud was returning to the rig, but BP failed to monitor the rate of return.  The returned mud should have been placed in a subset of the rig's mud pits, referred to as the "active mud pits," to facilitate monitoring.  Instead, the returned mud was being dispersed over a number of pits and mud from other operations was being routed to

the active mud pits. As a result, there was no way to know whether more mud was returning to the rig than was being pumped into the well, a fact that would have been evidence that a kick was in progress.

231. At 9:01 p.m. on April 20, 2010, pressure measurements in the well signaled the impending crisis. Pressure in the well should have remained constant or decreased because the pumping pressure remained constant. However, the pressure in the drilling pipe slowly began to *increase*, signaling an influx of hydrocarbons into the well.

232. The crew did not respond to the pressure reading until approximately 9:30 p.m., when driller Dewey Revette ordered a crew member to bleed pressure from the drilling pipe. Despite the strong evidence of a kick, BP and its crew took no steps to assess the cause of the pressure reading or to seal the well. In addition, no employee in BP's Houston office was monitoring the pressure in the Macondo well. As Fred Bartlit ("Bartlit"), a Presidential Commission investigator, made clear during a Commission presentation on November 9, 2010, drill pressure data was "available" in BP's office in Houston, but BP did not in fact monitor it the night of the *Deepwater Horizon* blowout: "There was nobody in that B.P. Macondo well office that night," Bartlit said. "Everybody had gone home."

233. Sometime after 9:40 p.m. on April 20, 2010, drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP.

***Explosion on the Deepwater Horizon***

234. The crew initially attempted to activate the rig's BOP annular preventer, a doughnut-shaped rubber and steel seal that fits around the drill pipe and seals the hydrocarbons from flooding the rig itself. However, the annular preventer failed to stop the flow of oil, most likely because the device had been ruptured four weeks earlier when the drilling pipe was moved

through the annular preventer while the preventer was in the closed position, sending a plume of drilling fluid filled with chunks of rubber to the surface.

235.   Well data indicates that at 9:38 p.m., the first hydrocarbons passed through the BOP.

236.   At 9:46 p.m. the crew attempted to activate the variable bore ram, which (like the annular preventer) should have sealed off the area around the drilling pipe.  This effort also failed to stop the flow of hydrocarbons.

237.   At 9:49 p.m., the hydrocarbon-filled drilling mud that was continuing to spew onto the deck of the rig ignited, causing the first explosion aboard the *Deepwater Horizon*.  One eyewitness referred to "a cascade of liquid" pouring out twenty stories above the main deck of the rig.  Another described hearing an explosion that sounded like a "blown tire, times 100."  Barrels filled with explosive materials were catching fire and launching into the sky like missiles.

238.   After the explosion, workers on the bridge did not immediately act to deploy the Emergency Disconnect System ("EDS").  Andrea Fleytas ("Fleytas"), a Dynamic Positioning Operator for the *Deepwater Horizon* who was in the bridge at the time of the explosion, told *The New York Times* that it did not occur to her to use the EDS and, in fact, she had never been taught how to use it.  With respect to the EDS system, Fleytas stated, "I don't know of any procedures."

239.   Sometime after the explosion, BP's Subsea Supervisor Christopher Pleasant made his way to the bridge and attempted to activate the EDS, which should have activated the BOP's blind shear ram.  The blind sheer ram – the last line of defense – is designed to seal a wellbore by

cutting through the drilling pipe and pinching it closed, as the rams close off the well.  However, the blind shear ram failed to respond.

240.   Despite the failure of the EDS, the BOP's "deadman switch" (an automatic response mechanism) should have triggered the blind sheer ram.  The deadman switch also failed to activate the blind shear ram.  Later inspections revealed that the device had a myriad of problems due to lack of inspection and poor maintenance, including low battery charges in the critical components responsible for deploying the blind shear ram and defective relays that supply the power to close the blind shear ram.

241.   At this point, the only option left to the crew to activate the BOP would have been an acoustical control signal that would trigger deployment of the blind sheer ram via an encoded pulse of sound transmitted by an underwater transducer.  However, BP decided not to install the acoustic switch.  While an acoustic switch is not required in the United States, it is mandated in many places throughout the world.  In those foreign locations, BP uses rigs that do include such a safety device.

242.   Witnesses on a supply ship stood horrified as they watched the fire growing on the rig and crew members leaping from the main deck and jumping 100 feet into the sea.  With no way to bring the explosion under control, crew members abandoned ship, struggling to fight their way to safety.  The *Deepwater Horizon* burned for thirty-six hours before finally tipping and sinking.  The impact to human lives was stark – 11 crew members were killed and 17 more were injured.

**BP Continues to Attempt to Activate the BOP Following the Abandonment of the Deepwater Horizon**

243.   Beginning at 1:15 a.m. on April 21, 2010, BP and other personnel began attempts to activate the BOP with remotely operated vehicles ("ROVs").  Over the ensuing days, BP attempted to activate the blind shear ram on several occasions.  All efforts failed.

244.   First, the ROVs applied hydraulic pressure to a panel controlling the blind shear ram, a method of activating the ram, referred to as "hot stab."  It would take BP ten days to learn that the method would necessarily fail because the targeted panel was actually attached to a useless test ram.

245.   The ROVs also cut electrical wires in an attempt to simulate the deadman switch and attempted to activate the ram by triggering the autoshear (an automated disconnect that is triggered if the rig drifts too far from the well, threatening to break the riser).  Still the ram did not deploy.

246.   At 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* sank, wrenching and further damaging the riser.

247.   On May 5, 2010, after learning that the attempts to activate the blind shear ram through the "hot stab" method were actually targeting a useless test ram, BP ceased its attempts to activate the BOP.

### B.      BP Was Wholly Unprepared to Contain the Oil Spill

*BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico*

248.   In the wake of the *Deepwater Horizon* catastrophe, it has become evident that BP's OSRP for the GOM was materially false and misleading when filed.  Indeed, the Presidential Commission has described BP's OSRP for the GOM as outright "***embarrassing***."  Indeed, Suttles admitted on May 10, 2010 that BP failed to have an oil spill response plan with "***proven equipment and technology***" in place that could contain the oil spill.  Similarly, in a November 9,

2010 interview with the BBC, Hayward ultimately confirmed that the Company had failed to draw up sufficient emergency response plans, admitting that "*we were making it up day to day*."

249.   For example, since BP claimed that it was prepared to recover approximately 500,000 barrels of spilled oil per day, and the worst case scenario for the Macondo well was the release of only 162,000 barrels of oil per day, the Company should have had no problems containing the oil spill.  However, as noted by the Presidential Commission:  "*Despite [BP's claims that it 'could recover nearly 500,000 barrels of oil per day'], the oil-spill removal organizations were quickly outmatched*."

250.   Furthermore, while BP's Regional OSRP for the GOM claimed that an oil spill occurring under the three different scenarios – *i.e.,* less than ten miles from the shoreline, more than ten miles from the shoreline, and from a mobile drilling rig that is drilling an exploratory well – could cause differences in the amount of oil spilled, BP consistently stated that the "shoreline impact" under each scenario would be identical.  This led the Presidential Commission to find that BP's Regional OSRP for the GOM "*evidenced [a] serious [lack] of attention to detail*."

251.   The Presidential Commission also noted several other errors in BP's OSRP for the GOM.  For instance, the Presidential Commission found that BP's Regional OSRP for the GOM was false when issued because "half of the 'Resource Identification' appendix (five pages) … was copied from material on [The National Oceanic and Atmospheric Administration ("NOAA")] websites, without any discernable effort to determine the applicability of that information to the Gulf of Mexico.  *As a result, the BP Oil Response Plan described biological resources nonexistent in the Gulf – including sea lions, sea otters, and walruses*."

252.   Likewise, BP's Regional OSRP for the GOM named Dr. Peter L. Lutz ("Lutz") from the University of Miami's School of Marine Sciences as a wildlife expert.  Lutz was a pioneer in whole-organism integrative physiology, but the Presidential Commission found that he "***had died several years before BP submitted its plan***."  Not only had Lutz been deceased since 2005, but he left the University of Miami almost twenty years prior to chair the marine biology department at a different university.

253.   Similarly, BP's Regional OSRP for the GOM included incorrect contact information for the Marine Spill Response Corporation ("MSRC").  According to the Presidential Commission, the MSRC was "BP's main oil-spill removal organization in the Gulf," but, inexplicably, "***a link in [BP's Regional OSRP] that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site***."  Likewise, the names and phone numbers of several Texas A&M University marine specialists were wrong and the listing of certain mammal stranding network offices in Louisiana and Florida were outdated and, in certain cases, had been closed.

254.   On June 8, 2010, journalist Tim Dickinson from *Rolling Stone* magazine published an article decrying BP's OSRP.  The article's powerful message was clear:  "***The effect of leaving BP in charge of capping the well***, says a scientist involved in the government side of the [clean up] effort, ***has been 'like a drunk driver getting into a car wreck and then helping the police with the accident investigation***" or, in other words, allowing a fox to guard the hen house and hoping that it does not get hungry.  The article also stated, in part, that:

> 'This response plan is not worth the paper it is written on,' said Rick Steiner, a retired professor of marine science at the University of Alaska, who helped lead the scientific response to the Valdez disaster.  'Incredibly, this voluminous document never once discusses how to stop a deepwater blowout.'

255.   Likewise, these gross deficiencies, errors and misrepresentations, among others, caused the Associated Press to publish an article on June 10, 2010 entitled "BP Spill Response Plans Severely Flawed" which detailed the "*glaring errors and omissions in BP's oil spill response plans*."   The article states, in relevant part, as follows:

> *BP PLC's 582-page regional spill plan for the Gulf, and its 52-page, [EP] … vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one*, according to an Associated Press analysis.

> * * *

> In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.

> * * *

> *The plans contain wildly false assumptions about oil spills. BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off. The internationally accepted formula would produce estimates 100 times higher.*

> * * *

> In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video. It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.

> * * *

> There are other examples of how BP's plans have fallen short:

> *Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore a claim that in retrospect seems absurd.*

> "The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.

83

*BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water. But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles*, according to Hans Graber, director of the University of Miami's satellite sensing facility. *Only a small fraction of the spill has been successfully skimmed. Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.*

*The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill. In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion.* **Heavy globs soon followed.** *Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.*

BP's site plan regarding birds, sea turtles or endangered marine mammals ("no adverse impacts") also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and Florida. More than 200 lifeless turtles, several dolphins and countless fish also have washed ashore.

*The response plans anticipate nothing on this scale. There weren't supposed to be any coastline problems because the site was far offshore.*
"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

\* \* \*

*Perhaps the starkest example of BP's planning failures:  The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case scenario all along.*

*Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers. And containment domes, top kills, top hats.*

*While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.*

84

256.     Information evidencing Defendant's knowledge as to the deficiencies in BP's emergency and oil spill planning and response capabilities has been produced in MDL 2179. Pursuant to the protective order in that case, and in anticipation of Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

257.     This evidence is bolstered by Inglis's testimony in MDL 2179 that BP never invested a dollar in developing methods to contain an oil spill.  Inglis Dep. at 162:9-162:21.  This information, once again, was never disclosed to the public or to Plaintiffs.

***The Failed Use of Unprecedented Amounts of Dispersants***

258.   As set forth below, BP's extensive and potentially problematic use of dispersants further demonstrated its lack of preparedness to respond to the spill.

259.   On April 22, 2010, BP began spraying massive amounts of dispersants – namely "Corexit" – on the oil that had reached the surface of the Gulf of Mexico.  Dispersants such as Corexit are not intended to remove oil from the water; rather, energy from wind and waves naturally disperses oil and dispersants may accelerate the process by allowing the oil to mix with water more easily, dispersing the oil vertically and horizontally in the water column.

260.   However, dispersants pose several serious health and environmental threats.  For example, dispersants – including Corexit – decrease the amount of oil on the surface of the water, but *increase* the amount of oil in the water column.  Corexit therefore enables the oil to spread over a wider area, significantly increasing the exposure of marine life to toxic chemicals and oil.  In addition, chemically dispersed oil can be toxic not just in the short term, but also over the long term.  Accordingly, the decision to engage in wide-spread use of dispersants must be

carefully considered, particularly given the fact that studies have found that dispersants may not increase biodegradation rates and *might even inhibit biodegradation*.

261.   Furthermore, Corexit is a chemical dispersant that contains 2-butoxy ethanol. According to the New Jersey Department of Health, 2-butoxy ethanol "may be a carcinogen in humans. There may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."  BP's OSRP for the GOM makes no mention of this serious side effect.

262.   Between April 22, 2010 through April 26, 2010, BP and its subcontractors applied 14,654 gallons of Corexit to the surface of the Gulf of Mexico.  Then, from April 27, 2010 to May 3, 2010, BP and its subcontractors applied another 141,358 gallons of Corexit to the surface of the Gulf of Mexico.  The following week, they applied an additional 168,988 gallons of Corexit to the surface of the Gulf of Mexico.  The Presidential Commission found that BP's extreme use of Corexit was "*novel*" and had never been used in these "*unprecedented volumes*." The Presidential Commission stated that while oil spill "responders had often deployed dispersants to respond to spills" it had "*never*" been done "in such volumes; during the Exxon Valdez spill, responders sprayed about *5,500 gallons [of dispersants], and that use was controversial*."

263.   As the volume of dispersants sprayed on the surface grew dramatically, BP then raised the idea of applying dispersants directly at the well.  Once again, however, the Presidential Commission found that oil spill responders "*had never before applied dispersants in the deep sea*" and "*responders were concerned about the absence of information of the effects of dispersants in the deepwater environment.  No federal agency had studied subsea dispersant use and private studies had been extremely limited.*"

86

264.    Because no federal agency had ever allowed the subsea release of dispersants in a deepwater environment, on May 10, 2010, the U.S. Coast Guard and EPA prohibited its use "until initial testing demonstrates the effectiveness of subsurface dispersant application."  Then, during a May 24, 2010 press conference, EPA Administrator Lisa Jackson announced that the government was instructing BP to "take immediate steps to significantly scale back the overall use of dispersants" and expressed EPA's belief that BP "can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more."  Based on the unknown and highly risky side effects of dispersants, on May 26, 2010, the U.S. Coast Guard and EPA issued a joint letter and directive stating, in part, as follows:

> Reduction in Use of Dispersants.  BP shall implement measures to limit the total amount of surface and subsurface dispersant applied each day to the minimum amount possible. ***BP shall establish an overall goal of reducing dispersant application by 75%*** from the maximum daily amount used as follows:
>
> a.  Surface Application.    ***BP shall eliminate the surface application of dispersants***.  In rare cases when there may have to be an exemption, BP must make a request in writing to the [Federal On Scene Coordinator ("FOSC")] providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application.  The FOSC must approve the request and volume of dispersant prior to initiating surface application.
>
> b.  Subsurface Application. ***BP shall be limited to a maximum subsurface application of dispersant of not more than 15,000 gallons in a single calendar day***.  Application of dispersant in amounts greater than specified in this Addendum 3 shall be in such amounts, on such day(s) and for such application (surface or subsurface) only as specifically approved in writing by the FOSC.

265.    "***Despite this directive***," the Presidential Commission noted that "***surface use of dispersants continued***."  While the Company did seek exemptions from the directive, "***EPA expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust explanations of why BP could not use mechanical recovery methods, such as skimming***

87

*and burning, instead of dispersants*." On July 14, 2010, EPA ultimately prohibited the use of dispersants altogether.

### The Failed Use of A Cofferdam

266. Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP began to theorize other ways that it might be able to contain and/or recover the spewing oil. The Company's new idea – which was noticeably absent from BP's OSRP – was to place a large containment dome (or "cofferdam") over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise*. BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment. Thus, BP was forced to quickly attempt to modify one of its existing cofferdams for these new and unintended purposes. The modification of the preexisting cofferdam was complete on or about May 4, 2010. BP began its attempt to place the 98-ton dome to the sea floor late in the evening on May 6, 2010.

267. It was essentially guaranteed that the *ad hoc* modifications that were hurriedly made to the cofferdam would be unsuccessful. In his book on the *Deepwater Horizon* incident published in late 2010, *Disaster on the Horizon*, former drilling engineer Bob Cavnar ("Cavnar") described the initial containment dome effort as the "***silliest contraption***" that BP built in the aftermath of the incident, and that the steps to construct and lower it down to the leaking BOP "never made much sense . . . they were more for show – to look like they were doing something while they were trying to come up with a real plan." Cavnar stated in an interview that the cofferdam was "destined to fail" due to the "scientific certainty" that gas hydrates would

immediately form in the device and clog it, and describes in his book the results of its deployment as "almost instantaneous failure."

268.   Likewise, the Presidential Commission noted:

BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.  BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.  ***Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High."  Others in the oil and gas industry were not so optimistic:  many experts believed the cofferdam effort was very likely to fail because of the hydrates***.

269.   Not surprisingly, the effort did fail.  Hydrates accumulated during the installation of the dome, yet BP only had a plan to deal with hydrates once the cofferdam was in place.  Thus, when crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before they could even place the dome over the leak, immediately clogging the opening through which oil was to be funneled.  This error in planning almost led to another catastrophe.  As noted by the Presidential Commission:

Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it.  BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface.  Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor.  ***In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job***."

270.   In the days after the failure of the cofferdam, BP temporarily utilized a device known as a "riser insertion tube" to collect some of the oil.  However, BP abandoned the effort after only a few days because of the relatively minor amount of oil the device actually managed to collect.

*The "Top Kill" and "Junk Shot" Efforts Fail*

271.    Following the failure of the Company's cofferdam experiment, BP tried to stop the flowing oil by embarking on so-called "top kill" and "junk shot" efforts.  Both methods are industry techniques that have been historically applied to stop the flow of oil from a blown-out well.

272.    BP, like the rest of the oil industry, was well aware of the Ixtoc I Oil Spill in 1979 in which a rig exploded, caught fire, sank, killed workers and released millions of gallons of oil into the Gulf of Mexico.  In the Ixtoc spill, the same two techniques were attempted and it took approximately 290 days to bring that well under control.  BP's Oil Spill Response Plan made no mention of having to rely on either of these methods let alone provide any qualification as to how effective each method might be in a similar circumstance.  Further, the Presidential Commission noted that neither technique "***had []ever been used in deepwater***."  In the end, both efforts failed to control the proliferation of oil from the Macondo well.

273.    A top kill – also known as a momentum or dynamic kill – involves pumping heavy mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir.  A junk shot complements a top kill and involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines.  That material is supposed to get caught on obstructions within the BOP and impede the flow of oil and gas.  By slowing or stopping the flow of oil, a successful junk shot makes it easier to execute a top kill.

274.    BP's top kill and junk shot plan began on the afternoon of May 26, 2010.  As with the cofferdam experiment, BP gave mixed messages about the potential likelihood of success to

both the government and the public.  In this regard, the Presidential Commission concluded, in relevant part, as follows:

> As with the cofferdam, BP struggled with public communications surrounding the top kill.  *At the time, both industry and government officials were highly uncertain about the operation's probability of success*.  *One MMS employee estimated that probability as less than 50 percent*, *while a BP contractor said that he only gave the top kill a "tiny" chance to succeed.  But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent."*  After the top kill failed, that prediction may have lessened public confidence in BP's management of the effort to contain the well.

275.    During three separate attempts over the next three days, BP pumped mud at rates exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP.  After the third unsuccessful attempt, BP acknowledged that the plan was a failure.  BP's explanation of the failed attempts focused on the well's 16-inch casing, the outermost barrier between the well and the surrounding rock for more than 1,000 vertical feet.  That casing was fabricated with three sets of weak points, or "rupture disks."  During the well's production phase, the hot oil coursing through the production casing, which is inside the 16-inch casing, would lead to a buildup of pressure in the well.  If the pressure buildup was too high, it could cause the collapse of one of the two casings.  The disks were designed to rupture and relieve this potential buildup of pressure before a casing collapsed.  According to BP, pressures created by the initial blowout could have caused the rupture of disks to collapse inward, compromising the well's integrity.

276.    The Presidential Commission, however, disagreed with BP's explanation and found, in part, that the "[c]ollapse of the rupture disks *was only one of BP's possible explanations for the unsuccessful top kill.  But the company presented it to the government as the most likely scenario*."  Indeed, the U.S. Government noted that it "*did not fully accept BP's analysis of what happened*" **and, in contrast, believed that "***the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current***

91

*5,000 barrels-per day estimate*.  Because BP did not pump mud into the well at a rate high

enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and

out of the riser."

### The "Top Hat" Failed to Collect the "Vast Majority" of the Spewing Oil

277.   In the aftermath of the failed top kill and junk shot plan, BP began shifting its main

focus to collecting the oil rather than killing the well itself.  On May 29, 2010, BP announced

that it would attempt to cut off the portion of the riser still attached to the top of the BOP and

install a collection device – or "top hat," which would then be connected via a new riser to the

*Discoverer Enterprise* vessel.  As before, BP's Oil Spill Response Plan failed to mention the top

hat technique as a potential remedy in the event of an oil spill.  BP began installing the top hat on

June 1, 2010 and had it in place by 11:30 p.m. on June 3, 2010.  By June 8, 2010 – forty-nine

days after the explosion occurred – the *Discoverer Enterprise* was collecting about 15,000

barrels of oil per day – or approximately 25% of the oil being released.

278.   BP also developed a system to bring oil and gas to the surface through the choke

line on the BOP.  More specifically, BP outfitted a vessel called the *Q4000* with collection

equipment, including an oil and gas burner imported from France. This vessel and resource was

also never mentioned in BP's Oil Spill Response Plan.

279.   While BP was able to slowly start collecting some of the oil, the Company was, in

the words of the Presidential Commission, once again "overly optimistic about the percentage of

the oil it could remove or collect."  Indeed, the Presidential Commission found, in part, as

follows:

> **On June 1, Suttles said that he expected the top hat, when connected to the**
> **Discoverer Enterprise, to be able to collect the "vast majority" of the oil.  Within**
> **days, it became apparent that the top hat and Discoverer Enterprise were**
> **inadequate.  On June 6, Hayward told the BBC that, with the Q4000 in place,**

*"we would very much hope to be containing the vast majority of the oil."  But when the Q4000 came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.*

280.   In the wake of the failure to contain most of the oil using the top hat, the U.S.

Coast Guard continued questioning BP's response to the spill.  As noted, in part, by the

Presidential Commission:

> BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels.[4]   One senior Coast Guard official challenged BP's definition of availability:  he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so.  Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the *Q4000*.

***The Well Is Finally Capped***

281.   Following the limited success of the top hat procedure, BP began presenting its

final well-control plans to government experts.  According to the Presidential Commission

Report:

> The [U.S. government] science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risk. *The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities.* ***According to one senior government official, before the increased supervision, BP "hoped for the best, planned for the best, expected the best*.**"  [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk.  ***BP, however, was not in the best position to tout that expertise:  its well had just blown out*.**

282.   By late June, BP was working towards deploying a "capping stack," yet another

*post hoc* measure nowhere reflected in BP's OSRP for the Gulf of Mexico.  The capping stack

was essentially a smaller version of a BOP, designed to sit atop the BOP and stop the flow of oil

and gas.

---

[4]   Dynamically positioned vessels have computer-controlled systems that maintain the vessel's exact position and direction, despite external factors such as wind, waves, and current.

283.    On July 9, 2010, Coast Guard Admiral Thad Allen ("Admiral Allen") authorized BP to install the capping stack, but not to close it.  Sealing the capping stack would increase the pressure in the well.  There was a concern that if one or more of the rupture disks had in fact ruptured, the increased pressure could force hydrocarbons into the surrounding formation, leading to uncontrolled eruptions from the ocean floor at other locations.

284.    The installation of the capping stack was completed on July 12, 2010.  The next day, experts conducted a "well integrity test" to determine if the well had been compromised and to see whether oil could flow into the rock formation.  According to the Presidential Commission:  "[t]he test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and visual data continuously, as recommended by the [U.S. government's] Well Integrity Team."

285.    On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping stack and began the well integrity test.  For the first time in 87 days – and after approximately five million barrels of oil had already seeped into the Gulf of Mexico – the well had finally stopped spewing oil.  Unfortunately, however, by that time, the vast environmental damage had already occurred and, as noted by *The New York Times* on August 6, 2010, "BP's containment efforts had captured only approximately 16 percent of the spill."

286.    Meanwhile, on July 19, 2010, BP publicly raised the possibility of actually killing the well through a procedure called a "static kill."  Like the top kill, the static kill involved pumping heavy drilling mud into the well in an effort to push oil and gas back into the reservoir. However, because the oil and gas were already static, the pumping rates required for the static kill to succeed were far lower than the top kill.  The U.S. government approved the static kill procedure on August 2, 2010.  By 11:00 p.m. on August 3, 2010, the static kill appeared to have

worked.  On August 8, 2010, Admiral Allen reported that the cement had been pressure-tested and was holding.

288.    In mid-September 2010, the first relief well – which BP had begun to drill in early May – finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir.  Thus, on September 19, 2010 – 152 days after the blowout – the U.S. government finally announced that "*the Macondo well is effectively dead*."  In total, 206 million gallons of crude oil spilled into the Gulf of Mexico, thousands of square miles of fishing grounds were closed through 2010 and billions of dollars of tourist revenue in the area were lost.

## IX.    DEFENDANT KNOWINGLY OR RECKLESSLY MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL FACTS DURING THE RELEVANT PERIOD

288.    Before the start of the Relevant Period, BP experienced a series of high-profile safety lapses that resulted in the loss of life, damage to the environment, harm to BP's reputation, and significant costs to BP in the form of criminal pleas and fines, civil settlements, and remediation expenses.  In particular, the 2005 Texas City refinery explosion and the 2006 Alaska oil spills were extremely damaging to the Company and left investors concerned about the ability of BP to operate safely and without catastrophic failures.

289.    Responding to these concerns, beginning on May 9, 2007, Defendant sought to assure investors that BP was a company committed to ensuring safe operations through the implementation of the Baker Panel recommendations and, in particular, its process safety system, OMS.  BP reaffirmed this commitment to safety for three years, and at nearly every opportunity during the Relevant Period.  In fact, in May 2009, Hayward lamented that he had "got so bored with saying 'safety, people, and performance' but [he had] determined that [he was] not going to say anything else."  This public commitment to right BP's past wrongs was touted as a sea change in BP's operations.

95

290.   Throughout the Relevant Period, Defendant consistently touted BP's operations in the deepwater Gulf of Mexico, a region that had become one of the most important areas of production for the Company and which BP hailed as a "profit centre" and a "high margin" production area.  In fact, however, BP's deepwater drilling operations created undisclosed risks of a catastrophic system failure that ultimately was realized when the *Deepwater Horizon* exploded and oil began to spew from the Macondo well.  Moreover, the explosion revealed that BP never committed to developing effective safety protocols and systems through OMS on rigs that BP did not fully-own, had not completed OMS in the Gulf of Mexico as it had claimed, and did not have procedures in place that would guide its employees through best practices to avoid an otherwise preventable spill or to contain a spill, should one occur.

## A.  The February 22, 2008 Statements

291.   On February 22, 2008, BP released its 2007 Annual Review, which contained the "Group Chief Executive's Review."  In his Executive Review, Hayward stated that, under his leadership, safety was BP's top priority.  For example, Hayward stated, in part, as follows: "[w]hen I took over as group chief executive, ***the immediate task was to restore the integrity and the efficiency of BP's operations.  I set out three priorities: safety, people and performance***."

292.   BP and Hayward's statements regarding BP's efforts to "restore the integrity . . . of BP's operations" by focusing on safety as a key priority were false and misleading and omitted to disclose material information when made, as demonstrated by, among other evidence, the following findings of the Presidential Commission:  BP's "***approach to managing safety has . . . not [been] on  process safety***.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been

96

unable to meet its professed commitment to safety" (¶16); "[T]he [*Deepwater Horizon*] blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, ***the root causes are systemic*** [to BP]" (¶15); There was ***no "comprehensive and systematic risk-analysis***, peer-review, or management of change process" for any of the key decisions leading up to the explosive loss of the *Deepwater Horizon* (¶108).  In addition, the National Academy of Engineering similarly found that, "The various failures mentioned in this report indicate the lack of a suitable approach for anticipating and managing the inherent risks, uncertainties, and dangers associated with deepwater drilling operations and a failure to learn from previous near misses. . . .  ***Of particular concern is an apparent lack of a systems approach*** that would integrate the multiplicity of factors potentially affecting the safety of the well, monitor the overall margins of safety, and assess the various decisions from perspectives of well integrity and safety."

293.    BP and Hayward knew, or were reckless in not knowing, that their statements regarding BP's efforts to "restore the integrity . . . of BP's operations" by focusing on safety as a key priority were false and misleading and omitted to disclose material information, as demonstrated by the following, among other evidence:

(a)    When Hayward became CEO in May 2007, one of his first commitments was to "focus on safety like a laser," a commitment that he reiterated throughout the Relevant Period.  (¶11)

(b)    Between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful

violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – all of BP's main competitors only had 22 citations combined during this period.  (¶165)

(c)      In addition, internal BP documents evidencing Defendant's knowledge of ongoing process safety issues have been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶148)

## B.  The February 27, 2008 Statements

294.      On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts.  There, Hayward stated, in part, as follows:

> Notwithstanding this track record *our intense focus on process safety continues*.
> *We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations*. Integrity related incidents have fallen significantly over the last three years and oil spills of more than one barrel continue a strong downward trend.

> Safe and reliable operations remain our number one priority.

295.      Hayward's statement that "We are making good progress in addressing the recommendations of the Baker Panel" was false and misleading, and omitted to disclose material information, when made, as demonstrated by, among other evidence,  the following findings of the Presidential Commission:  BP's "*approach to managing safety has . . . not [been] on process safety*.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety" (¶16); "[T]he [*Deepwater Horizon*] blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, *the root causes are systemic*

[to BP]" (¶15); There was *no "comprehensive and systematic risk-analysis*, peer-review, or management of change process" for any of the key decisions leading up to the explosive loss of the *Deepwater Horizon* (¶108). In addition, the National Academy of Engineering similarly found that, "The various failures mentioned in this report indicate the lack of a suitable approach for anticipating and managing the inherent risks, uncertainties, and dangers associated with deepwater drilling operations and a failure to learn from previous near misses. . . . *Of particular concern is an apparent lack of a systems approach* that would integrate the multiplicity of factors potentially affecting the safety of the well, monitor the overall margins of safety, and assess the various decisions from perspectives of well integrity and safety."

296.    Hayward knew, or was reckless in not knowing, that his statements that BP was continuing its "intense focus on process safety" and that BP was making "good progress in addressing the recommendations of the Baker Panel," were false and misleading and omitted to disclose material information, as demonstrated by the following, among other evidence:

(a)      When Hayward became CEO in May 2007, one of his first commitments was to "focus on safety like a laser," a commitment that he reiterated throughout the Relevant Period. (¶11)

(b)      Between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful." The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – all of BP's main competitors combined had only 22 citations during this period. (¶165)

(c)     In addition, internal BP documents evidencing Defendant's knowledge of ongoing process safety issues have been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶148)

297.    Hayward's claim that OMS was being implemented "across all of BP's operations" was false and misleading and omitted to disclose material information when made.  At the hearing on the motion to dismiss in MDL 2185, BP admitted that OMS did not apply to BP's operations on rigs unless the rig was owned by BP (*see* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20), thus demonstrating the falsity of Hayward's statements.  Further, Hayward's deposition testimony in MDL 2179 confirmed that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon* (¶87).   As a result, OMS did not apply to the vast majority of BP's drilling operations in the Gulf of Mexico at the time of the explosion of the *Deepwater Horizon*.

298.    Hayward knew, or was reckless in not knowing, that when he represented that BP was implementing OMS "across all of BP's operations," he omitted to disclose the material fact that OMS would not apply to rigs operated, but not owned, by BP, as demonstrated by the following, among other evidence:

(a)     GORC, which was tasked with oversight and implementation of OMS, met monthly and included sectional CEOs, with Hayward as Committee Chair.  Additional information regarding GORC's duties and responsibilities has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶71)

(b)      Hayward testified that he was knowledgeable about the scope and implementation of OMS through his participation in GORC and that he was responsible for overseeing OMS development and implementation, which gave him detailed knowledge about the scope of OMS.  (¶¶72-73)

(c)      Hayward and other members of GORC received regular status updates concerning the scope and implementation of OMS via the Orange Book.  As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS.  (¶74)

(d)      Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS.  (¶76)

(e)      The testimony of John Mogford, BP's former Global Head of Safety & Operations and a GORC member, in MDL 2185 confirmed that Hayward knew that OMS applied only to rigs that BP owned, because the scope of OMS was discussed and approved by GORC (¶86).

299.   The statements and omissions regarding BP's implementation of the Baker Panel recommendations and OMS were material to investors because, among other reasons, the statements pertained to BP's purported process safety reforms, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  Indeed, Hayward touted to investors that OMS would be the cornerstone of BP's efforts to improve its process safety protocols and to prevent major accidents in the wake of the Texas City disaster.  (¶¶ 71, 82, 90)

300.    BP is vicariously responsible for Hayward's misrepresentations and omissions as these statements were made within the scope of his role as BP's President and Chief Executive and in order to discharge his duties and responsibilities.

### C.  The April 17, 2008 Statements

301.    On April 17, 2008, Hayward and BP Chairman Peter Sutherland delivered speeches at the Company's 2008 Annual General Meeting.  BP posted transcripts of the speeches on its publicly-accessible website.  In his speech, Hayward again asserted that safety was of the utmost importance at BP and distinguished BP from other oil companies based on its deepwater operations.  In particular, Hayward stated, in part, as follows:

> When I took over as chief executive last May, I said that we would focus on three basic priorities: safety, people, and performance.  Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.

> Safety is our number one priority and in 2007 our overall safety record continued to improve.  Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

> ***Our intense focus on process safety continues***.  ***We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.*** This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard.

302.    Hayward's statement that "[w]e are . . . addressing the recommendations of the Baker Panel" was false and misleading, and omitted to disclose material information when made as demonstrated by, among other evidence, the following findings of the Presidential Commission:  BP's "***approach to managing safety has . . . not [been] on process safety***.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety" (¶16); "[T]he [*Deepwater Horizon*] blowout was not the product of a

series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, *the root causes are systemic* [to BP]" (¶15); There was *no "comprehensive and systematic risk-analysi*s, peer-review, or management of change process" for any of the key decisions leading up to the explosive loss of the *Deepwater Horizon* (¶108).  In addition, the National Academy of Engineering similarly found that, "The various failures mentioned in this report indicate the lack of a suitable approach for anticipating and managing the inherent risks, uncertainties, and dangers associated with deepwater drilling operations and a failure to learn from previous near misses. . . .  *Of particular concern is an apparent lack of a systems approach* that would integrate the multiplicity of factors potentially affecting the safety of the well, monitor the overall margins of safety, and assess the various decisions from perspectives of well integrity and safety.

303.   Hayward knew, or was reckless in not knowing, that his statement that "[w]e are . . . addressing the recommendations of the Baker Panel" was false and misleading and omitted to disclose material information, as demonstrated by the following, among other evidence:

(a)   When Hayward became CEO in May 2007, one of his first commitments was to "focus on safety like a laser," a commitment that he reiterated throughout the Relevant Period.  (¶11)

(b)   Between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – all of BP's main competitors combined had only 22 citations during this period.  (¶165)

(c)      In addition, internal BP documents evidencing Defendant's knowledge of ongoing process safety issues have been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶148)

304.    Hayward's claim that BP was implementing OMS "across all of BP's operations" was false and misleading and omitted to disclose material information when made.  At the hearing on the motion to dismiss in MDL 2185, BP admitted that OMS did not apply to BP's operations on rigs unless the rig was owned by BP (*see* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20), thus demonstrating the falsity of Hayward's statements.  Further, Hayward's deposition testimony in MDL 2179 confirmed that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon* (¶87).   As a result, OMS did not apply to the vast majority of BP's drilling operations in the Gulf of Mexico at the time of the explosion of the *Deepwater Horizon*.

305.    Hayward knew, or was reckless in not knowing, that when he represented that BP was implementing OMS "across all of BP's operations," he omitted to disclose the material fact that OMS would not apply to rigs operated, but not owned, by BP, as demonstrated by the following, among other evidence:

(a)      GORC, which was tasked with oversight and implementation of OMS, met monthly and included sectional CEOs, with Hayward as Committee Chair.  Additional information regarding GORC's duties and responsibilities has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶71)

(b)      Hayward testified that he was knowledgeable about the scope and implementation of OMS through his participation in GORC and that he was responsible for overseeing OMS development and implementation, which gave him detailed knowledge about the scope of OMS.  (¶¶72-73)

(c)      Hayward, Inglis, and other members of GORC received regular status updates concerning the scope and implementation of OMS via the Orange Book.  As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS. (¶74)

(d)      Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS.  (¶76)

(e)      The testimony of John Mogford, BP's former Global Head of Safety & Operations and a GORC member, in MDL 2185 confirmed that Hayward knew that OMS applied only to rigs that BP owned, because the scope of OMS was discussed and approved by GORC.  (¶86)

306.    The statements and omissions regarding BP's implementation of the Baker Panel recommendations and OMS were material to investors because, among other reasons, the statements pertained to BP's purported process safety reforms, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  Indeed, Hayward touted to investors that OMS would be the cornerstone of BP's efforts to improve its process safety protocols and to prevent major accidents in the wake of the Texas City disaster.  (¶¶ 71, 82, 90)

307.   BP is vicariously responsible for Hayward's misrepresentations and omissions as these statements were made within the scope of his role as BP's President and Chief Executive and in order to discharge his duties and responsibilities.

**D.  The December 17, 2008 Statements**

308.   On December 17, 2008, Hayward gave a speech at the HRH Prince Of Wales's 3rd Annual Accounting for Sustainability Forum.  BP posted a transcript of the speech on its publicly-accessible website.  Hayward claimed that BP was continuing to improve its process safety practices.  More specifically, Hayward stated, in part, as follows:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.
>
> These lapses exposed shortcomings - but they also gave us a huge opportunity to learn and improve the way we operate.  ***We opened ourselves up to scrutiny - and we listened more to our front-line operations people - who, of course, really know what is going on the ground.   And we have continuously reported progress against a response plan and against an independent external report***.
>
> One of the many consequences for us has been to develop and to ***embed a new Operating Management System right across BP*** - and we operate in 100 countries - so that is no mean feat.

309.   Hayward's claim that "[w]e opened ourselves up to scrutiny - and we listened more to our front-line operations people" was false and misleading, and omitted to disclose material information, as demonstrated by the following, among other evidence:

(a)      The Presidential Commission noted that a survey of crew members of the *Deepwater Horizon* prior to the explosion found that "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."  (¶175)

(b)      Beginning in 2008 and through January 2009 when he was fired in retaliation for whistleblowing, BP engineer Kenneth Abbott raised concerns regarding the lack of

established policies and practices for updating designs and blueprints, concerns which were substantiated by BP Ombudsman Stanley Sporkin.  In June 2010, Abbott testified before Congress that, "I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP."  Abbott further testified that "BP's own investigation of itself, by former Secretary of State James Baker, reported that BP has a culture which simply does not follow safety regulations.  From what I saw, that culture has not changed."  (¶170).  *See also* ¶176-181.

310.    Beginning in early 2008 and through early 2010, EPA Debarment Counsel Jeanne Pascal communicated to BP that she was in receipt of information from BP employees and from EPA demonstrating that BP was continuing to retaliate against workers and contractors who raised safety and environmental issues.   Pascal communicated this information repeatedly by telephone and email to senior BP officials, including Suttles, BP General Counsel Jack Lynch and BP's outside counsel, among other persons.  The BP Ombudsman, Judge Sporkin, also raised Pascal's concerns with the President of BP America, Lamar McKay.  Hayward either knew, or recklessly disregarded, that BP was continuing to retaliate against its workers, misconduct that Pascal informed BP supported an action to debar BP and thereby strip the Company and its subsidiaries of the right to bid for U.S. government contracts and oil and gas concessions.  (¶164)  *See also* ¶167-181.

311.    Hayward's claim that BP had "continuously reported progress against a response plan and against an independent external report" was false and misleading, and omitted to disclose material information, as demonstrated by, among other evidence, the Presidential Commission's findings that:  BP's "approach to managing safety has been on individual worker occupational safety but not on process safety.  These incidents and subsequent analyses indicate

107

that the company *does not have consistent and reliable risk-management processes* – and thus

has been unable to meet its professed commitment to safety" (¶16); "[T]he [*Deepwater Horizon*]

blowout was not the product of a series of aberrational decisions made by rogue industry or

government officials that could not have been anticipated or expected to occur again.  Rather, the

root causes are systemic [to BP]" (¶15); There was *no "comprehensive and systematic risk-*

*analysis*, peer-review, or management of change process" for any of the key decisions leading up

to the explosive loss of the *Deepwater Horizon* (¶108).  In addition, the National Academy of

Engineering similarly found that, "The various failures mentioned in this report indicate the lack

of a suitable approach for anticipating and managing the inherent risks, uncertainties, and

dangers associated with deepwater drilling operations and a failure to learn from previous near

misses. . . . *Of particular concern is an apparent lack of a systems approach* that would

integrate the multiplicity of factors potentially affecting the safety of the well, monitor the

overall margins of safety, and assess the various decisions from perspectives of well integrity

and safety.

312.    Hayward knew, or was reckless in not knowing, that his statement that "we have

continuously reported progress against . . . an independent external report" was false and

misleading and omitted to disclose material information, as demonstrated by the following,

among other evidence:

(a)     When Hayward became CEO in May 2007, one of his first commitments

was to "focus on safety like a laser," a commitment that he reiterated throughout the Relevant

Period.  (¶11)

(b)     Between June 2007 and February 2010, BP received a total of 862

citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of

which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – all of BP's main competitors combined had only 22 citations during this period.  (¶165)

(c)     In addition, internal BP documents evidencing Defendant's knowledge of ongoing process safety issues have been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶148)

313.    Hayward's claim that OMS was embedded "right across BP" was false and misleading and omitted to disclose material information when made.  At the hearing on the motion to dismiss in MDL 2185, BP admitted that OMS did not apply to BP's operations on rigs unless the rig was owned by BP (*see* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20), thus demonstrating the falsity of Hayward's statements.  Further, Hayward's deposition testimony in MDL 2179 confirmed that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon.*  (¶87)  As a result, OMS did not apply to the vast majority of BP's drilling operations in the Gulf of Mexico at the time of the explosion of the *Deepwater Horizon*.

314.    Hayward knew, or was reckless in not knowing, that when he represented that BP's OMS was embedded "right across BP," he omitted to disclose the material fact that OMS would not apply to rigs operated, but not owned, by BP, as demonstrated by the following, among other evidence:

(a)     GORC, which was tasked with oversight and implementation of OMS, met monthly and included sectional CEOs, with Hayward as Committee Chair.  Additional

109

information regarding GORC's duties and responsibilities has been produced in MDL 2179. Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal. (¶71)

(b)     Hayward testified that he was knowledgeable about the scope and implementation of OMS through his participation in GORC and that he was responsible for overseeing OMS development and implementation, which gave him detailed knowledge about the scope of OMS. (¶72-73).

(c)     Hayward and other members of GORC received regular status updates concerning the scope and implementation of OMS via the Orange Book.  As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS. (¶74)

(d)     Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS.  (¶76)

(e)     The testimony of John Mogford, BP's former Global Head of Safety & Operations and a GORC member, in MDL 2185 confirmed that Hayward and Inglis knew that OMS applied only to rigs that BP owned, because the scope of OMS was discussed and approved by GORC.  (¶86)

315.    The statements and omissions regarding continuous progress against an independent external report (the Baker Panel report) and its implementation of OMS were material to investors because, among other reasons, the statements pertained to BP's purported process safety reforms, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  Indeed, Hayward touted to investors that OMS would be

the cornerstone of BP's efforts to improve its process safety protocols and to prevent major accidents in the wake of the Texas City disaster.  (¶¶ 71, 82, 90)

316.    BP is vicariously responsible for Hayward's misrepresentations and omissions as these statements were made within the scope of his role as BP's President and Chief Executive and in order to discharge his duties and responsibilities.

## E.    The March 4, 2009 Statements

317.    On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by Hayward.  In the report, BP misrepresented the scope and implementation of its OMS, BP's marquee process safety initiative, and made numerous false statements about its supposed safe practices and the quality of its deepwater Gulf of Mexico operations. Specifically, the Form 20-F stated, in part, as follows:

> We continue to implement our new operating management system *(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.*

> When fully implemented, *OMS will be the single framework* within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . .  The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis.  BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability.  A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

> All operated businesses plan to transition to OMS by the end of 2010.  *Eight sites completed the transition to OMS in 2008*; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, *the Gulf of Mexico*,  Colombia and the Endicott field in Alaska. . . .  For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators.  A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks. As part of its transition to OMS, a site

issues its local OMS handbook, and this summarizes its approach to risk management.  Each site also develops a plan to close gaps that is reviewed annually.  The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively.

Experience so far has supported our expectation that having one integrated and coherent system brings benefits of simplification and clarity, and that the process of change is supporting our renewed commitment to safe operations.

\* \* \*

●     Executive management has taken a range of actions to demonstrate their leadership and commitment to safety.  The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP.  Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. . . .

318.   BP and Hayward's claim that OMS provided "a framework for operations across BP . . . in every site" was false and misleading and omitted to disclose material information when made.  At the hearing on the motion to dismiss in MDL 2185, BP admitted that OMS did not apply to BP's operations on rigs that were operated, but not owned, by BP (*see* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20), thus demonstrating the falsity of the statements.  Further, Hayward's deposition testimony in MDL 2179 confirmed that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon*. (¶87)  As a result, OMS did not apply to the vast majority of BP's drilling operations in the Gulf of Mexico at the time of the explosion of the *Deepwater Horizon*.

319.   BP and Hayward knew, or were reckless in not knowing, that in stating that OMS provided "a framework for operations across BP . . . in every site," the Company omitted to disclose the material fact that OMS would not apply to rigs operated, but not owned, by BP, as demonstrated by the following, among other evidence:

112

(a)      GORC, which was tasked with oversight and implementation of OMS, met monthly and included sectional CEOs, with Hayward as Committee Chair.  Additional information regarding GORC's duties and responsibilities has been produced in MDL 2179. Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶71)

(b)      Hayward and Inglis testified that they were knowledgeable about the scope and implementation of OMS through their participation in GORC and that they were responsible for overseeing OMS development and implementation, which gave them detailed knowledge about the scope of OMS.  (¶72-73)

(c)      Hayward, Inglis and other members of GORC received regular status updates concerning the scope and implementation of OMS via the Orange Book.  As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS.  (¶74)

(d)      Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS.  (¶76)

(e)      The testimony of John Mogford, BP's former Global Head of Safety & Operations and a GORC member, in MDL 2185 confirmed that Hayward and Inglis knew that OMS applied only to rigs that BP owned, because the scope of OMS was discussed and approved by GORC.  (¶89)

320.   BP and Hayward's claim that BP's operations in the Gulf of Mexico had "completed the migration to OMS in 2008" was false and misleading and omitted to disclose material information.  At the hearing on the motion to dismiss in MDL 2185, BP conceded that this statement was false and misleading when made.   MTD Hr'g Tr. (Dkt. 304) at 58: 15-21

113

("The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that that is a statement of specific fact . . . that the plaintiffs have alleged and that I will admit to the Court is not accurate").  (¶91)

321.   BP, through its Executive Officers and Directors, and Hayward knew or should have known that the Company's claim that its operations in the Gulf of Mexico had "completed the transition to OMS in 2008" was false and misleading when made and omitted to disclose material information as demonstrated by, among other evidence:

(a)      Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  (¶¶93-94)

(b)      Other BP personnel, including GORC member John Baxter, testified that OMS had not been implemented in the Gulf of Mexico as of April 2010.  (¶88)

(c)      A January 24, 2011 *Fortune* magazine article entitled "BP:  An Accident Waiting to Happen," revealed a previously unreleased internal BP strategy document issued in December 2008 that pertained to OMS implementation. The strategy document warned GORC members, including Hayward and Inglis, that there were still "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform Company-wide process safety procedures.

(d)      Additional information regarding Defendant's knowledge as to the timing of the transition to OMS in the Gulf of Mexico has been produced in MDL 2179.

114

Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶97)

322.    BP and Hayward's statements regarding the scope and implementation of OMS were material to investors because, among other reasons, the statements pertained to BP's purported process safety reforms, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  Indeed, Hayward touted to investors that OMS would be the cornerstone of BP's efforts to improve its process safety protocols and to prevent major accidents in the wake of the Texas City disaster.  (¶¶ 71, 82, 90)

**F.    The April 16, 2009 Statements**

323.    On April 16, 2009, BP issued its 2008 Sustainability Review, which contained a "Group Chief Executive's Review" containing remarks by Hayward.  Hayward stated, in part: "You can see a similar balanced approach in our new *operating management system (OMS), which is to be implemented at each BP site.  It covers everything from compliance and risk management through to governance and measuring results."*

324.    BP and Hayward's statements that BP was implementing OMS "at each BP site" and that the OMS would "cover everything from compliance and risk management through to governance and measuring results" were false and misleading and omitted to disclose material information when made.  At the hearing on the motion to dismiss in MDL 2185, BP's counsel admitted that OMS did not apply to rigs operated, but not owned, by BP.  See MTD Hr'g (Dkt. No. 304) at 66:6-68:20.  In addition, Hayward's deposition testimony in MDL 2179 confirmed that BP's OMS and safety systems did not apply to third-party contractor in the Gulf of Mexico, including the Deepwater Horizon.  (¶87)  As a result, OMS did not apply to the vast majority of

BP's drilling operations in the Gulf of Mexico at the time of the explosion of the *Deepwater Horizon*.

325.   BP and Hayward  knew or were reckless in not knowing the statements were false and misleading and omitted material information, as demonstrated by the following, among other evidence:

(a)   The GORC, which was tasked with oversight and implementation of OMS, met monthly and included section CEO's, with Hayward as Committee Chair.  As such, Hayward duties and responsibilities at BP required him to be intimately familiar with the details and scope of OMS implementation.  (¶71)

(b)   Hayward admitted at his deposition in MDL 2179 that he had detailed knowledge about the scope and implementation of OMS through his participation in GORC, and that he was responsible for overseeing OMS development and implementation. (¶¶ 72-73)

(c)   Hayward, Inglis, and other members of GORC received regular status updates concerning the scope and implementation of OMS via the Orange Book.  As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS.  (¶74)

(d)   Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS.  (¶76)

(e)   The testimony of John Mogford, BP's former Global Head of Safety & Operations and a GORC member, in MDL 2179 confirmed that Hayward and Inglis knew that OMS applied only to rigs that BP owned, because the scope of OMS was discussed and approved by GORC.  (¶86)

326.   BP and Hayward's statements regarding the scope and implementation of OMS were material to investors because, among other reasons, the statements pertained to BP's purported process safety reforms, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  Indeed, Hayward touted to investors that OMS would be the cornerstone of BP's efforts to improve its process safety protocols and to prevent major accidents in the wake of the Texas City disaster.  (¶¶ 71, 82, 90)

327.   BP is vicariously liable for Hayward's misrepresentations and omissions as these statements were made within the scope of his role as BP's President and Chief Executive Officer and in order to discharge his duties and responsibilities.

## G.   The February 26, 2010 Statements

328.       On February 26, 2010, BP issued its 2009 Annual Review.  In the Annual Review, BP made misrepresentations concerning the scope of OMS.  In a section entitled "Sustaining momentum and growth," BP acknowledged that its safety protocols are material to investors by including a separate section on safety entitled "Safety, reliability, compliance and continuous improvement."  That section states:

> Safe, reliable and compliant operations remain the group's first priority.  A key enabler for this is the BP operating management system *(OMS), which provides a common framework for all BP operations*, designed to achieve consistency and continuous improvement in safety and efficiency.  Alongside mandatory practices to address particular risks, *OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework*.

329.       BP's statement that in February 2010 the OMS "provides a common framework for all BP operations" and that the "OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in

accordance with the group-wide framework" were false or misleading when made, and omitted to disclose material facts necessary to make the statements not misleading.  At the hearing on the motion to dismiss in MDL 2185, BPs' counsel admitted that OMS did not apply to rigs operated, but not owned, by BP.  See MTD Hr'g (Dkt. No. 304) at 66:6-68:20.  In addition, Hayward's deposition testimony in MDL 2179 confirmed that BP's OMS and safety systems did not apply to rigs operated, but not owned, by BP, including the *Deepwater Horizon*.  (¶87)  As a result, OMS did not apply to the vast majority of BP's drilling operations in the Gulf of Mexico at the time of the explosion of the *Deepwater Horizon*.

330.     BP knew or was reckless in not knowing that when representing  in February 2010 the OMS was to be "implemented at each BP site," BP was omitting the material facts that the OMS was still in its pilot phase in the Gulf of Mexico and it was never intended to apply to contracted drilling rigs such as the *Deepwater Horizon*, as demonstrated by the following, among other evidence:

(a)     The GORC, which was tasked with oversight and implementation of OMS, met monthly and included section CEOs, with Hayward as Committee Chair.  As such, Hayward duties and responsibilities at BP required him to be intimately familiar with the details and scope of OMS implementation.  (¶71)

(b)     Hayward and Inglis admitted at their depositions in MDL 2179 that they had detailed knowledge about the scope and implementation of OMS through his participation in GORC, and that he was responsible for overseeing OMS development and implementation.  (¶¶72-73)

(c)     Hayward, Inglis and other members of GORC received regular status updates concerning the scope and implementation of OMS via the Orange Book.  As described

by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS.  (¶74)

          (d)       Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS.  (¶76)

          (e)       The testimony of John Mogford, BP's former Global Head of Safety & Operations and a GORC member, in MDL 2179 confirmed that Hayward and Inglis knew that OMS applied only to rigs that BP owned, because the scope of OMS was discussed and approved by GORC.  (¶86)

          (f)       Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010. (¶¶93-94)

          (g)      Moreover, Hayward and Inglis (and other GORC members) made the decision not to apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon*.  (¶88)  *See also* Armstrong Dep. at 207:20-208:18.

331.     The foregoing statements regarding BP's implementation of OMS were material to investors because, among other reasons, the statements pertained to BP's process safety implementation of the Baker Panel recommendations, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  Indeed, Hayward touted to investors that OMS would be the cornerstone of BP's efforts to improve its process

119

safety protocols and to prevent major accidents in the wake of the Texas City disaster.  (¶¶ 71, 82, 90)

## H.    The March 5, 2010 Statements

332.    On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by Hayward.  In the report, BP continued to tout its position as the largest producer of oil in deepwater Gulf of Mexico operations while delivering safety in its operations. In addition, the Form 20-F falsely stated, in part, that:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the *BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency*.

> \* \* \*

> This performance follows several years of intense focus on training and procedures across BP. *BP's operating management system (OMS), which provides a single operating framework for all BP operations*, is a key part of continuing to drive a rigorous approach to safe operations.  2009 marked an important year in the continuing implementation of OMS.

> \* \* \*

> Our OMS covers all areas from process safety, to personal health, to environmental performance.

> \* \* \*

> *Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments*, *including*: the establishment of a safety & operations (S&O) function with the highest caliber of staff; *development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites*; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. Throughout this time the group chief executive has made safety the number one priority.

333.     BP and Hayward's statements that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites" were false or misleading when made, and omitted to disclose material facts necessary to make the statements not misleading.  At the hearing on the motion to dismiss in MDL 2185, BP admitted that OMS did not apply to BP's operations on rigs unless the rig was owned by BP (*see* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20), thus demonstrating the falsity of Hayward's statements.  Further, Hayward's deposition testimony in MDL 2179 confirmed that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon* (¶87).   As a result, OMS did not apply to the vast majority of BP's drilling operations in the Gulf of Mexico at the time of the explosion of the *Deepwater Horizon*.

334.     BP and Hayward knew or were reckless in not knowing that when representing OMS was a "group-wide" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," that the OMS would not apply to rigs operated, but not owned, by BP, as demonstrated by the following, among other evidence:

(a)     GORC, which was tasked with oversight and implementation of OMS, met monthly and included sectional CEOs, with Hayward as Committee Chair.  Additional information regarding GORC's duties and responsibilities has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶71)

(b)     Hayward and Inglis testified that they were knowledgeable about the scope and implementation of OMS through their participation in GORC, and that Hayward was responsible for overseeing OMS development and implementation.  As such, Hayward had detailed knowledge about the scope of OMS implementation. (¶72-73)

(c)      Hayward, Inglis, and other members of GORC received regular status updates concerning the scope and implementation of OMS via the Orange Book.  As described by Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS.  (¶74)

(d)      The testimony of John Mogford, BP's former Global Head of Safety & Operations and a GORC member, in MDL 2185 confirmed that Hayward and Inglis knew that OMS applied only to rigs that BP owned, because the scope of OMS was discussed and approved by GORC.  (¶86)

335.      BP and Hayward's statement that "[f]ollowing the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments" was false and misleading when made, and omitted to disclose material facts necessary to make the statements not misleading, as demonstrated by, among other evidence,  the following findings of the Presidential Commission:  BP's "***approach to managing safety has . . . not [been] on process safety***.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety" (¶16); "[T]he [*Deepwater Horizon*] blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, ***the root causes are syste**mic [to BP]*" (¶15); There was **no "*comprehensive and systematic risk-analysis***, peer-review, or management of change process" for any of the key decisions leading up to the explosive loss of the *Deepwater Horizon* (¶108).  In addition, the National Academy of Engineering similarly found that, "The various failures mentioned in this report indicate the lack of a suitable approach for anticipating and managing the inherent risks, uncertainties, and

dangers associated with deepwater drilling operations and a failure to learn from previous near misses. . . . ***Of particular concern is an apparent lack of a systems approach*** that would integrate the multiplicity of factors potentially affecting the safety of the well, monitor the overall margins of safety, and assess the various decisions from perspectives of well integrity and safety."

336.     BP and Hayward knew, or were reckless in not knowing, that their statement that "[f]ollowing the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments" was false and misleading and omitted to disclose material information, as demonstrated by the following, among other evidence:

(a)     When Hayward became CEO in May 2007, one of his first commitments was to "focus on safety like a laser," a commitment that he reiterated throughout the Relevant Period.  (¶11)

(b)     Between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – all of BP's main competitors combined had only 22 citations during this period.  (¶165)

(c)     In addition, internal BP documents evidencing Defendant's knowledge of ongoing process safety issues have been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶148)

123

337.     The foregoing statements were material to investors because, among other reasons, the statements pertained to BP's process safety and implementation of the Baker Panel recommendations, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  Indeed, Hayward touted to investors that OMS would be the cornerstone of BP's efforts to improve its process safety protocols and to prevent major accidents in the wake of the Texas City disaster.  (¶¶ 71, 82, 90)

**I.     The March 22, 2010 Statements**

338.    On March 22, 2010, Inglis delivered a speech discussing BP's Gulf of Mexico Operations at the Howard Weil Energy Conference in New Orleans, Louisiana, which bills itself as "one of the premier investor conferences in the energy industry."  *See* http://howardweil.com/energy-conference.aspx. BP posted a transcript of the speech on its publicly-accessible website.  During the presentation, Inglis stated, in part:

> We are currently planning to make final investment decisions for 24 new major projects in the next two years.  Each project has been high-graded though our project selection and progression process.  They are concentrated in the Gulf of Mexico, the North Sea, Azerbaijan and Angola – high margin production areas that improve the portfolio and enable profitable growth.
>
> * * *
>
> Safety and operational integrity underpins everything we do, and ***we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.***  And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

339.     Inglis's statements the BP was "now in the final phase of rolling out our operating management system" and that said system "provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance" were false and misleading and omitted to disclose material information when

124

made. At the hearing on the motion to dismiss in MDL 2185, BP admitted that OMS did not apply to rigs operated, but not owned, by BP. *See* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20. As of the date of Inglis' statement, OMS applied to only one drilling rig out of the seven drilling rigs in Gulf of Mexico, the BP-owned PDQ on *Thunderhorse*. (¶88) Hayward's deposition testimony in MDL 2179 confirmed that BP's OMS and safety systems did not apply to rigs operated, but not owned, by BP, including the *Deepwater Horizon*. (¶87) As a result, OMS did not apply to the vast majority of BP's drilling operations in the Gulf of Mexico at the time of the explosion of the *Deepwater Horizon*.

340.     Inglis knew or was reckless in not knowing that his statements were false and misleading and omitted to disclose material information, as demonstrated by the following, among other evidence:

(a)     As Chief Executive of Exploration and Production, Inglis knew, or was reckless in not knowing, that as of the date of this statement, OMS applied to only one drilling rig out of the seven drilling rigs in Gulf of Mexico, the BP-owned PDQ on *Thunderhorse*. (¶88)

(b)     Inglis was a member of GORC, and as such, was charged with oversight and implementation of OMS with respect to exploration and production activities in the deepwater Gulf of Mexico. (¶¶34,71-72)

(c)     Moreover, Inglis received the quarterly Orange Book that contained detailed reports concerning the scope of OMS and revealed that the status of its implementation across BP's various business units, including Exploration and Production in the Gulf of Mexico, was incomplete. (¶¶74-75)

(d)      Inglis (and other GORC members) made the decision not to apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon.* (¶88); *see also* Armstrong Dep. at 207:20-208:18.

(e)      Inglis testified in MDL 2185 that "[o]ne of the purposes of OMS would be to prevent loss of primary containment."  Inglis Dep. at 242:23-243:9.  Moreover, on July 13, 2009, Inglis sent an email to the Upstream Senior Leadership Team that expressed concern over contractor operated rigs – *e.g.* the *Deepwater Horizon* – not conforming to BP's Control of Work practices.  (¶ 151)   Additional information regarding BP's Control of Work practices has been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.

(f)      BP had only begun to implement its OMS in a pilot stage in the Gulf of Mexico when BP, in part due to a re-organization led by Inglis, terminated and/or displaced the key employees responsible for the implementation of OMS.  According to CW2 it was not true that BP was in the final stages of rolling out OMS in the Gulf of Mexico in 2010 and employees in key positions, including Wells Team Leaders and Well Site Leaders, in Gulf of Mexico operations had no knowledge of OMS requirements. (¶¶98-106)

341.      The foregoing statements were material to investors because, among other reasons, the statements pertained to BP's process safety and implementation of the Baker Panel recommendations, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  Indeed, Hayward touted to investors that OMS would be the

cornerstone of BP's efforts to improve its process safety protocols and to prevent major accidents in the wake of the Texas City disaster.  (¶¶ 71, 82, 90)

342.    BP is vicariously liable for Inglis's misrepresentations and omissions because they were published on BP's publically accessible website and Inglis made these statements in the discharge of his duties and responsibilities as BP's Chief Executive Officer of Exploration and Production.

**J.  The March 23, 2010 Statements**

343.    On March 23, 2010, Hayward delivered a speech at the Peterson Institute for International Economics in Washington, D.C. in which he discussed BP's changes to its safety program following the Texas City, Texas refinery explosion.  BP posted a transcript of the speech on its publicly-accessible website.  During the presentation, Hayward falsely stated, in part, that:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery**.**
>
> ***That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority.**

344.    Hayward's statement that the Texas City disaster changed "BP's approach to safety and operations integrity" and, as a result, that "providing a safe working environment is a paramount responsibility, and [BP's] first and foremost priority" was false and misleading when made, and omitted to disclose material facts necessary to make the statements not misleading, as demonstrated by, among other evidence, the following findings of the Presidential Commission: BP's "*approach to managing safety has . . . not [been] on  process safety*.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety"

(¶16); "[T]he [*Deepwater Horizon*] blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, ***the root causes are systemic*** [to BP]" (¶15); There was ***no "comprehensive and systematic risk-analysis***, peer-review, or management of change process" for any of the key decisions leading up to the explosive loss of the *Deepwater Horizon* (¶108). In addition, the National Academy of Engineering similarly found that, "The various failures mentioned in this report indicate the lack of a suitable approach for anticipating and managing the inherent risks, uncertainties, and dangers associated with deepwater drilling operations and a failure to learn from previous near misses. . . .  ***Of particular concern is an apparent lack of a systems approach*** that would integrate the multiplicity of factors potentially affecting the safety of the well, monitor the overall margins of safety, and assess the various decisions from perspectives of well integrity and safety.

345.    Hayward knew, or was reckless in not knowing, that his statements were false and misleading and omitted to disclose material information, as demonstrated by the following, among other evidence:

(a)    When Hayward became CEO in May 2007, one of his first commitments was to "focus on safety like a laser," a commitment that he reiterated throughout the Relevant Period.  (¶11)

(b)    Between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97 percent of all willful violations found by OSHA in all

U.S. refineries during the same period – all of BP's main competitors combined had only 22 citations during this period.  (¶165)

(c)     In addition, internal BP documents evidencing Defendant's knowledge of ongoing process safety issues have been produced in MDL 2179.  Pursuant to the protective order in that case, and Defendant's assertion of confidentiality over this material, Plaintiffs have previously filed the additional information under seal.  (¶148)

346.     The foregoing statements were material to investors because, among other reasons, the statements pertained to BP's process safety and implementation of the Baker Panel recommendations, which directly affected the Company's risk profile.  Following the release of the Baker Panel report, BP consistently stated that it would implement the mandates of the report across all of its operations.  (¶¶ 71, 82, 90)

347.     BP is vicariously liable for Hayward's misrepresentations and omissions as these statements were made within the scope of his role as BP's President and Chief Executive Officer and in order to discharge his duties and responsibilities.

### As the Truth Begins to Emerge, BP Continues to Deceive Investors

### April 20, 2010

348.     On the evening of April 20, 2010, after the markets closed, the Macondo well suffered a significant – yet preventable – blowout, leading to a fatal explosion aboard the *Deepwater Horizon* killing 11 crew members and injuring many others.  After attempts to stop the blowout failed, the surviving crew members abandoned ship, as the rig became engulfed in flames.  Oil and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico.

### April 21, 2010

349.     On April 21, 2010, BP issued two press releases about the *Deepwater Horizon* explosion.  In the first press release, BP confirmed a statement by Transocean reporting a fire aboard the rig.  In the second press release, BP offered its full support to Transocean and said it "stood ready to assist" in responding to the tragedy.  However, both press releases failed to disclose that oil was already leaking from the Macondo well into the Gulf of Mexico.

**April 22, 2010**

350.     At approximately 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* rig sank, further damaging the riser that had connected the rig to the wellhead on the ocean floor.

**April 24 - 26, 2010**

351.     On Saturday, April 24, 2010, while the unsuccessful attempts to activate the BOP continued, ROVs discovered additional leaks in the broken riser.  Although officials had initially estimated that it would take the ROVs 24 to 36 hours to deploy the BOP, by Monday, April 26, 2010, oil continued to spew into the Gulf of Mexico.  This news caused BP's ordinary shares to fall 31.8p, or 5%, to close at 610p per share on April 27, 2010.

**K.     The April 24, 2010 Statement**

352.     On April 24, 2010, Suttles participated in a joint press conference with Coast Guard leader Rear Admiral Landry. Suttles participated in the press conference as BP's lead representative at the Unified Command. At the press conference, Suttles stated that BP had detected ongoing releases of oil from the Macondo well at a rate of approximately 1,000 barrels per day at the seabed. At the same press conference, Rear Admiral Landry also stated that oil was leaking from the Macondo well at a rate of approximately 1,000 barrels per day: "It's 1,000 barrels emanating from 5,000 feet below the surface." Suttles failed to correct Landry's

erroneous statement. Prior to the press conference, Landry had asked Suttles if he could support a flow rate estimate of 1,000 barrels per day and Suttles said yes.

353.    Suttles' misrepresentation was materially false or misleading when made and was known by Suttles to be false at that time or was made with reckless disregard for the truth because it falsely represented that the amount spilling from the Macondo well was approximately 1,000 barrels of oil per day when, in fact, the true rate was much higher. Suttles failed to disclose that the Company's internal estimates of the amount of oil flowing from the well were much higher than the 1,000 barrels per day stated by Suttles and Rear Admiral Landry.

354.    For example, on April 21, 2010, Suttles' deputy, David Rainey, among others, received an email containing a worst-case oil discharge rate from the Macondo well of 100,000 barrels of oil per day. *See* BP-HZN-2179MDL04925832. This worst-case discharge calculation was arrived at using sophisticated software modeling, with the participation of all the reservoir engineers in BP's Gulf of Mexico Exploration Division. *See id*. Mr. Rainey is currently under federal indictment for obstruction of a Congressional Committee investigation and making false statements to a federal prosecutor regarding BP's internal flow rate estimates. *See United States of America v. David Rainey*, 2:12-cr-00291-KDE-DEK (E.D. La.).

355.    An internal BP document also dated April 22, 2010 contained a "flow rate and production profile" for the Macondo well which contained a high-end flow rate estimate above 97,000 barrels per day. See BP-HZN-2179MDL00442709-12. These calculations were created by the principle reservoir engineer for the Macondo well. *See id.*; Bozeman Dep. at 16:21–17:2.

356.    Another internal email dated April 22, 2010 discusses a flow rate estimate of 82,000 barrels per day, which was calculated by Alistair Johnston, an expert retained by BP. *See*

BP-HZN-2179MDL05004973. Mr. Johnston's flow rate estimate was specifically designed to approximate flowing conditions on the Macondo well. *See id.*

357.    Also on April 22, 2010, BP drilling engineer Kurt Mix used computer software to model oil flow rates from the Macondo well, which resulted in estimated flow rates of 64,000; 93,000; 110,000; and 138,000 barrels per day. *See* BP-HZN-2179MDL04815271. Mr. Mix has been convicted of obstructing a federal investigation into the Macondo oil spill by deleting text messages and voice mails relevant to, among other things, BP's internal flow rate estimates. *See United States of America v. Kurt Mix*, 2:12-cr-00171-SRD-SS (E.D. La.).

358.    On April 23, 2010, BP's Ryan Malone sent an email, on which Suttles was copied, providing an estimated flow rate of 31 gallons per minute (which equals approximately 1,417 barrels per day). The next day, (before Suttles made his April 24 misrepresentation) Malone sent another email, again copying Suttles, warning all to "[d]isregard the estimate for flowrate" previously sent because "[i]t is wrong[.]" *See* BP-HZN-2179MDL00441598.

359.    All of the internal flow rate estimates and information cited above in ¶¶ 353-358 preceded Suttles' and Landry's statements at the April 24, 2010 press conference. Suttles had a duty to disclose these internal flow rate estimates in order to make his statement not misleading. Suttles conceded in his MDL 2179 deposition that he purposefully did not avail himself of these internal reports prior to making any of his public statements regarding the Macondo flow rate. *See* Suttles Dep. at 435:15-436:19 (testifying that he never "engage[d] with [BP's] flow assurance people" on their calculations of potential flow rates prior to his publicly providing estimates of the flow rates). Suttles further testified that he was "very concerned" about the inaccuracy of publicly providing an inaccurate flow rate because it was "so difficult to predict" and "could be inaccurate." *See id.* at 346:7-16; 403:23-404:14; 436:11-16.

360.     BP is vicariously responsible for Suttles' misrepresentations and omissions as these statements were made within the scope of his role as  BP's Chief Operating Officer for Exploration and Production and in order to discharge his duties and responsibilities.

**L.     The April 28-29, 2010 Statements**

361.     On April 28, 2010, after the markets closed, Coast Guard leader Rear Admiral Landry announced during a joint press conference with BP that NOAA had increased its estimate of the oil flow rate from 1,000 to 5,000 barrels per day.  During the joint press conference, Suttles again reiterated that BP's best estimate was that ***1,000 barrels of oil per day were flowing from the Macondo well***.  In addition, Suttles stated, in part, as follows:

> Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak.  This leak is just beyond the top of the blowout preventer in the pipe work called the riser.  Given the location, ***we do not believe this changes the amount currently estimated to be released***.

362.     On April 29, 2010, Department of Homeland Security Janet Napolitano announced that "***today I will be designating that this is a spill of national significance***."  On the same day, Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well.  For example, during an interview with The Early Show, Suttles stated, in part, as follows:  "***I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today***."  Suttles made a nearly identical false statement later in the day during an interview with The Today Show.

363.     Suttles's April 28 statements that the flow rate was 1,000 barrels per day and his April 29 statement estimating a flow rate of 1,000-5,000 per day were false and misleading and omitted to disclose material information when made.  The Flow Rate Technical Group, established by the National Incident Command, concluded that the flow rate was 62,000 barrels per day, which declined to 53,000 barrels per day as the reservoir was depleted.

364.     Suttles knew or was reckless in not knowing that his estimates of flow rates on April 28 and 29 were false and misleading and omitted material information, as demonstrated by the following, among other evidence:

(a)     In a hearing before the U.S. House of Representatives on May 26, 2010, Representative Edward Markey was outraged about Suttles' misrepresentations and stated, in part, as follows:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking. According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. *Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.*
>
> * * *
>
> BP has also turned over another document dated April 26 [2010] which includes a 5,000 barrel per day figure as well. *So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels* that were spilling into the Gulf every day.

(b)     David Rainey's deposition testimony in MDL 2179 indicated that one internal estimate of the amount of oil flowing from the well was as high as 92,000 barrels per day.  These figures were provided to BP's senior management in two internal BP documents created April 26, 2010 and April 27, 2010 – *i.e., before* Suttles made his public misrepresentations.  Rainey Dep. at 146:2-150:24, 153:3-160:17.

(c)     In his book on the *Deepwater Horizon* incident, former drilling engineer Bob Cavnar explained that **"[n]o one in the industry ever believed the flow was less than 20,000 barrels a day**."  In an interview, Cavnar further explained that "If pressure directly from the pay

sands blows out a major deepwater rig, by definition it's going to result in a very significant flow of oil."

(d)　　Likewise, in a May 27, 2010 news conference, President Obama remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

> *I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public interest.*　I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming. So my attitude **is** *we have to verify whatever it is they say about the damage*.

> This is an area, by the way, where I do think our efforts fell short.　And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front.　But I do believe that *when the initial estimates came that there were -- it was 5,000 barrels spilling into the ocean per day*, that was based on satellite imagery and satellite data that would give a rough calculation.　*At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like*.

(e)　　A grand jury has been empanelled on this very issue of BP's intentional deception in connection with the actual spill rate, according to a July 2011 public filing by Halliburton.

365.　　The rate of oil flow from the Macondo would have been material to BP investors because it would bear directly upon the legal and financial liabilities facing the Company in the aftermath of the Deepwater Horizon disaster.　Under the Clean Water Act, for example, the Company could owe fines of as much as $4,300 for every barrel of oil spilled, in addition to royalties for the oil it squandered.

366.　　BP is responsible for Suttles's misrepresentations and omissions as these statements were made within the scope of his role as the Chief Operating Officer of BP's Exploration and Production and in order to discharge his duties and responsibilities.

**May 3, 2010**

367.     On May 3, 2010, after initially blaming Transocean and others for the Macondo well blowout and spill, BP admitted that it was fully responsible for the disaster in the Gulf of Mexico.  More specifically, Hayward told NPR's Steve Inskeep that:  "It is indeed BP's responsibility to deal with this, and we are dealing with it . . . .  We will absolutely be paying for the cleanup operation.  There is no doubt about that.  It's our responsibility – we accept it fully."  On this news, the Company's ordinary shares fell from 575.5p per share on Friday, April 30, 2010 to close at 552.84p per share on Tuesday, May 4, 2010, the next trading day.

## M. The May 5, 2010 Statements

368.     On May 5, 2010, Hayward conducted an interview with journalists from the Houston Chronicle, at BP's offices in Houston.  In reference to the oil flow rate at the Macondo well, Hayward stated, "*A guesstimate is a guesstimate.  And the guesstimate remains 5,000 barrels a day*."

369.     Hayward's statements that the best "guestimate" of the Macondo's flow rate on May 5, 2010 was 5,000 barrels per day was false and misleading and omitted to disclose material information when made.  The Flow Rate Technical Group, established by the National Incident Command, concluded that the flow rate was 62,000 barrels per day, which declined to 53,000 barrels per day as the reservoir was depleted.  *See* *http://www.doi.gov/deepwaterhorizon/loader.cfm?csModule=security/getfile&PageID=237763*

370.     Hayward knew or was reckless in not knowing that his estimate of flow rates was false and misleading and omitted material information, as demonstrated by the following, among other evidence:

(a)      In a hearing before the U.S. House of Representatives on May 26, 2010,

Representative Edward Markey was outraged about BP's misrepresentations and stated, in part,

as follows:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking. According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. ***Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.***
>
> * * *
>
> BP has also turned over another document dated April 26 [2010] which includes a 5,000 barrel per day figure as well. ***So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels*** that were spilling into the Gulf every day.

(b)      David Rainey's deposition testimony in MDL 2179 indicated that one

internal estimate of the amount of oil flowing from the well was as high as 92,000 barrels per

day.  These figures were provided to BP's senior management in two internal BP documents

created April 26, 2010 and April 27, 2010.  Rainey Dep. at 146:2-150:24, 153:3-160:17.

(c)      In his book on the *Deepwater Horizon* incident, former drilling engineer

Bob Cavnar explained that **"[n]o one in the industry ever believed the flow was less than**

**20,000 barrels a day."**  In an interview, Cavnar explained further  "If pressure directly from

the pay sands blows out a major deepwater rig, by definition it's going to result in a very

significant flow of oil," he said.

(d)      Likewise, in a May 27, 2010 news conference, President Obama

remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

> *I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public*

137

*interest.* I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming. So my attitude is *we have to verify whatever it is they say about the damage.*

This is an area, by the way, where I do think our efforts fell short.  And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front.  But I do believe that *when the initial estimates came that there were -- it was 5,000 barrels spilling into the ocean per day,* that was based on satellite imagery and satellite data that would give a rough calculation.  *At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like.*

(e)      Moreover, a grand jury has been empanelled on this very issue of BP's intentional deception in connection with the actual spill rate, according to a July 2011 public filing by Halliburton.

371.      The rate of oil flow from the Macondo well would have been material to BP investors because it would bear directly upon the legal and financial liabilities facing the Company in the aftermath of the Deepwater Horizon disaster.  Under the Clean Water Act, for example, the company could owe fines of as much as $4,300 for every barrel of oil spilled, in addition to royalties for the oil it squandered.

372.      BP is responsible for Hayward's misrepresentations and omissions as these statements were made within the scope of his role as BP's President and Chief Operating Officer and in order to discharge of duties and responsibilities.

## SUBSEQUENT STATEMENTS AND EVENTS

**The Saturday May 29 – June 1, 2010 Statements**

373.      On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed.  The failure of the "top kill" indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells.  The failed attempt to kill the well by

138

using the "top kill" and "junk shot" efforts shocked investors.  As noted by ABC News on Saturday, May 29, 2010:  "We begin tonight with ***breaking news*** from the Gulf***.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed. . . . That live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis***."  Similarly, on that same day, the Agence France Presse reported, in part, that:  "***The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history*** . . ." Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "***slaughtered in London trading on Monday***."

374.    On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided ***new*** evidence that:

> Internal documents from BP show that there were serious problems and safety concerns with the Deepwater Horizon rig ***far earlier than those the company described to Congress last week.***
>
> * * *
>
> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control."  ***And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.***

375.    On Tuesday, June 1, 2010, minutes before the close of the U.S. market, U.S. Attorney General Eric Holder announced that the U.S. Department of Justice had opened formal criminal and civil probes into BP in response to the oil spill and its false assurances that it could stop the flow of oil.  On the disclosure of the failed top kill procedure and *The New York Times*

article, the Company's ordinary shares fell from 494.8p per share on Friday, May 28, 2010 to

close at 430p per share on June 1, 2010, a decline of 64.8p per share, or more than 13%.

**June 2, 2010**

376.     On June 2, 2010, Hayward admitted that it was "an entirely fair criticism" to

blame BP for the disorganized and poor cleanup effort because ***"[w]hat's undoubtedly true is***

***that we did not have the tools you would want in your tool kit"*** to stop the leak from the

Macondo well in the Gulf of Mexico in the aftermath of the explosion.

**June 9, 2010**

377.     On June 9, 2010, fears that the Company would suspend dividends caused a

further decline in BP securities.  On this news, the Company's ordinary shares fell from 408.9p

per ordinary share on June 8, 2010 to close at 391.9p per ordinary share on June 9, 2010, a

decline of 17p or 4%.

378.     Speculation regarding the possibility that BP would suspend dividend

payments continued on June 9, 2010.  An Associated Press article published on the afternoon of

June 9, 2010 entitled "Dividend Worries Weigh on BP Shares" explained, "cutting the dividend

would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from

companies in the blue-chip FTSE 100 index . . . ."  On this news, and after the markets re-

opened, BP ordinary shares fell an additional 7% from 391.9p per share on June 9, 2010 to

365.5p per share on June 10, 2010.

**June 14, 2010**

379.   Then, on June 14, 2010, BP's Board of Directors met to discuss suspending the

Company's dividend payments in light of the Company's agreement to setup a $20 billion claim

fund for damages caused by the *Deepwater Horizon* catastrophe.  On that date, *The New York Times* reported, in part, as follows:

> To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually. Senate Democrats are asking BP to set up a $20 billion cleanup fund. BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating income. ***But in response to the federal government's requests, BP's board met Monday to consider its options.***   A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called.   ***A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.***

380.    On this disclosure, according to a news source:  "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."  BP ordinary shares closed at 362p per share on June 14, 2010, down 7.629% from the prior day's closing price of 391.9p per share.

## X.    LOSS CAUSATION

381.    Defendant's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  Throughout the Relevant Period, the market prices of BP ordinary shares were artificially inflated as a direct result of Defendant's materially false and misleading statements and omissions.  For example, prior to the *Deepwater Horizon* incident, securities analysts touted BP's renewed dedication to safety and BP's operations in  the Gulf of Mexico as one of the main focuses for BP's future results:

- A February 28, 2008 analyst report from JP Morgan stated that "Safety and operations: although BP has already made significant progress in this area through the

implementation of the Baker panel recommendation and their 'sixpoint plan', safety and operations remains one of BP's main priorities."

- An October 9, 2009 analyst report from Bank of America stated that "[w]e believe that the focus of results will centre around . . . the ongoing exploration effort in the Gulf of Mexico (GoM) . . ."

- A February 1, 2010 analyst report from Dolmen Stockbrokers stated "we also foresee better production figures as a consequence of early restoration of operations at the company's US refineries and the ramping up of production in the Gulf of Mexico."

- A March 3, 2010 analyst report from Bank of America stated that "the development of recent deepwater discoveries in the GoM (eg, Tiber field) along with further growth from TNKBP is set to be the key drivers."

- A March 3, 2010 analyst report from JP Morgan described BP's Gulf of Mexico projects as "high margin."

- A March 12, 2010 analyst report from Bank of America stated that "[w]hilst BP has limited experience in Brazil, we would argue that their knowledge of the GoM – particularly in the Lower Tertiary area - is second to none and are clearly taking a positive view here."

382.      When the truth became known, the prices of BP securities declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Plaintiffs.  The chart below shows the fluctuation of the price of BP ordinary shares up to, during, and following the Relevant Period.

**BP Ordinary Share Reaction Throughout the Relevant Period**



383.     During the Relevant Period, BP's ordinary shares traded as high as 658.20p per share.

384.     On April 20, 2010, prior to the explosion on the *Deepwater Horizon*, BP's ordinary shares closed at 655.4p per share as Defendant continued to deceive investors regarding BP's true risk profile and its utter lack of process safety controls.  That night, after the markets closed, the explosion aboard the *Deepwater Horizon* occurred.

385.     Due to Defendant's ongoing misrepresentations and omissions regarding the true state of BP's safety measures and operational protocols the explosion and resulting oil spill, the truth regarding Defendant's failure to implement process safety controls emerged on April 20, 2010 and within a week the share price had dropped more than 10% in value, and it would continue to plummet during the weeks of subsequent corrective disclosures.

143

386.     On April 26, 2010, officials announced that attempts to stop the spill had failed and oil was flowing into the Gulf of Mexico.  This news caused BP ordinary shares to fall from their closing price of 639.7p per share on Friday, April 23, 2010 to close at 610p per share on April 27, 2010, a decline of 29.7p, or 4.643%, per share.

387.     On April 29, 2010, NOAA increased its estimate regarding the amount of oil that was spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day and the U.S. government declared the Macondo disaster a spill of national significance.  This news caused BP ordinary shares to fall over 6.5%, to close at 584.2p on April 29, 2010.

388.     On May 3, 2010, BP admitted full responsibility for the disaster in the Gulf of Mexico.  On this news, the Company's ordinary shares fell from 575.5p per share on Friday, April 30, 2010 to close at 552.84p per share on Tuesday, May 4, 2010, the next trading day.

389.     On May 10, 2010, Hayward admitted that the volume of oil spilling into the Gulf of Mexico was far greater than BP's initial statements indicated.  Additionally, BP revealed that oil spill costs to date had reached $350 million.  In reaction to this news, BP's ordinary shares fell from 561.29p per share to close at 549.2p per share on May 10, 2010.

390.     On May 24, 2010, BP announced that the costs for remediating the oil spill to date had more than doubled, from $350 million to $760 million.  In addition, the Company announced that it was capturing less oil than it expected.  Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress.  On this news, the Company's ordinary shares fell from 517.75p to close at 493p per share on May 24, 2010.

391.     On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed.  This was highly material

144

to investors.  For example, ABC News reported the "***breaking news***" and stated, on Saturday, May 29, 2010, as follows:  "We begin tonight with ***breaking news*** from the Gulf*.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed. . . . That live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis*."  Similarly, on that same day, the Agence France Presse reported, in part, that:  "***The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history*** . . ."  Finally, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "***slaughtered in London trading on Monday***."

392.    On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided new evidence regarding serious safety concerns with the *Deepwater Horizon* rig far earlier than those previously described by BP.  The next day, Sunday, May 30, 2010, Dudley conducted an interview and admitted that BP's original oil flow estimates were vastly understated.  On these disclosures, the Company's ordinary shares fell from 494.8p per share on Friday, May 28, 2010 to close at 430p per share on Tuesday, June 1, 2010, a decline of 64.8p per share, or more than 13%.

393.    On June 9, 2010, fears that the Company would suspend dividends caused a further decline in BP securities.  An Associated Press article dated June 9, 2010 entitled "Dividend Worries Weigh on BP Shares" explained, "[s]hares in BP PLC fell further on Wednesday [June 9, 2010] amid fears the British oil company will bow to U.S. political pressure

to cut dividends to help pay for the Gulf of Mexico oil spill disaster."  On this news, the Company's ordinary shares fell from 408.9p per share to close at 391.9p per share on June 9, 2010, a decline of 17p, or over 4%.

394.    Speculation regarding the possibility that BP would suspend dividend payments continued on June 9, 2010.  Indeed, the Associated Press article published on the afternoon of June 9, 2010 (after the close of the London Stock Exchange) explained that "Cutting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."    On this news, and after the markets re-opened, BP ordinary shares fell an additional 7% from 391.9p per share on June 9, 2010 to close at 365.5p per share on June 10, 2010, a drop of more than 6.7%.

395.    On June 14, 2010, BP's Board of Directors officially met to discuss suspending the Company's dividend payments in light of the Company's agreement to set up a $20 billion claim fund for damages caused by *Deepwater Horizon* catastrophe.  According to one news source:  "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill." On this news, the Company's ordinary shares fell from 391.9p per share to close at 362p per share that same day, a decline of nearly 30p per share, or almost 8%.

396.    In all, as a consequence of the revelation of truth concerning BP securities during the Relevant Period, the Company's securities fell substantially in value, causing losses in excess of $100,000,000 suffered by Plaintiffs.

397.    Defendant materially misstated the risks of the Company's operations, particular with respect to deepwater drilling in the Gulf of Mexico.  The adverse consequences of the materialization of this risk as disclosed by Defendant was entirely foreseeable to Defendant

146

at all relevant times.  Defendant's conduct, as alleged herein, proximately caused foreseeable

losses and damages to Plaintiffs.

## XI.   DEFENDANT HAD AN AFFIRMATIVE DUTY TO DISCLOSE MATERIAL INFORMATION REGARDING PROBLEMS WITH PROCESS SAFETY AND THE TRUE SCOPE OF OMS

398.   BP, as a publically-traded company, has an affirmative duty to disclose certain

material information regarding its business, finances and operations.  In addition to the myriad

disclosure duties imposed on BP by statutory and regulatory regimes, BP also proclaimed to

the public that it was embracing an independent duty to report on its progress with regard to

the implementation of its process safety reforms that were proposed by the Baker Panel in the

wake of the Texas City disaster.  Specifically, Recommendation No. 9 of the Baker Panel

states:

> BOARD MONITORING – BP's Board should monitor the implementation of the
> recommendation of the Panel . . . and the ongoing process safety performance of BP's
> U.S. refineries.  The Board should, for a period of at least five calendar years, engage an
> independent monitor to report annually to the Board on BP's progress in implementing
> the Panel's recommendation . . . *The Board should also report publically on the
> progress of such implementation and on BP's ongoing process safety performance at
> all BP U.S. Refineries.*

399.   Following the release of the Baker Panel recommendations, BP consistently

stated that it would implement the mandates *across all lines of business*.  As such, Defendant

publicly committed to implement the enumerated, measurable steps recommended by the Baker

Report to fix BP's enormous safety process problems and assumed the duty to report regularly to

investors about these efforts and its progress on process safety improvements.

400.   When a company has a duty – or otherwise chooses – to disclose information

related to material facts, it has *a duty to make a complete and accurate disclosure*.  This is

especially true where, as here, the company is the only source of information regarding the

subject matter of the disclosure, and countervailing facts or problems are not discoverable by other reasonable means.  Nondisclosure will become the equivalent of fraudulent concealment when it becomes necessary for a company to disclose such countervailing information in order to prevent its positive statements from being materially misleading.

401.     As such, when Defendant made statements about, among other things, BP's significant progress in process safety reform and the effectiveness and scope of the OMS, but concealed from investors a wide-spread and endemic failure to:  implement the recommendations of the Baker Panel; remedy significant "gaps" in OMS implementation; and implement OMS in BP's deepwater drilling operations (BP's riskiest and most profitable operations) –  these concealments rose to the level of material and actionable misrepresentations.

402.     Indeed, Defendant's silence under these circumstances amounted to an affirmation that a state of things existed which did not exist.  As a result, BP's investors were injured to the same extent as if a positive misrepresentation had been made.   Once Defendant chose to speak about critical, overarching process safety reforms, it had the duty to speak fully and completely about those issues, including the true risks associated with its deepwater operations in the Gulf of Mexico.  Defendant's selective disclosure of positive information and concealment of material, negative information acted as a fraud on BP's investors.

## XII.   PLAINTIFFS JUSTIFIABLY RELIED ON BP'S FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

403.     Plaintiffs and agents acting on their behalf relied upon the material misstatements and material omissions discussed herein in purchasing and retaining their BP ordinary shares.

404.     Plaintiffs and their agents did not know and could not have known that Defendant's statements regarding BP's safety protocols and risk profile were false and

148

misleading, and omitted material information, when deciding to purchase and retain BP ordinary shares.

405.     Plaintiffs and their agents were not privy to the non-public information on BP's operations and process safety protocols that would have allowed them to make an independent determination of BP's true risk profile.

406.     Moreover, the complex and highly technical nature of exploratory drilling operations -- described as posing challenges analogous to those in space travel –  and similar complex matters pertaining to process safety efforts related to such operations made it entirely expected and reasonable for Plaintiffs and their agents to rely upon Defendant's representations when making their decision to invest in BP.

407.     In sum, during the Relevant Period, Plaintiffs and their agents purchased and retained BP shares in reasonable reliance on BP's misstatements and suffered damages as a result.

## FIRST CLAIM
## Common Law Deceit

408.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

409.     During the Relevant Period, BP made statements which, at the time and in light of the circumstances in which they were made, were materially false and misleading representations of fact, or omitted to state material facts BP had a duty to disclose to Plaintiffs and the investing public.

410.     When making these false and misleading representations, BP knew that they were false and/or made them with reckless disregard for their truth.

411.     BP made the false and misleading representations with the intent that they be acted upon by others, including investors and prospective investors in BP securities, such as Plaintiffs and/or their investment advisers.  BP's false and misleading representations were disseminated publicly to BP's shareholders and the investing public, including Plaintiffs.

412.     Plaintiffs and/or their investment advisers, relying upon BP's statements containing the false and misleading information, purchased BP securities at artificially inflated prices during the Relevant Period.

413.     Plaintiffs and/or their investment advisers acted in reasonable and justifiable reliance on BP's false and misleading statements, without knowing that they were false, when making investment decision regarding BP securities.

414.     BP's false and misleading representations and omissions constitute deceit under English common law.

415.     As a direct and proximate result of BP's misrepresentations and omissions, Plaintiffs suffered damages in connection with their purchases of BP securities during the Relevant period.

## SECOND CLAIM
### Violations of the Financial Services and Markets Act (2000) of the United Kingdom

416.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

417.     This Count is brought pursuant to Section 90A of the Financial Services and Markets Act of 2000 ("FSMA 2000"), as amended by the Companies Act of 2006, against BP, seeking damages in relation to Plaintiffs' purchases of BP securities during the Relevant Period.

418.     During the Relevant Period, BP made statements which, at the time and in light of the circumstances in which they were made, were materially false and misleading

150

representations of fact, or omitted to state material facts BP had a duty to disclose to Plaintiffs and the investing public.  BP made these false statements in reports and statements published in response to provisions implementing Articles 4, 5 and 6 of Directive 2004/109/EC of the Transparency Obligations Directive and in its preliminary statements pertaining thereto.

419.    When making these false and misleading representations, BP knew that they were false and/or made them with reckless disregard for their truth.

420.    BP made the false and misleading representations with the intent that they be acted upon by others, including investors and prospective investors in BP securities, such as Plaintiffs and/or their investment advisers.  BP's false and misleading representations were disseminated publicly to BP's shareholders and the investing public, including Plaintiffs.

421.    Plaintiffs and/or their investment advisers, relying upon BP's statements containing the false and misleading information, purchased BP securities at artificially inflated prices during the Relevant Period.

422.    Plaintiffs and/or their investment advisers acted in reasonable and justifiable reliance on BP's false and misleading statements, without knowing that they were false, when making investment decision regarding BP securities.

423.    By reason of the foregoing, BP is liable to Plaintiffs for compensation as provided by Section 90A of the FSMA 2000.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.  Awarding compensatory and punitive damages in favor of Plaintiffs against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount proven at trial, including pre-judgment and post-judgment interest thereon;

151

b.   Awarding Plaintiffs such other relief as this Court may deem just and proper.

Respectfully submitted,

MICHAEL DEWINE
Attorney General of Ohio

By: /s/  Brian P. Muething
Gregory M. Utter (0032528)
Paul V. Muething (0032527)
Brian P. Muething (0076315)
W. Jeffrey Sefton (0075671)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio  45202
Phone: (513) 579-6400
Fax: (513) 579-6457
gmutter@kmklaw.com
pmuething@kmklaw.com
bmuething@kmklaw.com
jsefton@kmklaw.com

J. Pierre Tismo, Esq.
Dyer, Garofalo, Mann & Schultz
131 N. Ludlow Street, Suite 1400
Dayton, OH  45402
Phone: (937) 223-8888
Toll Free:  (800) 223-8897
Fax: (937) 824-8630
ptismo@dgmslaw.com

Trial Attorneys for Plaintiffs,
Ohio Public Employees Retirement System, the State
Teachers Retirement System of Ohio, the School
Employees Retirement System of Ohio, and the Ohio
Police & Fire Pension Fund
Special Counsel for the Attorney General

OF COUNSEL

BERMAN DEVALERIO
Glen DeValerio
Kristin J. Moody
Steven J. Buttacavoli
One Liberty Square
Boston, MA  02109
Tel: (617) 542-8300
Fax: (617) 542-1194

BLOCK & LEVITON LLP
Jeffrey C. Block
Jason M. Leviton
Whitney E. Street
Mark A. Delaney
155 Federal Street, Suite 1303
Boston, MA 02110
Tel:  (617) 398-5600
Fax:  (617) 507-6020

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims to which they are entitled.

/s/ Brian P. Muething

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served by electronic CM/ECF filing on this 9th day of June, 2014 on the following:

Frances Floriano Goins
Isaac J. Eddington
ULMER & BRENE LLP
Skylight Office Tower
1660 West 2nd St., Suite 1100
Cleveland, Ohio 44113-1448

OF COUNSEL:

Richard C. Pepperman, II
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, New York 1004-2498

Daryl A. Libow
Amanda F. Davidoff
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-5805

    /s/  Brian P. Muething
Brian P. Muething

5472636.4

154

**BP, PLC**
**Ordinary Shares (ISIN GB 0007980591)**
**Exhibit A**

Relevant Period:                 05/09/07 - 05/28/10
Ohio Public Employees' Retirement System ("OPERS")

| Trade Date | Transaction | No. Shares | Base Unit Price |
|---|---|---|---|
| 05/08/07 | Holdings | 1,098,203 | |
| 05/21/08 | BUY | 558,112 | $12.8182 |
| 05/22/08 | BUY | 110,135 | $12.9152 |
| 07/02/08 | BUY | 81,270 | $11.3571 |
| 08/05/08 | BUY | 28,740 | $9.9921 |
| 08/14/08 | BUY | 38,300 | $9.8634 |
| 08/15/08 | BUY | 49,000 | $9.7232 |
| 10/27/08 | BUY | 105,120 | $6.7821 |
| 10/28/08 | BUY | 307,200 | $7.2328 |
| 11/03/08 | BUY | 57,981 | $8.2421 |
| 11/03/08 | BUY | 284,100 | $8.2154 |
| 11/19/08 | BUY | 181,000 | $7.5441 |
| 12/09/08 | BUY | 275,600 | $7.8658 |
| 12/16/08 | SELL | (2,388) | $8.0084 |
| 02/03/09 | BUY | 255,300 | $6.8091 |
| 02/12/09 | SELL | (40,513) | $7.2674 |
| 02/27/09 | SELL | (12,215) | $6.5498 |
| 04/02/09 | BUY | 158,100 | $6.8662 |
| 05/22/09 | SELL | (35,189) | $7.8989 |
| 06/25/09 | BUY | 377,260 | $7.8224 |
| 07/02/09 | BUY | 586,350 | $8.0227 |
| 07/10/09 | BUY | 357,350 | $7.6013 |
| 07/14/09 | BUY | 221,900 | $7.7218 |
| 07/15/09 | BUY | 15,624 | $8.0073 |
| 07/29/09 | SELL | (353,168) | $8.3291 |
| 08/03/09 | SELL | (20,885) | $8.6612 |
| 08/06/09 | BUY | 376,304 | $8.6154 |
| 08/17/09 | BUY | 631,987 | $8.2904 |
| 10/08/09 | SELL | (775,274) | $8.6676 |
| 10/15/09 | BUY | 17,287 | $8.9179 |
| 10/23/09 | BUY | 366,073 | $9.5072 |
| 11/02/09 | BUY | 170,166 | $9.5715 |
| 11/10/09 | BUY | 413,119 | $10.0394 |
| 11/16/09 | SELL | (303,600) | $9.7343 |
| 12/02/09 | BUY | 114,305 | $9.7752 |
| 12/14/09 | BUY | 35,610 | $9.4727 |
| 01/26/10 | SELL | (338,200) | $9.6789 |
| 02/25/10 | BUY | 43,935 | $8.8924 |
| 03/17/10 | BUY | 77,734 | $9.6694 |
| 03/17/10 | BUY | 124,930 | $9.6721 |
| 03/17/10 | BUY | 163,103 | $9.7067 |
| 03/18/10 | BUY | 60,781 | $9.6792 |
| 03/18/10 | BUY | 116,600 | $9.7222 |
| 03/18/10 | BUY | 155,467 | $9.7383 |
| 03/18/10 | BUY | 272,067 | $9.7065 |
| 03/19/10 | BUY | 23,320 | $9.7248 |
| 03/19/10 | BUY | 23,320 | $9.7289 |
| 03/19/10 | BUY | 30,269 | $9.6188 |
| 03/19/10 | BUY | 34,980 | $9.7284 |

| 03/19/10 | BUY | 75,722 | $9.7250 |
|---|---|---|---|
| 03/19/10 | BUY | 148,566 | $9.5898 |
| 03/19/10 | BUY | 207,787 | $9.5770 |
| 03/19/10 | BUY | 223,410 | $9.7477 |
| 03/22/10 | BUY | 8,747 | $9.5682 |
| 03/30/10 | BUY | 18,141 | $9.4381 |
| 04/19/10 | BUY | 174,300 | $9.9087 |
| 04/29/10 | BUY | 49,192 | $8.8821 |
| 04/29/10 | BUY | 136,708 | $8.9540 |
| 05/04/10 | BUY | 6,623 | $8.5047 |
| 05/04/10 | BUY | 598,277 | $8.5178 |
| 05/06/10 | BUY | 184,600 | $8.6542 |
| 05/07/10 | BUY | 95,960 | $8.4211 |
| 05/11/10 | BUY | 350,900 | $8.1074 |
| 05/11/10 | BUY | 447,600 | $8.1233 |
| 05/12/10 | BUY | 505,600 | $8.2168 |
| 05/25/10 | BUY | 1,251,410 | $6.9998 |
| 05/27/10 | BUY | 303,900 | $7.3462 |
| 05/27/10 | BUY | 388,242 | $7.4861 |

**BP, PLC**
**Ordinary Shares (ISIN GB 0007980591)**
**Exhibit B**

Relevant Period:          05/09/07 - 05/28/10
State Teachers' Retirement System of Ohio ("STRS")

| Trade Date | Transaction | No. Shares | Base Unit Price |
|---|---|---|---|
| 05/08/07 | Holdings | 1,902,785 | |
| 09/19/07 | BUY | 685,013 | $11.8372 |
| 09/20/07 | BUY | 685,013 | $11.8652 |
| 11/08/07 | BUY | 635,419 | $12.8895 |
| 12/19/07 | BUY | 36,508 | $12.0940 |
| 12/20/07 | BUY | 92,464 | $12.0440 |
| 01/07/08 | BUY | 348,633 | $12.5525 |
| 01/08/08 | BUY | 529,904 | $12.6465 |
| 02/08/08 | BUY | 543,684 | $10.58 |
| 03/04/08 | BUY | 481,764 | $10.6386 |
| 08/04/08 | BUY | 330,800 | $10.3721 |
| 08/19/08 | SELL | (167,159) | $9.4674 |
| 08/20/08 | BUY | 450,000 | $9.56 |
| 08/21/08 | BUY | 200,000 | $9.68 |
| 09/03/08 | BUY | 575,000 | $9.16 |
| 09/05/08 | BUY | 626,937 | $9.03 |
| 09/09/08 | SELL | (132,168) | $8.9231 |
| 09/15/08 | BUY | 375,000 | $8.83 |
| 09/16/08 | BUY | 325,000 | $8.51 |
| 09/23/08 | BUY | 839,000 | $9.1821 |
| 10/09/08 | BUY | 125,000 | $7.26 |
| 10/17/08 | BUY | 301,900 | $7.2487 |
| 10/17/08 | BUY | 444,000 | $7.2487 |
| 10/17/08 | BUY | 1,188,600 | $7.1760 |
| 10/20/08 | BUY | 87,000 | $7.9812 |
| 10/20/08 | BUY | 127,900 | $7.9812 |
| 10/20/08 | BUY | 1,590,600 | $7.9285 |
| 10/21/08 | BUY | 520,800 | $8.0567 |
| 10/22/08 | BUY | 200,000 | $7.3350 |
| 10/27/08 | BUY | 90,000 | $6.51 |
| 10/30/08 | BUY | 111,000 | $8.3225 |
| 10/31/08 | BUY | 700,000 | $8.0479 |
| 02/09/09 | BUY | 450,000 | $7.6572 |
| 02/12/09 | BUY | 669,834 | $7.1790 |
| 03/10/09 | BUY | 469,660 | $6.01 |
| 04/03/09 | SELL | (984,700) | $6.7805 |
| 04/14/09 | SELL | (898,200) | $6.4471 |
| 04/15/09 | SELL | (1,463,200) | $6.5191 |
| 04/20/09 | SELL | (320,200) | $6.5343 |
| 04/23/09 | SELL | (669,834) | $6.6492 |
| 04/23/09 | SELL | (828,900) | $6.6907 |
| 05/12/09 | BUY | 342,161 | $7.8650 |
| 05/13/09 | BUY | 226,335 | $7.7778 |
| 05/18/09 | BUY | 452,828 | $7.7896 |
| 06/04/09 | BUY | 425,275 | $8.5190 |
| 06/26/09 | BUY | 25,152 | $7.95 |
| 07/06/09 | SELL | (1,104,800) | $7.5944 |
| 08/04/09 | BUY | 471,800 | $8.5864 |
| 12/01/09 | SELL | (452,000) | $9.7303 |

| 02/25/10 | SELL | (36,368) | $8.6815 |
|----------|------|----------|---------|
| 02/26/10 | SELL | (44,317) | $8.7443 |
| 03/10/10 | BUY | 193,333 | $9.30 |
| 03/26/10 | SELL | (121,559) | $9.4118 |
| 03/29/10 | SELL | (132,180) | $9.4068 |
| 03/30/10 | SELL | (99,511) | $9.4629 |
| 03/31/10 | SELL | (273,300) | $9.4776 |
| 04/07/10 | BUY | 623,000 | $9.8192 |
| 04/29/10 | SELL | (623,000) | $8.8285 |
| 05/05/10 | BUY | 296,900 | $8.5326 |
| 05/13/10 | BUY | 55,295 | $7.9959 |
| 05/14/10 | BUY | 262,105 | $7.8461 |
| 05/21/10 | BUY | 224,500 | $7.5093 |

**BP, PLC**
**Ordinary Shares (ISIN GB 0007980591)**
**Exhibit C**

Relevant Period:            05/09/07 - 05/28/10
School Employees Retirement System of Ohio ("SERS")

| Trade Date | Transaction | No. Shares | Base Unit Price |
|---|---|---|---|
| 05/08/07 | Holdings | 861,805 | |
| 05/16/07 | BUY | 65,450 | $11.04 |
| 05/31/07 | BUY | 738,853 | $11.17 |
| 05/31/07 | BUY | 17,547 | $11.17 |
| 09/19/07 | BUY | 62,809 | $11.84 |
| 09/20/07 | BUY | 62,808 | $11.86 |
| 10/05/07 | BUY | 39,386 | $11.68 |
| 10/12/07 | BUY | 84,473 | $12.42 |
| 10/12/07 | BUY | 64,752 | $12.43 |
| 10/15/07 | BUY | 28,370 | $12.73 |
| 10/16/07 | BUY | 24,980 | $12.75 |
| 11/08/07 | BUY | 38,134 | $12.89 |
| 12/14/07 | BUY | 18,437 | $12.47 |
| 12/19/07 | BUY | 39,127 | $12.09 |
| 12/20/07 | BUY | 99,099 | $12.04 |
| 01/07/08 | BUY | 43,358 | $12.55 |
| 01/08/08 | BUY | 65,902 | $12.64 |
| 01/17/08 | SELL | (34,366) | $11.03 |
| 03/04/08 | BUY | 40,648 | $10.64 |
| 03/20/08 | SELL | (16,575) | $9.92 |
| 04/10/08 | BUY | 4,616 | $10.81 |
| 04/16/08 | BUY | 160,518 | $11.04 |
| 04/29/08 | BUY | 67,197 | $12.00 |
| 05/14/08 | BUY | 301,470 | $12.04 |
| 05/15/08 | BUY | 180,130 | $12.16 |
| 05/27/08 | SELL | (19,000) | $12.52 |
| 07/23/08 | SELL | (170,600) | $10.47 |
| 07/24/08 | BUY | 14,400 | $10.20 |
| 07/24/08 | BUY | 89,500 | $10.20 |
| 07/24/08 | SELL | (267,400) | $10.20 |
| 08/13/08 | SELL | (387,361) | $9.81 |
| 08/14/08 | SELL | (23,612) | $9.96 |
| 08/15/08 | SELL | (8,500) | $9.78 |
| 08/18/08 | SELL | (4,604) | $9.68 |
| 08/19/08 | SELL | (8,481) | $9.56 |
| 08/20/08 | SELL | (10,582) | $9.56 |
| 08/21/08 | SELL | (23,612) | $9.62 |
| 08/22/08 | SELL | (15,741) | $9.55 |
| 08/26/08 | SELL | (83,300) | $9.49 |
| 08/26/08 | SELL | (20,700) | $9.41 |
| 08/27/08 | SELL | (19,676) | $9.60 |
| 08/28/08 | SELL | (23,612) | $9.60 |
| 08/29/08 | SELL | (30,931) | $9.63 |
| 09/01/08 | SELL | (7,084) | $9.41 |
| 09/02/08 | SELL | (9,251) | $9.13 |
| 09/03/08 | SELL | (31,482) | $9.12 |
| 09/04/08 | SELL | (40,297) | $9.20 |
| 09/17/08 | BUY | 40,263 | $8.49 |
| 09/22/08 | BUY | 103,200 | $9.24 |

| | | | |
|---|---|---|---|
| 09/23/08 | BUY | 14,200 | $9.21 |
| 10/10/08 | BUY | 17,606 | $6.43 |
| 10/13/08 | BUY | 85,259 | $7.12 |
| 10/17/08 | BUY | 53,182 | $7.18 |
| 10/22/08 | BUY | 33,199 | $7.25 |
| 10/27/08 | BUY | 135,041 | $6.64 |
| 11/25/08 | BUY | 87,880 | $7.97 |
| 12/17/08 | BUY | 29,378 | $8.21 |
| 12/17/08 | BUY | 18,362 | $8.13 |
| 02/25/09 | BUY | 39,667 | $6.54 |
| 02/26/09 | BUY | 17,898 | $6.63 |
| 03/11/09 | SELL | (37,074) | $6.18 |
| 03/12/09 | SELL | (16,300) | $6.21 |
| 03/12/09 | SELL | (16,056) | $6.22 |
| 03/12/09 | SELL | (5,091) | $6.19 |
| 03/13/09 | SELL | (3,892) | $6.36 |
| 03/16/09 | SELL | (2,573) | $6.37 |
| 03/17/09 | SELL | (2,583) | $6.33 |
| 03/17/09 | SELL | (3,892) | $6.39 |
| 03/20/09 | SELL | (111,000) | $6.68 |
| 04/03/09 | SELL | (20,132) | $6.75 |
| 04/09/09 | BUY | 76,900 | $6.52 |
| 04/15/09 | SELL | (19,031) | $6.52 |
| 04/16/09 | SELL | (4,357) | $6.53 |
| 05/07/09 | SELL | (100,770) | $7.68 |
| 05/12/09 | BUY | 105,170 | $7.86 |
| 05/13/09 | BUY | 69,569 | $7.78 |
| 05/13/09 | SELL | (28,457) | $7.74 |
| 05/14/09 | SELL | (17,785) | $7.63 |
| 05/15/09 | SELL | (19,497) | $7.65 |
| 05/18/09 | BUY | 30,385 | $7.79 |
| 05/22/09 | SELL | (112,200) | $7.91 |
| 05/26/09 | SELL | (138,630) | $7.94 |
| 06/04/09 | BUY | 32,791 | $8.52 |
| 06/17/09 | SELL | (208,094) | $8.19 |
| 07/02/09 | BUY | 30,945 | $7.92 |
| 07/03/09 | BUY | 11,573 | $7.88 |
| 07/31/09 | BUY | 98,600 | $8.28 |
| 08/03/09 | BUY | 106,700 | $8.62 |
| 10/07/09 | SELL | (25,588) | $8.63 |
| 10/09/09 | SELL | (16,594) | $8.64 |
| 12/04/09 | BUY | 254,710 | $9.68 |
| 12/07/09 | SELL | (73) | $9.55 |
| 12/07/09 | SELL | (18,251) | $9.58 |
| 01/11/10 | BUY | 59,940 | $10.27 |
| 01/12/10 | BUY | 65,860 | $10.20 |
| 01/21/10 | BUY | 48,500 | $9.92 |
| 01/29/10 | BUY | 29,100 | $9.47 |
| 03/03/10 | SELL | (23,454) | $9.06 |
| 03/29/10 | SELL | (33,200) | $9.41 |
| 03/30/10 | SELL | (45,580) | $9.45 |
| 03/31/10 | SELL | (78,805) | $9.45 |
| 04/01/10 | SELL | (63,950) | $9.60 |
| 04/06/10 | SELL | (92,270) | $9.76 |
| 04/07/10 | SELL | (66,705) | $9.77 |
| 05/25/10 | BUY | 379,448 | $6.93 |
| 05/27/10 | BUY | 117,747 | $7.43 |

**BP, PLC**
**Ordinary Shares (ISIN GB 0007980591)**
**Exhibit D**

Relevant Period:        05/09/07 - 05/28/10
Ohio Police and Fire Pension Fund

| Trade Date | Transaction | No. Shares | Base Unit Price |
|---|---|---|---|
| 05/08/07 | Holdings | 1,198,209 | |
| 05/25/07 | SELL | (7,500) | $11.25 |
| 06/05/07 | BUY | 35,795 | $11.36 |
| 06/15/07 | BUY | 41,000 | $11.73 |
| 06/18/07 | BUY | 800 | $11.67 |
| 07/02/07 | SELL | (11,700) | $12.18 |
| 07/27/07 | SELL | (34,400) | $11.70 |
| 08/06/07 | BUY | 26,495 | $11.37 |
| 08/14/07 | BUY | 4,800 | $10.95 |
| 11/27/07 | SELL | (7,000) | $11.95 |
| 01/16/08 | SELL | (6,500) | $11.01 |
| 01/28/08 | SELL | (56,024) | $10.45 |
| 02/06/08 | SELL | (2,900) | $10.71 |
| 02/26/08 | SELL | (4,800) | $11.18 |
| 03/04/08 | BUY | 161,200 | $10.64 |
| 03/13/08 | SELL | (16,500) | $10.85 |
| 03/31/08 | SELL | (15,800) | $10.17 |
| 04/29/08 | SELL | (27,941) | $12.00 |
| 04/30/08 | BUY | 197,700 | $12.18 |
| 05/27/08 | SELL | (141,200) | $12.27 |
| 06/09/08 | SELL | (7,300) | $11.78 |
| 06/30/08 | SELL | (3,700) | $11.49 |
| 08/11/08 | SELL | (4,300) | $10.09 |
| 10/07/08 | BUY | 15,100 | $7.65 |
| 10/10/08 | BUY | 7,700 | $6.46 |
| 10/17/08 | BUY | 34,800 | $7.46 |
| 10/23/08 | SELL | (42,900) | $7.52 |
| 10/24/08 | SELL | (76,700) | $6.79 |
| 10/27/08 | SELL | (39,600) | $6.61 |
| 10/28/08 | SELL | (27,600) | $7.20 |
| 11/03/08 | SELL | (23,705) | $8.03 |
| 11/04/08 | BUY | 11,100 | $8.19 |
| 11/05/08 | SELL | (4,201) | $8.41 |
| 11/13/08 | BUY | 249,400 | $6.90 |
| 11/24/08 | SELL | (207,770) | $7.68 |
| 11/25/08 | SELL | (303,458) | $7.94 |
| 12/02/08 | BUY | 29,900 | $7.57 |
| 03/03/09 | SELL | (155,000) | $5.68 |
| 04/01/09 | BUY | 5,300 | $6.65 |
| 04/14/09 | SELL | (148,600) | $6.50 |
| 04/17/09 | SELL | (5,600) | $6.62 |
| 07/13/09 | BUY | 22,386 | $7.53 |
| 08/04/09 | BUY | 123,400 | $8.62 |
| 08/04/09 | SELL | (9,000) | $8.66 |
| 08/11/09 | BUY | 465,423 | $8.57 |
| 08/20/09 | BUY | 99,946 | $8.59 |
| 10/14/09 | BUY | 19,831 | $8.88 |
| 10/22/09 | BUY | 506,242 | $9.40 |
| 11/11/09 | BUY | 431,376 | $9.83 |

161

| 11/30/09 | BUY | 171,700 | $9.59 |
| 12/01/09 | BUY | 167,370 | $9.79 |
| 12/02/09 | BUY | 251,600 | $9.82 |
| 12/03/09 | BUY | 73,579 | $9.75 |
| 12/03/09 | BUY | 158,900 | $9.77 |
| 12/15/09 | BUY | 40,933 | $9.45 |
| 01/08/10 | BUY | 200,000 | $9.95 |
| 01/11/10 | BUY | 76,700 | $10.32 |
| 01/12/10 | BUY | 87,900 | $10.25 |
| 01/14/10 | BUY | 53,200 | $10.29 |
| 01/15/10 | BUY | 253,400 | $10.28 |
| 01/18/10 | BUY | 45,300 | $10.31 |
| 01/19/10 | BUY | 35,500 | $10.32 |
| 02/03/10 | BUY | 203,600 | $9.23 |
| 02/25/10 | BUY | 28,576 | $8.80 |
| 03/04/10 | BUY | 97,400 | $9.21 |
| 03/05/10 | BUY | 97,600 | $9.24 |
| 03/17/10 | BUY | 6,000 | $9.64 |
| 03/18/10 | BUY | 8,600 | $9.68 |
| 03/19/10 | BUY | 3,000 | $9.60 |
| 03/22/10 | BUY | 20,000 | $9.51 |
| 03/31/10 | BUY | 27,545 | $9.50 |
| 04/26/10 | SELL | (329,500) | $9.76 |
| 04/27/10 | SELL | (305,550) | $9.56 |
| 04/29/10 | SELL | (351,100) | $8.67 |
| 04/29/10 | SELL | (915,320) | $8.95 |